**Nos. 22-11071, 22-11086**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Case No. 22-11071

Jennifer VanDerStok; Michael G. Andren; Tactical Machining, L.L.C., a limited liability company; Firearms Policy Coalition, Incorporated, a nonprofit corporation,

Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendants-Appellants.

consolidated with

No. 22-11086

Blackhawk Manufacturing Group, Incorporated, doing business as 80 Percent Arms,

Intervenor Plaintiff-Appellee,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas

**BRIEF FOR APPELLANTS**

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

## STATEMENT REGARDING ORAL ARGUMENT

The district court entered a preliminary injunction prohibiting the enforcement of two provisions of a federal regulation promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives. Those provisions implement important requirements of the Gun Control Act and clarify that certain partially complete firearm frames or receivers, as well as weapon parts kits or aggregations of parts that enable a purchaser to readily assemble an operational firearm, fall within the statutory definition of "firearm." The United States Court of Appeals for the Eighth Circuit and two district courts have considered motions for a preliminary injunction or a stay pending appeal similar to the requests at issue in this appeal, and each has denied those motions. Given the importance of the challenged provisions to public safety, the government respectfully requests that the Court hold oral argument in this appeal.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................iii

INTRODUCTION ................................................................................................1

STATEMENT OF JURISDICTION ...................................................................3

STATEMENT OF THE ISSUE............................................................................3

STATEMENT OF THE CASE .............................................................................3

    A.    Legal Background ....................................................................3

    B.    Procedural Background.............................................................7

SUMMARY OF ARGUMENT........................................................................... 12

STANDARD OF REVIEW ................................................................................ 17

ARGUMENT ...................................................................................................... 17

I.    Plaintiffs Are Unlikely to Succeed on the Merits Because the Rule
Comports with the Gun Control Act.................................................... 18

    A.    A Nonfunctional Frame or Receiver May Constitute a "Frame" or
"Receiver" Under the Gun Control Act ......................................18

    B.    Weapon Parts Kits May Constitute Firearms Under the Gun
Control Act ...........................................................................24

II.    Plaintiffs Are Not Entitled to the Extraordinary Remedy of a
Preliminary Injunction ........................................................................ 28

    A.    The Rule, Which Does Not Alter Preexisting Statutory
Requirements for the Commercial Sale of Firearms, Inflicts No
Irreparable Harm on Plaintiffs..................................................28

        1.    Plaintiffs May Continue to Purchase and Sell Firearms
Under the Rule ............................................................28

2.      The Individual Plaintiffs' Claims of Harm Are Untethered to the Rule .............................................................................. 30

3.      The Manufacturer Plaintiffs' Claims of Irreparable Harm Fare No Better ...................................................................... 33

B.    The Balance of the Equities and the Public Interest Strongly Favor Denying Injunctive Relief ............................................... 39

CONCLUSION ................................................................................................ 43

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*A.O. Smith Corp. v. FTC*,
  530 F.2d 515 (3d Cir. 1976) ................................................................ 38

*American Hosp. Ass'n v. Harris*,
  625 F.2d 1328 (7th Cir. 1980) ............................................................ 37

*Division 80, LLC v. Garland*,
  No. 3:22-cv-148, 2022 WL 3648454 (S.D. Tex. Aug. 23, 2022) ............... 11

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005) ............................................................... 37

*Iowa Utils. Bd. v. FCC*,
  109 F.3d 418 (8th Cir. 1996) .............................................................. 37

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  No. 3:22-cv-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022) ................. 11

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................... 18

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
  415 U.S. 1 (1974) ............................................................................... 37

*Texas v. Biden*,
  10 F.4th 538 (5th Cir. 2021) (per curiam) ...................................... 32, 36

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) .............................................................. 38

*United States v. Annis*,
  446 F.3d 852 (8th Cir. 2006) .............................................................. 25

*United States v. Ryles*,
  988 F.2d 13 (5th Cir. 1993) ........................................................... 15, 25

*United States v. Segura*,
  747 F.3d 323 (5th Cir. 2014) .............................................................. 39

*United States v. Stewart*,
  451 F.3d 1071 (9th Cir. 2006) ............................................................ 25

*United States v. Wick*,
    697 F. App'x 507 (9th Cir. 2017) ................................................. 25

*Wages & White Lion Invs., LLC v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) .................................................. 38

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) ........................................... 17, 18, 37, 39, 42

*Women's Med. Ctr. of Nw. Hous. v. Bell*,
    248 F.3d 411 (5th Cir. 2001) .................................................. 17

**Statutes:**

Gun Control Act of 1968:
    18 U.S.C. § 921 *et seq.* ................................................... 3
    18 U.S.C. § 921(a)(3) ...................................................... 1, 4
    18 U.S.C. § 921(a)(3)(A) .................................. 6, 19, 20, 23, 24, 26, 27
    18 U.S.C. § 921(a)(3)(B) .................................... 7, 20, 21, 22
    18 U.S.C. § 922(a)(2)-(3) .................................................. 4
    18 U.S.C. § 922(b)(3) ..................................................... 4, 29
    18 U.S.C. § 922(g) ................................................... 11, 12, 40
    18 U.S.C. § 922(g)(1) ...................................................... 32
    18 U.S.C. § 922(g)(4) ...................................................... 32
    18 U.S.C. § 922(t) ......................................................... 4
    18 U.S.C. §§ 922-923 ...................................................... 4
    18 U.S.C. § 923(a) ......................................................... 4
    18 U.S.C. § 923(g)(1)(A) ................................................... 4
    18 U.S.C. § 923(i) ......................................................... 4

26 U.S.C. § 5845(b) ........................................................ 19, 23

28 U.S.C. § 1292(a)(1) ..................................................... 3

28 U.S.C. § 1331 ........................................................... 3

**Regulations:**

27 C.F.R. § 478.11 ........................................................ 7, 24

27 C.F.R. § 478.12(c) ..................................................... 6, 18

27 C.F.R. § 478.41(b) ..................................................... 29

**Other Authorities:**

ATF, *Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers* (Sept. 27, 2022), www.atf.gov/firearms/docs/ open-letter/all-ffls-september-2022-impact-final-rule-2021- 05f-partially-complete-ar/download ..................................................23, 31, 35

*Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022) ..................................................... 1, 5, 6, 7, 17, 18, 19, 20, 24, 33, 40
33 Fed. Reg. 18,555 (Dec. 14, 1968) .................................................................. 4

# INTRODUCTION

Congress enacted licensing, background check, and recordkeeping requirements to ensure that law enforcement officers may trace firearms used in crimes and that firearms are not sold to those, such as felons, who cannot lawfully possess them. In delineating these requirements, Congress defined "firearm" to include, as relevant here, "any weapon" that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive," as well as the "frame or receiver" (that is, the major structural component) "of any such weapon." 18 U.S.C. § 921(a)(3). This definition reflects Congress's understanding that limiting the statute only to operational weapons would allow persons to circumvent the statute by selling firearms that may readily be converted into operational weapons without obtaining a license, marking such weapons with traceable serial numbers, keeping records, or running background checks.

Responding to technological advances that have led to an increasing variety of frames and receivers and the proliferation of kits and parts that permit individuals to easily assemble firearms and that have been sold outside Congress's carefully constructed regulatory scheme, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) promulgated the rule at issue in this case. *See Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022). At a high level, the Rule updates the definition of "frame or receiver" to reflect modern firearms and clarifies that kits or aggregations of parts that enable a purchaser to

readily assemble an operational weapon, or readily construct a functional frame or receiver, fall within the statutory definition of "firearm."

The Rule does not prohibit the purchase, sale, or possession of any firearm, nor does the Rule prohibit an individual from making a firearm. Nonetheless, the district court preliminarily enjoined certain portions of the Rule. That decision was erroneous. The Rule comports fully with the plain language of the statute. And no plaintiff is irreparably harmed by the Rule, which imposes only modest burdens. Nothing in the Rule prohibits the individual plaintiffs from purchasing the products they allege a desire to buy, and the manufacturer plaintiffs (both of which are permitted to sell the firearms they manufacture) may continue to sell all their products as long as they comply with the terms of the Gun Control Act. Rather than setting in motion the parade of horribles invoked by plaintiffs and the district court, the Rule simply reinforces compliance with Congress's gun-safety regime. It ensures that statutorily required background checks are conducted before individuals are permitted to purchase firearms from dealers and that federal firearms licensees mark firearms with serial numbers and keep transaction records to enable law enforcement to trace firearms used in crimes. The Rule serves critical law-enforcement and public-safety interests that plainly outweigh any minor burden plaintiffs may potentially experience, and this Court should vacate the preliminary injunction.

## STATEMENT OF JURISDICTION

The district court granted plaintiffs' motions for the entry or extension of a preliminary injunction on September 2, 2022; October 1, 2022; and November 3, 2022. *See* ROA.33, 36, 39. The federal government filed timely notices of appeal from the first two orders on November 1, 2022, and from the third order on November 4, 2022. *See* ROA.39-40. The district court had jurisdiction over the case under 28 U.S.C. § 1331, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Plaintiffs challenge an ATF rule that implements provisions of the Gun Control Act requiring that post-1968 firearms sold by licensed dealers be serialized and that those dealers conduct background checks on purchasers and maintain records of transactions. The district court granted plaintiffs' motions for a preliminary injunction, concluding that plaintiffs were likely to succeed on their claims that two provisions of the Rule are contrary to the statute, that they had demonstrated irreparable harm, and that the balance of the equities and the public interest weighed in favor of relief. The question presented is whether the district court erred in entering that preliminary injunction.

## STATEMENT OF THE CASE

### A.     Legal Background

**1.** Through the Gun Control Act of 1968, *codified as amended*, 18 U.S.C. § 921 *et seq.*, Congress has enacted requirements for persons who import, manufacture, or deal

3

in "firearms," *id.* §§ 922-923. Such persons must obtain a federal firearms license, *id.* § 923(a), maintain records of firearm acquisition and disposition, *id.* § 923(g)(1)(A), and conduct a background check before transferring firearms to a non-licensee, *id.* § 922(t). Congress has also required importers and manufacturers to identify each firearm they import or manufacture with a serial number on the frame or receiver. *Id.* § 923(i). In addition, Congress generally prohibits a licensee from selling a firearm directly to a non-licensee in a different state; instead, such sales generally must be routed through a federal licensee in the purchaser's home state. *See id.* § 922(a)(2)-(3), (b)(3).

The statutory scheme hinges on the definition of "firearm." Congress defined that term as follows:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3).

Congress did not define "frame" or "receiver" in the statute, instead leaving it to the agency to do so. Thus, in 1968, ATF defined "[f]irearm frame or receiver" by regulation as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968). That regulation provided direction as to which portion of a weapon constituted the frame

or receiver for licensing, serialization, and recordkeeping purposes and ensured that a component necessary for the weapon's functioning could be traced if the weapon were used in a crime. *See* 87 Fed. Reg. at 24,652.

**2.** In the last half-century, changes in weapon design have rendered ATF's regulatory definition obsolete. Today, most weapons have a split or multi-piece receiver, or they incorporate a striker rather than a hammer to fire the weapon. *See* 87 Fed. Reg. at 24,652. As a result, as many as 90% of firearms do not have a single component that houses a hammer, a bolt or breechblock, and a firing mechanism; under a restrictive application of the 1968 regulation, those firearms would arguably have no frame or receiver. *Id.*

In addition, technological advances have made it easier to create and sell weapon parts kits and easy-to-complete frames or receivers. Although these items meet the statutory definition of "firearm," some entities have been engaged in the business of selling these items to individual purchasers without complying with the Gun Control Act. 87 Fed. Reg. at 24,652. Such sales permit purchasers who have not completed a background check to assemble firearms easily. And because these privately made firearms usually lack serial numbers, they are nearly impossible for law enforcement to trace when they are used in crimes. *Id.* at 24,652, 24,659.

**3.** Responding to this threat to the continued effective implementation of Congress's gun-safety scheme, ATF promulgated the Rule. As relevant here, the Rule includes provisions aimed at ensuring that the regulatory definitions and requirements

related to serializing, recordkeeping, and licensing reflect the modern realities of firearm design.

First, the Rule updates the 1968 regulatory definitions of "frame" and "receiver." The Rule defines the "frame" of a handgun (*e.g.*, a pistol) as the housing or structure for the component designed to hold back the hammer, striker, bolt, or similar primary energized component before initiating the firing sequence. The Rule defines the "receiver" of a long gun (*e.g.*, a rifle) or other projectile weapon as the housing or structure for the primary component designed to block or seal the breech before initiating the firing sequence. *See* 87 Fed. Reg. at 24,727, 24,735. These updated definitions are intended to identify one component for each weapon as the "frame" or "receiver" to which serialization and other statutory requirements attach. In addition, the Rule clarifies that frames and receivers that are partially complete, disassembled, or nonfunctional (such as a frame or receiver parts kit) constitute frames or receivers under the statute if they are "clearly identifiable as an unfinished component part of a weapon" and if they are designed to, or may readily be converted to, function as a frame or receiver. *Id.* at 24,663, 24,727-28, 24,739; *see* 27 C.F.R. § 478.12(c).

Second, the Rule amends the regulatory definition of "firearm." As explained, the statutory definition includes inoperable weapons that are "designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). As the Rule explains, weapon parts kits—which may contain all components necessary to easily assemble a functional weapon and even the templates

6

and tools to allow that assembly—have increasingly been sold not in compliance with the Gun Control Act's licensing, recordkeeping, and background check requirements. 87 Fed. Reg. at 24,662. The Rule thus amends the regulatory definition of "firearm" to specify that the term includes "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.* at 24,662, 24,727, 24,735; *see* 27 C.F.R. § 478.11.

## B.    Procedural Background

1. In August 2022, plaintiffs Jennifer VanDerStok and Michael Andren (two individual firearm owners), Tactical Machining L.L.C. (a manufacturer), and Firearms Policy Coalition filed suit challenging the Rule in district court and sought a preliminary injunction. The district court granted that motion in part.

At the outset, the court held that plaintiffs had shown that they were likely to succeed in showing that two provisions of the Rule are contrary to the Gun Control Act. First, the court held that the Rule's definitions of "frame" and "receiver" to include partially complete, disassembled, or nonfunctional frames and receivers that may readily be converted to functional frames and receivers conflict with the Gun Control Act. ROA.756-60. That conclusion was based primarily on the court's belief that "Congress intentionally omitted" such "disassembled" or "nonfunctional" language from the provision of the Gun Control Act establishing that frames and receivers are "firearms." *See* ROA.758-59; *see also* 18 U.S.C. § 921(a)(3)(B). Second, the court held that the Rule's definition of "firearm" to include a weapon parts kit that is

7

designed to, or may readily be assembled to, function as a firearm could not be squared with the Gun Control Act. ROA.761-64. That conclusion was based primarily on the court's belief that the definition of "firearm" in the Gun Control Act "does not cover weapon *parts*, or aggregations of weapon parts, regardless of whether the parts may be readily assembled" into a weapon that expels a projectile. ROA.761-62.

Next, the district court concluded that Tactical Machining, but not the other plaintiffs, had demonstrated a substantial threat of irreparable harm from the Rule. ROA.765-69. The court observed that Tactical Machining's owner had submitted a declaration asserting that the company would likely go out of business if the Rule took effect, because the company's business "consists of producing and selling items" that Tactical Machining contends may qualify as "firearms" under the Rule's definitions. ROA.765. And the court accepted Tactical Machining's allegation that it had ceased selling certain items once the Rule took effect and had experienced some lost revenue as a result. ROA.766. Based on those purported harms, and any compliance costs that the company might incur by, for example, keeping the records required by the Gun Control Act, the district court concluded that Tactical Machining had demonstrated irreparable harm. ROA.766. By contrast, the court found that the remaining plaintiffs had "barely substantiate[d]" their claims of injury and that, as a result, the court could not find that any of those plaintiffs was likely to suffer irreparable harm absent an injunction. ROA.769.

The district court then concluded that the balance of the equities and the public interest weighed in favor of a preliminary injunction prohibiting enforcement of the Rule as to Tactical Machining. ROA.770-71. According to the court, on Tactical Machining's side of the balance was a fear of "substantial economic harm" and the "loss of previously enjoyed freedoms." ROA.770. And although the Rule explains that its implementation furthers a critical public safety interest "in preventing dangerous individuals from possessing firearms" and in allowing law enforcement to trace firearms recovered from crime scenes, the district court seemingly discounted those interests because an "overriding public interest" is served "when administrative agencies comply with their obligations under the APA." ROA.770 (quotation omitted). The court additionally determined that the government's, and the public's, law-enforcement and public-safety interests were "further outweighed" by Tactical Machining's "strong likelihood of success on the merits of the[] statutory interpretation claims." ROA.771.

The district court therefore enjoined enforcement of the two challenged provisions of the Rule against Tactical Machining. ROA.772. Shortly thereafter, ATF explained to the district court that it had nearly finished its response to Tactical Machining's product classification request (that is, a request that ATF determine whether the submitted product constitutes a "firearm" under the Rule). But the district court held that its preliminary injunction prohibited ATF from responding to

that request and informing Tactical Machining whether or not its submitted product

was even covered by the Rule. ROA.1174.

2. Although the district court initially declined to enter an injunction extending

beyond Tactical Machining, the court invited plaintiffs to "submit further briefing and

evidence" to demonstrate that the injunction should be extended to additional parties,

up to and including nationwide. ROA.772. After that briefing was submitted, the

district court entered an additional order extending the preliminary injunction to also

prohibit implementation of the challenged provisions of the Rule against the two

individual plaintiffs and against Tactical Machining's customers.

With respect to the individual plaintiffs, the court concluded that they had

sufficiently demonstrated irreparable harm because they averred that they "have

chosen to refrain from purchasing products classified" as firearms under the Rule "in

response to the perceived threat of looming civil and criminal liability." ROA.1188-92.

Without addressing again the balance of the equities and the public interest, the court

determined that the individual plaintiffs were entitled to a preliminary injunction

based on the perceived showing of irreparable harm. ROA.1196-97.

With respect to Tactical Machining's customers, the court accepted the

company's assertion that the Rule had created fear and confusion among its

customers such that demand for its products had declined following the Rule's

implementation. ROA.1197. Based on its acceptance of that assertion, the court

extended the preliminary injunction to prohibit ATF from enforcing the Rule against

Tactical Machining's customers, on the theory that such an extension was required to redress the company's irreparable financial harm. ROA.1197-98. Two days later, the court sua sponte modified the scope of that extension to exclude "individuals prohibited from possessing firearms under 18 U.S.C. § 922(g)." ROA.1207-08. Notwithstanding that modification, however, Tactical Machining remains free under the preliminary injunction to sell firearms to any customer over the Internet and without running a background check.

Two other district courts have denied similar motions for preliminary injunctions. *See Division 80, LLC v. Garland*, No. 3:22-cv-148, 2022 WL 3648454 (S.D. Tex. Aug. 23, 2022); *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 3:22-cv-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022).

3. After the district court below granted its original preliminary injunction, BlackHawk moved to intervene in this litigation for purposes of seeking a preliminary injunction against implementation of the Rule. Even though BlackHawk waited to file a motion to intervene until after the district court articulated its view that the Rule was unlawful, the district court nevertheless granted the intervention motion, ROA.1320-29, and subsequently granted BlackHawk's motion for a preliminary injunction, ROA.1651-62.

In granting that motion, the district court first "incorporate[d] by reference the reasoning" in its initial opinion to conclude that BlackHawk was likely to succeed on the merits. ROA.1655-56. Then, relying on reasoning similar to that it had employed

in finding that Tactical Machining was likely to suffer irreparable harm, the court concluded that the Rule would cause BlackHawk irreparable harm in the form of decreased sales and potential compliance costs. ROA.1656-57. And the court concluded that BlackHawk's "liberty interest" in selling products without complying with the statutory requirements and the public interest "in a government that abides by its own statutory and constitutional obligations" outweighed the law-enforcement and public-safety interests advanced by the Rule, which the court stated were "appreciably undermined by [the district c]ourt's preliminary determination that the [Rule] is likely unlawful." ROA.1659-60. The court therefore entered a preliminary injunction prohibiting the government from enforcing and implementing the Rule against BlackHawk or its customers (except for individuals prohibited from possessing firearms under 18 U.S.C. § 922(g)). ROA.1661-62.[1]

## SUMMARY OF ARGUMENT

Congress has required that those who wish to manufacture, import, or deal in firearms must obtain a license; conduct a background check before transferring a firearm; and maintain records of firearms transactions. And Congress has required that firearms be marked with a serial number when they are imported or

---

[1] The day before the district court granted BlackHawk's motion for a preliminary injunction, two more proposed intervenor-plaintiffs—Defense Distributed, a company that deals in products designed to enable purchasers to construct firearms; and Second Amendment Foundation, Inc., a nonprofit organization—also moved to intervene in the litigation. *See* ROA.39, 1522. On December 19, the district court granted that motion. *See* D. Ct. Dkt. No. 137.

manufactured. These requirements are critical components of Congress's gun-safety scheme because they prevent firearms from being sold to individuals, like felons, who may not lawfully possess them and because they enable law enforcement to trace firearms used in crimes. ATF promulgated the Rule challenged here to ensure the continued effective implementation of these statutory requirements in the face of technological advances that have rendered 50-year-old regulatory definitions obsolete. The Rule does not, however, prohibit any person who may otherwise lawfully possess a firearm from buying, possessing, or making any firearm for personal use. Nor does the Rule prohibit any properly licensed individual from engaging in the business of selling firearms. Instead, as relevant here, the Rule simply clarifies that certain products, such as certain partially complete frames and receivers and certain ready-to-assemble weapon and frame or receiver parts kits, must be sold in compliance with federal firearms laws.

Despite the absence of any substantial harms flowing from the Rule, the district court concluded that plaintiffs had demonstrated that the balance of equities favored preliminary injunctive relief. The court therefore entered a preliminary injunction prohibiting the government from enforcing two provisions of the Rule against the individual and manufacturer plaintiffs, along with their customers. The district court thereby permitted the manufacturer plaintiffs to continue to sell products over the Internet that enable individuals to readily assemble untraceable firearms—like AR-15 rifles—and to do so without background checks, eliminating a crucial, statutorily

13

mandated obstacle to the purchase of such products by convicted felons and other prohibited persons. The district court's analysis was incorrect at every step, and this Court should vacate the preliminary injunction.

**I.** The district court erred in concluding that plaintiffs were likely to succeed on the merits. The court held that two provisions of the Rule are likely contrary to the Gun Control Act, but each of the challenged provisions is fully consistent with the statute.

The Rule's clarification that a "frame" or "receiver" includes a partially complete, disassembled, or nonfunctional frame or receiver that may "readily" be converted into a functional frame or receiver accords with the Gun Control Act's text and structure. The statute does not itself define the terms "frame" or "receiver." In interpreting those terms to include a nonfunctional frame or receiver that may "readily" be converted to a functional one, ATF acted consistently with the text of the provision, Congress's approach to other terms in similar statutes, and the reality underlying the statutory scheme that any contrary approach would permit individuals to circumvent important federal firearms laws. And ATF's approach is further supported by the agency's longstanding practice of treating certain partially complete frames or receivers as frames or receivers for purposes of the Gun Control Act.

The Rule's clarification that a "firearm" also includes certain weapon parts kits that are designed to or may readily be converted into an operational firearm similarly comports with the Gun Control Act. The Act's definition of "firearm" makes clear

14

Congress's intent to include certain partially complete, or nonoperational, weapons within its scope, and consistent with that intent, courts have long recognized that such weapons can constitute "firearms." *See, e.g.*, *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993). A weapon parts kit that includes parts designed to enable the ready assembly of an operational firearm plainly satisfies the statute's definition, and any other approach would impermissibly result in circumvention of the statute, enabling felons and others who cannot lawfully possess firearms to easily obtain untraceable firearms over the Internet.

**II.** Even if plaintiffs could demonstrate a likelihood of success as to either of their claims, they would still be unable to justify a preliminary injunction.

**A.** Plaintiffs cannot establish irreparable harm. The Rule does not forbid the sale (or purchase) of any firearm, weapon kit, or other item; instead, it primarily clarifies that certain items must be sold in accordance with the Gun Control Act's licensing, recordkeeping, and background check requirements. Plaintiffs who wish to purchase or sell the regulated products at issue here may therefore continue to do so if they are not prohibited from possessing firearms and comply with the Act's relatively modest requirements.

Nevertheless, the district court held that the individual plaintiffs had demonstrated irreparable harm based on a fear of criminal liability if they failed to comply with the Rule. That conclusion finds no support in the text of the Rule or the preexisting statutory requirements. The individual plaintiffs may continue to purchase

the products covered by the Rule—with no threat of criminal liability—so long as they comply with the longstanding commercial sale requirements contained in the Gun Control Act. And there is no serious argument that the statutory requirements themselves impose irreparable harm. To the contrary, the Gun Control Act permits plaintiffs—who allege that they are not prohibited from possessing firearms under federal law—to purchase a firearm directly from an in-state licensed manufacturer or dealer. And it permits plaintiffs to purchase a firearm from an out-of-state manufacturer if the firearm is delivered to an in-state federal firearms licensee for transfer to them.

The district court's conclusion that the manufacturer plaintiffs had demonstrated irreparable harm fares no better. Although the district court accepted plaintiffs' assertions that the Rule would cause them substantial losses in revenue, those assertions were unsupported by probative evidence and are irreconcilable with the fact that the plaintiffs are licensed manufacturers who may continue to sell the products that they manufacture. And the district court's alternative conclusion that plaintiffs might suffer irreparable harm by way of costs generated by complying with the Rule similarly fails. Plaintiffs never quantified those compliance costs, which tens of thousands of federally licensed manufacturers and dealers bear every day, nor have they explained how the costs are sufficient to justify the extraordinary relief of a preliminary injunction.

16

**B.** The district court compounded its error by incorrectly concluding that the balance of the equities weighed in favor of injunctive relief. As the Rule explains, its provisions serve critical law-enforcement and public-safety interests. In recent years, there has been a substantial increase in the availability of kits, many not sold in compliance with statutory requirements, enabling purchasers to easily construct operational firearms outside the regime constructed by Congress. As a result, prohibited persons have been able to easily acquire firearms, there has been a proliferation of unserialized firearms in circulation, and law enforcement has faced difficulty tracing firearms recovered from crime scenes. *See, e.g.*, 87 Fed. Reg. at 24,655-60. The substantial law-enforcement and public-safety interests protected by the Rule plainly outweigh any modest financial burdens on plaintiffs.

## STANDARD OF REVIEW

This Court reviews the "district court's grant of a preliminary injunction" for "abuse of discretion." *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 418-19 (5th Cir. 2001). The district court's "[f]indings of fact are reviewed only for clear error," but "legal conclusions are subject to *de novo* review." A decision to grant a preliminary injunction "grounded in erroneous legal principles is reviewed *de novo*." *Id.* at 419.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). To justify that relief, a plaintiff must show that it is "likely to succeed on the merits," that it "is likely to suffer

17

irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. The government's interest and the public interest "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The district court's conclusion that plaintiffs met their burden fails at each step.

## I.     Plaintiffs Are Unlikely to Succeed on the Merits Because the Rule Comports with the Gun Control Act

In granting a preliminary injunction to plaintiffs, the district court held that plaintiffs are likely to succeed on their claims that two portions of the Rule are contrary to the Gun Control Act. First, the court held that the Rule contravened the statute by making clear that certain partially complete, disassembled, or nonfunctional frames and receivers constitute frames and receivers subject to regulation. Second, the court held that the Rule contravened the statute by clarifying that "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive" is a "firearm." 87 Fed. Reg. at 24,727, 24,735. The district court was incorrect on both counts.

### A.     A Nonfunctional Frame or Receiver May Constitute a "Frame" or "Receiver" Under the Gun Control Act

In defining the statutory terms "frame" and "receiver," the Rule clarifies that those terms include a "partially complete, disassembled, or nonfunctional frame or receiver" that "is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). The

district court's conclusion that this definition is unlawful misunderstands both the statute and the Rule.

**1.** In defining the statutory terms "frame" and "receiver" to include a partially complete, disassembled, or nonfunctional frame or receiver that may "readily" be converted into a functional one, ATF acted in accordance with the statutory text and structure. As the Rule explains, the text of the statute does not "define the term 'frame or receiver,'" instead leaving it to the agency to define "at what point an unregulated piece of metal, plastic, or other material becomes a 'frame or receiver' that is a regulated item under Federal law." 87 Fed. Reg. at 24,685. And nothing in the statute precludes ATF from exercising that authority to determine that the relevant point comes before the frame or receiver is fully complete and is instead when the frame or receiver reaches a stage where it is readily converted to a functional frame or receiver. There is not, for example, any statutory language specifying that to be subject to regulation, a "frame" or "receiver" must be "fully complete" or "functional" or "operable."

To the contrary, the statutory text and structure makes clear Congress's intent to permit ATF to adopt an interpretation like the one in the Rule. When defining weapons throughout the firearms laws, Congress has repeatedly made clear that non-operational weapons that are either "designed to" or may "readily" be converted to operational weapons are included. *See, e.g.*, 18 U.S.C. § 921(a)(3)(A); 26 U.S.C. § 5845(b) (defining "machinegun" to include a weapon that "can be readily restored

19

to shoot[] automatically more than one shot, without manual reloading, by a single function of the trigger"). These provisions reflect the reality that any other approach would permit persons to circumvent statutory requirements by producing or purchasing nearly complete weapons readily converted into operational ones. In including a similar provision in the regulatory definitions of "frame" and "receiver," ATF acted in conformity with those congressional determinations and with the statutory scheme. That ATF's interpretation accords with the statutory structure is only further underscored by Congress's linking of the frame-or-receiver provision to § 921(a)(3)(A). In § 921(a)(3)(B), Congress provided that the term "firearm" includes the frame or receiver of "any such weapon," explicitly referring back to the immediately preceding description of such weapons that includes those that "may readily be converted to" operable weapons.

The correctness of ATF's interpretation is confirmed by its consistency with previous regulatory practice. As the Rule explains, "ATF has long held that a piece of metal, plastic, or other material becomes a frame or receiver when it has reached a critical stage of manufacture," which is "when it is brought to a stage of completeness that will allow it to accept the firearm components to which it is designed for [sic], using basic tools in a reasonable amount of time." 87 Fed. Reg. at 24,685 (brackets in original) (quotation omitted). The Rule's clarification that partially complete frames or receivers constitute frames or receivers when they are readily converted to functional ones generally accords with this previous approach while also providing additional

20

clarity to regulated entities by incorporating, and substantially elaborating on the application of, language that has long been used in similar statutory and regulatory contexts. *Cf. id.* at 24,663, 24,668, 24,685.

Indeed, consistent with that longstanding regulatory practice, the district court correctly recognized that an "incomplete receiver may still be a receiver within the meaning of the statute, depending on the degree of completeness." ROA.759-60. That correct recognition accords with the Rule, which does no more than explain what "degree of completeness" is required for a partially complete frame or receiver to "be a [frame or] receiver within the meaning of the statute."

**2.** In nevertheless concluding that the Gun Control Act precludes ATF from defining "frame" and "receiver" to include certain partially complete, disassembled, or nonfunctional frames and receivers, the district court focused on two perceived problems with ATF's approach. First, the court observed that Congress defined "firearm" to include the "frame" or "receiver" of a weapon but did not specifically include a provision in the statute covering parts that may readily be converted to a frame or receiver. ROA.757-58; *see* 18 U.S.C. § 921(a)(3)(B). Second, the court suggested that the Rule impermissibly permits ATF to "regulate a component as a 'frame or receiver' even after ATF determines that the component in question is not a frame or receiver." ROA.758-60. Neither of those concerns is persuasive.

As to the first concern, the district court's conclusion proceeds from the incorrect premise that § 921(a)(3)(B) itself defines "frame or receiver" and so some

inference may be drawn from the nonexistence of "readily" language in that provision. In fact, that provision states only that the term "firearm" includes "the frame or receiver of any such weapon." *See* 18 U.S.C. § 921(a)(3)(B). It does not then go on to provide any definition of "frame" or "receiver," leaving it to the agency to do so in interpreting the statutory terms. And it is implausible to think that Congress precluded ATF from following the statute's lead and determining that a "frame" and a "receiver" includes disassembled or nonfunctional frames or receivers that may "readily" be converted to functional ones. Any such limit on ATF's authority would not only fail to reflect the statutory scheme, it would also allow (for example) violent felons to purchase online ready-to-assemble, untraceable firearms just because the frame or receiver is not fully completed. That result cannot be reconciled with the fact that Congress plainly contemplated that the definition of "firearm" in the statute would encompass nonfunctional firearms.

The district court's second concern similarly rests on an incorrect understanding of the relevant provisions. ATF does not claim authority to simultaneously "determine" that a partially complete or nonfunctional frame or receiver "is not a frame or receiver" and also "regulate [it] as a frame or receiver." ROA.758-60. To the contrary, in promulgating the Rule, ATF simply explained when a partially complete receiver will "still be a receiver within the meaning of the statute," ROA.759-60: when it is "readily" converted to a functional receiver. Thus, under the Rule, a partially complete, disassembled, or nonfunctional frame or receiver that may

readily be converted to a functional one has reached a state of manufacture where it is the frame or receiver of a weapon. And that result mirrors Congress's approach in related contexts. As with ATF's definitions of "frame" and "receiver," Congress has defined items that may readily be converted into operational firearms or machineguns as "firearms" or "machineguns" themselves. *See* 18 U.S.C. § 921(a)(3)(A); 26 U.S.C. § 5845(b).

As explained, the district court itself acknowledged that an "incomplete receiver may still be a receiver within the meaning of the statute, depending on the degree of completeness." ROA.759-60. To the extent that the district court's conclusion that the rule conflicts with the Gun Control Act reduces to the concern that there may be some products on the market that are not sufficiently readily assembled to allow them to be regulated as frames or receivers, the district court failed to identify any such product that ATF has attempted to regulate. *Cf.* ATF, *Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers* (Sept. 27, 2022), www.atf.gov/firearms/docs/open-letter/all-ffls-september-2022-impact-final-rule-2021-05f-partially-complete-ar/download (explaining that certain partially complete receivers will generally not constitute receivers when sold without accompanying tools, jigs, or other materials to enable their ready completion). And assuming someone were to object to the classification of any particular product, the proper avenue to raise the concern would be in connection with ATF's actions as to that particular product. Any hypothetical concern on that score cannot support a

23

facial attack on the Rule, nor does it justify a preliminary injunction prohibiting ATF from implementing the provision.

## B.    Weapon Parts Kits May Constitute Firearms Under the Gun Control Act

The Rule further clarifies that a "firearm" subject to regulation under the Gun Control Act encompasses "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 87 Fed. Reg. at 24,727, 24,735; *see* 27 C.F.R. § 478.11. That provision of the Rule is also consistent with the statute, and the district court's contrary conclusion suffers from several flaws.

**1.** The text and structure of the Gun Control Act, as well as all relevant precedent, make clear that ATF's determination that certain weapon parts kits constitute "firearms" under that statute is correct. With respect to the text, Congress defined a firearm to include any weapon that "is designed to" or "may readily be converted to expel a projectile." 18 U.S.C. § 921(a)(3)(A). That definition plainly reflects Congress's inclusion of unfinished, or nonoperational, weapons. And a weapon parts kit that includes parts enabling a purchaser to readily assemble an operational firearm plainly satisfies the statute's definition: such an assemblage of parts is both "designed to" and "may readily be converted to" function as a firearm. Indeed, plaintiffs have never offered any explanation for what other purpose such a kit could possibly be designed.

In essence, a weapon parts kit is a disassembled firearm, and courts have long recognized that even disassembled, or nonoperational, weapons constitute "firearms" for Gun Control Act purposes. For example, in *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993), this Court held that a "disassembled" shotgun, which had the barrel removed from the stock, constituted a "firearm" under a provision of the Sentencing Guidelines reflecting the Act's definition. This Court explained that "[b]ecause Ryles' disassembled shotgun could have been 'readily converted' to an operable firearm," it was a "firearm" for purposes of the Guidelines enhancement. *Id.* Similarly, in *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006), the court held that a rifle with the clip and bolt removed constituted a "firearm" under a provision of the Sentencing Guidelines reflecting the Act's definition. As the court explained, although the rifle was "partially disassembled" and not operational, the defendant "could easily make the rifle operational" by reinserting the bolt and clip. *Id.* (quotation omitted). Thus, because the "definition turns on what the weapon is designed to do, not on whether it is capable of doing its job at" any "particular moment," the court concluded that the nonoperational rifle constituted a firearm. *Id.* (quotation omitted); *see also, e.g.*, *United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017); *United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006) (both similar).

And as with nonfunctional frames and receivers, interpreting the statutory definition of "firearm" to encompass an aggregation of parts that is readily converted to a functional firearm is necessary to comport with Congress's intent in enacting the

25

Gun Control Act. Any contrary interpretation would permit the sale of weapon parts kits that enable the purchaser to quickly and easily assemble an operational firearm without compliance with the background check, licensing, and recordkeeping requirements of the Gun Control Act. That result would allow circumvention of the statute, enabling felons and other prohibited persons to obtain firearms and thwarting law enforcement's ability to trace firearms that are used in crimes.

**2.** Despite the statutory text and context, and all applicable precedent, confirming the correctness of ATF's interpretation, the district court concluded that the statute does not permit ATF to regard weapon parts kits as "firearms," primarily because the statutory definition "does not cover weapon *parts*, or aggregations of weapon parts." ROA.761-62.

The district court's attempt to carve aggregations of weapon "parts" out of the definition of "firearm" fails in light of the statutory text. The Gun Control Act makes clear that weapons that are "designed to" or "may readily be converted to expel a projectile" are firearms, regardless of whether the weapons are currently operable or assembled. 18 U.S.C. § 921(a)(3)(A). A weapon parts kit that both is designed to allow a purchaser to assemble his own firearm and includes the parts necessary to allow such ready assembly plainly meets that definition. *Cf.* ROA.758 (recognizing that the definition of "firearm" includes "disassembled, nonfunctional, and antique firearms because they are 'designed' to fire projectiles even if they are practically unable to do

so"). It was thus unnecessary (and would have been superfluous) for Congress to also separately regulate parts or aggregations of parts as such.

The district court's plucking of other language from other statutory provisions that it believed "Congress could have" used underscores its error. For example, the court stated that Congress could have used language making clear that parts "that 'may be readily assembled' into a weapon" are "firearms" or that parts "'designed' to be part of a weapon" are "firearms." ROA.762-63. But Congress used nearly identical language, defining firearms to include both weapons "designed to" and weapons that "may readily be converted to" expect a projectile, 18 U.S.C. § 921(a)(3)(A). And the district court's attempted distinction between, for example, "readily assembled into a weapon" and "readily be converted to a weapon" cannot possibly bear the weight the court put on it; those two phrases are synonymous.

Finally, the erroneous nature of the district court's conclusion is further highlighted by the absurd consequences it engenders. It is difficult to discern any persuasive distinction between a "disassembled" or "nonfunctional" firearm—which no party contends evades the statute's coverage—and a weapon parts kit. A weapon parts kit is, in essence, nothing more than a disassembled, currently nonfunctional weapon that is designed and intended to be assembled into a functional weapon. There is no indication in the text or statutory scheme that Congress intended to allow such a kit to evade the licensure, background check, marking, or recordkeeping requirements enumerated in the Gun Control Act. Such a result would create a

27

substantial loophole allowing anybody, including convicted felons, to purchase a disassembled weapon that may be assembled in short order. That result would frustrate the core purposes of the Gun Control Act, impairing law enforcement efforts to prevent and solve crimes involving firearms, and does not reflect the statute that Congress enacted.

## II.     Plaintiffs Are Not Entitled to the Extraordinary Remedy of a Preliminary Injunction

Even setting aside the merits, the district court erred in granting plaintiffs a preliminary injunction. No plaintiff has demonstrated any irreparable harm flowing from the Rule, let alone any that could possibly outweigh the countervailing interests in law enforcement and public safety advanced by the Rule.

### A.     The Rule, Which Does Not Alter Preexisting Statutory Requirements for the Commercial Sale of Firearms, Inflicts No Irreparable Harm on Plaintiffs

#### 1.     Plaintiffs May Continue to Purchase and Sell Firearms Under the Rule

The Rule does not forbid the sale (or purchase) of any firearm, weapon kit, or other item; instead, the Rule clarifies that certain items, like ready-to-assemble kits, are "firearms" and so must be sold in accordance with the Gun Control Act's licensing, recordkeeping, and background check requirements. Thus, plaintiffs who wish to purchase or sell regulated products may do so if they comply with the Act.

These requirements are not especially onerous. An entity that already possesses a federal firearms manufacturer's license, like Tactical Machining or BlackHawk, is

permitted to sell the firearms that it manufactures at retail, *see* 27 C.F.R. § 478.41(b), subject to certain restrictions on direct sales to out-of-state customers who wish to purchase the product without going to the licensee's place of business, 18 U.S.C. § 922(b)(3). Even for such customers, sales are permitted so long as the firearm is shipped to a licensee in the customer's state of residence, which can then transfer the firearm to the customer after fulfilling background check and recordkeeping requirements. And conversely, an individual who wishes to purchase one of the regulated products may continue to do so (assuming he is not prohibited from possessing firearms); he may simply need to purchase the product from an in-state seller or have the sale routed through an in-state licensee.

In short, the Rule does not prohibit any plaintiff from selling or purchasing any product; it simply clarifies that sales of certain products must be conducted in accordance with statutory licensing, background check, serializing, and recordkeeping requirements. Indeed, there are tens of thousands of federally licensed firearms manufacturers and dealers around the country, all of whom manage to bear the costs associated with those requirements when selling firearms. And there are, of course, many more firearms owners who similarly bear the minor costs associated with statutory compliance when they purchase firearms from federal licensees. These kinds of incidental costs do not rise to the level of irreparable harm warranting an injunction.

29

## 2. The Individual Plaintiffs' Claims of Harm Are Untethered to the Rule

The district court nevertheless concluded that the individual plaintiffs had demonstrated irreparable harm flowing from the Rule. To reach that erroneous conclusion, the district court accepted speculative assertions of harm based on plaintiffs' misunderstanding of how the Rule interacts with preexisting statutory requirements.

The individual plaintiffs' claim of irreparable harm rests on their assertions that they each wish to purchase at least one item colloquially referred to as an AR-15 "80% Lower" receiver from a manufacturer like Tactical Machining and that they believe that item might be classified as a firearm under the Rule. ROA.910-13; *see also* ROA.1188. But that claim of irreparable harm ignores the simple reality that plaintiffs remain free to purchase those products.

Indeed, as both plaintiffs' declarations acknowledge, regardless of whether a so-called "80%" receiver is classified as a "firearm" under the Gun Control Act, plaintiffs—who aver that they are not prohibited from possessing firearms under federal law—may purchase such a product without incurring any criminal liability, so long as they comply with the Gun Control Act's requirements for firearm purchases. *See* ROA.232, 234, 910-13. The statute permits plaintiffs, like other non-prohibited persons, to purchase a firearm directly from an in-state licensed manufacturer as well as from an out-of-state licensed manufacturer, like Tactical Machining, if the firearm

is delivered to an in-state federal firearms licensee for transfer to plaintiffs. ROA.910-13. And if the particular receivers plaintiffs wish to purchase are *not* in fact firearms within the meaning of the statute as clarified in the Rule, *see Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers, supra,* plaintiffs are free to purchase those items as they wish.

Plaintiffs acknowledge that they may continue to purchase unfinished receivers, even if classified as firearms, from out-of-state licensed manufacturers; they simply complain that their local licensee may charge a $30 fee to complete the transfer. *See* ROA.910-13. But that complaint fails to advance their argument, as the district court recognized. The Rule does not impose that fee, and plaintiffs can avoid it altogether by purchasing their desired "80% Receiver" from an in-state manufacturer (for example, intervenor-plaintiff BlackHawk is, like the individual plaintiffs, located in Texas and manufactures and distributes items including partially assembled AR-15 receivers, *see* ROA.1333, 1408) or other licensee. Plaintiffs have never identified any specific out-of-state manufacturer's product that they wish to purchase, much less have they articulated any reason that they could not obtain a sufficiently similar product from an in-state manufacturer. And in any event, as the district court correctly recognized, the possibility of incurring a $30 transfer fee "is not sufficient for a showing of irreparable harm" because it is not "more than merely de minimis." ROA.1188; *see also* ROA.1188 n.25 (collecting cases holding that similar, or larger, inflation-adjusted amounts are de minimis).

31

Despite correctly rejecting plaintiffs' argument that the commercial sale restrictions found in the Gun Control Act imposed irreparable harm on plaintiffs, the district court nevertheless concluded that the individual plaintiffs demonstrated the requisite irreparable harm based on a "perceived" threat of "looming civil and criminal liability" for "making those purchases." ROA.1190-91; *see also* ROA.910-13. But that conclusion cannot be squared with the fact, seemingly acknowledged by plaintiffs, *cf.* ROA.233, 235, that plaintiffs may continue to purchase the products they identify—with no threat of criminal or civil liability—so long as they comply with the statutory requirements that apply to all firearms purchasers. Nor can plaintiffs manufacture irreparable harm simply by choosing not to comply with those minimally burdensome requirements. Such "self-inflicted" injury "does not qualify as irreparable." *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam). The only way plaintiffs could be directly affected by having to purchase the receivers they seek through licensed dealers would be if they were, in fact, prohibited under the Gun Control Act from doing so because of a prior conviction or mental health commitment, for example. *See, e.g.,* 18 U.S.C. § 922(g)(1), (g)(4). But plaintiffs have declared that they are free of such restrictions. ROA.232, 234.

Similarly, although the district court briefly suggested that plaintiffs might be able to demonstrate irreparable harm based on their fear that the Rule will result in criminal liability for their purchasing a partially assembled receiver while already in possession of templates or jigs, *see* ROA.1189, that suggestion is unwarranted. The

portion of the Rule that the district court seemingly referred to explains that it would be impermissible under preexisting federal statutes for entities to "structur[e] transactions to avoid" the Gun Control Act's requirements. 87 Fed. Reg. at 24,713. But that portion of the Rule is specifically referring to requirements placed on "persons who manufacture and sell unassembled weapons or weapon parts kits." *Id.* It recognizes, for example, that it may be impermissible for two manufacturers to conspire with each other to each market and sell half of a weapon parts kit without complying with the statutory requirements if that kit would, when purchased in a single transaction, constitute a firearm. But those commercial regulations of manufacturers and dealers do not purport to regulate private individuals' conduct. To the contrary, nothing in the Rule or the underlying statute restricts individuals not otherwise prohibited from possessing firearms from buying the various component parts needed to make their own firearm or suggest any criminal consequences for doing so. *Cf. id.* at 24,676 ("[T]he [Gun Control Act] and this rule do not prohibit individuals from assembling or otherwise making their own firearms from parts for personal use, such as self-defense or other lawful purposes.").

### 3. The Manufacturer Plaintiffs' Claims of Irreparable Harm Fare No Better

The district court's conclusion that the manufacturer plaintiffs had demonstrated irreparable harm was similarly incorrect.

**a.** As an initial matter, the district court's conclusions regarding the impact of the Rule on plaintiffs' bottom line were based on speculation that the Rule would cause plaintiffs substantial losses in revenue and potentially result in their going bankrupt. *See* ROA.765 (Tactical Machining); ROA.1656-67 (BlackHawk). But plaintiffs failed to provide any persuasive evidence explaining how the Rule would lead to such harms. And any pretense of dire financial straits is impossible to square with the relatively minor steps necessary for licensed manufacturers like Tactical Machining and BlackHawk to continue to sell their products in compliance with the Rule.

The drops in revenue Tactical Machining and BlackHawk claim occurred immediately following the effective date of the Rule likely occurred instead because of actions taken by the manufacturers themselves. It was the manufacturers' choice to discontinue selling certain products rather than to continue selling them in ways that complied with the Rule (even though both manufacturer plaintiffs are permitted to sell the products they manufacture, even if those products constitute firearms). *See* ROA.766 ("Tactical Machining ceased sales of various parts."); ROA.927 (BlackHawk explaining that it "discontinued" sales of many products). The self-inflicted nature of any harm is only underscored with respect to Tactical Machining by their successful request that the district court not only enjoin ATF from enforcing the Rule against them but also prohibit ATF from even informing Tactical Machining whether the product they submitted for classification would be subject to regulation under the

34

Rule. ROA.1174. Such a request does not reflect an entity attempting to minimize the potential harms flowing from the challenged regulation.

Drops in revenue immediately following the rule were also likely attributable to temporary uncertainty immediately following the Rule's promulgation. BlackHawk's claim that many of its customers were unwilling to buy so-called 80% Receivers without "assurances" that those products are not covered by the Rule is based on interactions in the days after the Rule took effect. *See* ROA.926-28. Since that time, ATF has issued an Open Letter to the firearms industry to dispel any confusion in the industry or among the public by explaining the application of the Rule's definition of "receiver" to partially complete receivers. *See Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers, supra*. BlackHawk has not provided any evidence following that Open Letter to suggest that its customers remain confused or unwilling to purchase any specific items even despite the additional guidance provided in the letter. And if there were any lingering confusion about whether a particular product qualified as a "firearm," BlackHawk could both request that ATF provide a classification for that specific product and, in the meantime, simply sell the item in question in compliance with the statutory requirements for firearm sales. BlackHawk's suggestion that it might cease its business rather than engage in any of those relatively costless avenues of compliance lacks support or credibility.

No more persuasive is the district court's invocation of ATF's Regulatory Impact Analysis, which stated that some non-licensed manufacturers and retailers may

choose to go out of business rather than obtain a license. *See* ROA.765-66. Such self-inflicted injuries cannot provide the irreparable harm necessary to support an injunction. *See Texas*, 10 F.4th at 558.

In short, as explained, the Rule does not prohibit the manufacturer plaintiffs from selling any of their products; it simply may require that some of those products be sold in compliance with the statutory requirements that attach to firearm sales, statutory requirements with which licensees—who are familiar with the regulations governing firearm sales—comply when they sell products every day. Against that backdrop, it is plain that the manufacturer plaintiffs have not demonstrated the requisite harm to support their request for a preliminary injunction.

**b.** The district court also incorrectly concluded that the manufacturer plaintiffs could support their request for a preliminary injunction based on the routine business costs associated with selling weapon parts kits and unfinished receivers in compliance with the Gun Control Act. The district court so held because any such compliance costs would be unrecoverable because of the United States' sovereign immunity. *See* ROA.767-68 (Tactical Machining); ROA.1657 (BlackHawk). That conclusion fails on multiple levels.

As an initial matter, nowhere have plaintiffs ever attempted to quantify the compliance costs they expect to incur in light of the Rule. As explained, the relevant statutory requirements are not especially burdensome and simply require, for example, that plaintiffs run a background check before selling a firearm and keep records of

those sales. And there are tens of thousands of federally licensed firearms dealers around the country, all of whom manage to bear those ordinary compliance costs. In light of that reality, plaintiffs have failed to demonstrate that the actual expenses of complying with the Rule are anything more than the sort of de minimis harm that even the district court understood could not support a preliminary injunction. *See* ROA.1188 & n.25.

In any event, even if plaintiffs could demonstrate some compliance costs that were more than de minimis, such ordinary expenses cannot justify preliminary injunctive relief. As the Supreme Court has made clear, such relief is "an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Consistent with that admonition, the ordinary and insubstantial costs of operating a business in compliance with government regulation cannot constitute irreparable harm. Instead, such harm must be "certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). Thus, for example, the Supreme Court has held that ordinary "litigation expense," even if "unrecoupable," "does not constitute irreparable injury" for purposes of preliminary injunctive relief. *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974). Similarly, the courts of appeals have consistently held that "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *see also, e.g., American Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("[I]njury resulting from attempted

37

compliance with government regulation ordinarily is not irreparable harm."); *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976) ("Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction. Rather, in cases like these, courts ought to harken to the basic principle of equity that the threatened injury must be, in some way, 'peculiar'.").

The court declined to directly address those important principles, instead suggesting that this Court's precedent compels the conclusion that any compliance costs constitute irreparable harm in a suit against the federal government where damages are unavailable. *See* ROA.767-68 (primarily citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016); and *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021)). But this Court's cases do not support that extraordinary proposition. To the contrary, the cited cases both involved extraordinary costs: in *Texas*, compliance would have cost the plaintiffs $2 billion, *Texas*, 829 F.3d at 433; while in *Wages & White Lion*, the compliance "threaten[ed] the very existence of [the movant's] business" and the government made "no developed argument contesting irreparable harm," rendering the issue forfeited, *Wages & White Lion*, 16 F.4th at 1142 (quotation omitted). The district court did not cite, and we are not aware of, any case from this Court holding that routine compliance costs like those implicated here constitute irreparable harm.

To the extent that some language in those cases may have additionally suggested that any compliance costs might suffice to demonstrate irreparable harm in these circumstances, that language was, given the tremendous costs at issue in those cases, dicta not binding on this Court. *See United States v. Segura*, 747 F.3d 323, 328-29 (5th Cir. 2014). As explained, ordinary compliance costs generally do not constitute the sort of substantial and imminent harm necessary to justify preliminary relief, even in a suit against the United States. Indeed, were the rule otherwise, plaintiffs could justify a preliminary injunction against the United States—or, in many circumstances, against States—based on very small financial harm—a result that would uniquely disadvantage those governments and that is, like many of plaintiffs' arguments, incompatible with the Supreme Court's admonition that preliminary injunctive relief is "extraordinary." *Winter*, 555 U.S. at 24.

### B. The Balance of the Equities and the Public Interest Strongly Favor Denying Injunctive Relief

Even if plaintiffs could demonstrate some irreparable harm, any such harm could not outweigh the significant public interest in enforcement of the Rule.

As ATF explained in the Rule, unserialized firearms have proliferated in recent years; in 2021, nearly 20,000 such firearms were reported to ATF as having been recovered by law enforcement from potential crime scenes, and the United States has recently brought many criminal cases "to counter the illegal trafficking of unserialized privately completed and assembled weapons, the possession of such weapons by

prohibited persons, and other related Federal crimes." 87 Fed. Reg. at 24,656-57. This "proliferation of untraceable firearms severely undermines" law enforcement's ability to engage in the "integral" process of "determin[ing] where, by whom, or when" a firearm used in a crime was manufactured and "to whom [it was] sold or otherwise disposed," *id.* at 24,656, 24,659, thereby impairing law enforcement officials' ability to apprehend violent individuals who may pose an ongoing threat to public safety.

Not only does the Rule enable law enforcement officials to better trace firearms used in crimes, but it also helps ensure that those firearms do not end up in the hands of individuals prohibited from possessing firearms—such as felons—in the first place. One of the Gun Control Act's requirements is that a dealer conduct a background check before selling a firearm to an unlicensed person. The Rule clarifies that products like weapon parts kits and partially complete frames or receivers must be sold in compliance with the statute, preventing (for example) violent felons from purchasing firearms over the Internet. The Rule therefore, as ATF recognized, "increase[s] public safety by, among other things, preventing prohibited persons from acquiring firearms." 87 Fed. Reg. at 24,654.

The district court did not seriously contest any of these substantial public-safety and law-enforcement interests weighing in favor of continued implementation of the Rule. Indeed, the court itself seemed to recognize the importance of at least some of those interests in sua sponte excluding from its injunction "individuals prohibited from possessing firearms under 18 U.S.C. § 922(g)." ROA.1207-08. But

that qualification did not change the fact that the injunction permits the manufacturer plaintiffs to continue selling items over the Internet that indisputably allow purchasers to readily assemble untraceable operational weapons like AR-15 rifles without any background check. That reality substantially interferes with the interests of the government and the public in reducing crime and ensuring public safety.

The district court failed to persuasively explain how the minimal compliance costs engendered by the Rule—like the minutes it may take to run a background check or the cost to maintain records of firearm transfers—outweigh the overriding public interest in ensuring firearms are not readily obtainable by those who may not lawfully possess them and in tracing firearms used in often violent crimes. And although the court suggested that the relevant balancing should include the possibility, based on ATF's Regulatory Impact Analysis, that businesses other than plaintiffs might dissolve rather than comply with the Rule, *see* ROA.770, such a choice by some hypothetical business would be a self-inflicted injury that does not receive any weight for these purposes.

Nor can the district court's balancing be justified by its belief that the government's interests in the Rule were "appreciably undermined by [the district court's] preliminary determination that the [Rule] is likely unlawful," ROA.1659. That conclusion rests on a fundamental misapplication of the preliminary injunction framework. To succeed in their request for a preliminary injunction, plaintiffs must demonstrate not only that they are "likely to succeed on the merits," but also that "the

balance of equities tips in [their] favor" and "that an injunction is in the public interest." *Winter*, 555 U.S. at 20. If the district court's reasoning were correct, the consideration of equitable factors would collapse into one inquiry: any plaintiff who could establish a likelihood of success on the merits would also establish that the balance of equities and the public interest tipped in his favor. That is not the law. *See id.* at 31-32 (declining to "address the underlying merits" but holding plaintiffs had failed to meet the equitable factors).

## CONCLUSION

For the foregoing reasons, the orders of the district court should be reversed and the grant of preliminary injunctive relief should be vacated.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

*s/ Sean R. Janda*
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Sean R. Janda*
Sean R. Janda

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,269 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda

**ADDENDUM**

# TABLE OF CONTENTS

18 U.S.C. § 921(a)(3) ............................................................................................................A1

**18 U.S.C. § 921**

**§ 921. Definitions**

(a) As used in this chapter—

. . .

(3) The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.