**Nos. 22-11071, 22-11086**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

No. 22-11071

Jennifer VanDerStok; Michael G. Andren; Tactical Machining, L.L.C., a limited liability company; Firearms Policy Coalition, Incorporated, a nonprofit corporation,
*Plaintiffs-Appellees,*

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,
*Defendants-Appellants.*

consolidated with

---

No. 22-11086

Blackhawk Manufacturing Group, Incorporated, doing business as 80 Percent Arms,
*Intervenor Plaintiff-Appellee,*

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms and Explosives,
*Defendants-Appellants.*

---

On Appeal from United States District Court
for the Northern District of Texas, No. 4:22-CV-00691-O

---

## BRIEF FOR PLAINTIFF-APPELLEES

---

|  | */s/ Erin M. Erhardt* |
|---|---|
|  | Erin M. Erhardt |
| Cody J. Wisniewski | Kaitlyn D. Schiraldi |
| FIREARMS POLICY COALITION | MOUNTAIN STATES LEGAL FOUNDATION |

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Plaintiff-Appellees: | Counsel for All Appellees: |
|---|---|
| Jennifer VanDerStok<br><br>Michael G. Andren<br><br>Tactical Machining, L.L.C.<br><br>Firearms Policy Coalition, Inc. | Erin M. Erhardt and Kaitlyn D. Schiraldi, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood, CO<br><br>Cody J. Wisniewski, FIREARMS POLICY COALITION, Las Vegas, NV |

| Intervenor-Appellees: | Counsel for Intervenor-Appellees: |
|---|---|
| Blackhawk Manufacturing Group Inc., *d/b/a* 80 Percent Arms | Brian Daniel Poe, BRIAN D. POE ATTORNEY PLLC, Fort Worth, TX<br><br>Joseph Christopher Amrhein, Jr., Michael J. Sullivan, and Nathan P. Brennan, ASHCROFT LAW FIRM, LLC, Boston, MA |

| Additional Intervenors Below: | Counsel for Additional Intervenors: |
|---|---|
| Defense Distributed<br><br>Second Amendment Foundation Inc. | Charles Flores, Nicholas M. Bruno, and Zachary Nelson, BECK REDDEN LLP, Houston, TX |

| Defendant-Appellants: | Counsel for All Appellants: |
|---|---|
| Merrick Garland, U.S. Attorney General<br><br>U.S. Department of Justice<br><br>Steven Dettlebach, ATF Director<br><br>Bureau of Alcohol, Tobacco, Firearms, and Explosives | Abby Wright, Sean Janda, and Martin Tomlinson, U.S. DEPARTMENT OF JUSTICE, Washington, D.C. |

| Other Interested Parties (*Amici*) Not Including Governments: | Counsel for Interested Parties: |
|---|---|
| Brady<br>Everytown for Gun Safety Action Fund<br>March For Our Lives | Kathleen Hartnett, Daniel Grooms, Adam Katz, and Rachel Alpert, COOLEY, L.L.P. San Francisco, CA |
| District Attorneys for the Counties of Dallas and Travis, Texas Prosecutors Against Gun Violence | Lee Richards, Arthur Greenspan, David Massey, Rachel Mechanic, Jacob Taber, and Rebecca Salk, PERKINS COIE, L.L.P. Dallas, TX |

| Proposed Intervenors Below: | Counsel for Proposed Intervenors: |
|---|---|
| Not an LLC dba JSD Supply | J. Mark Brewer, BREWER & PRITCHARD, P.C., Houston, TX<br><br>Matthew Joseph Smid, DANIEL, MOORE, EVANS, BIGGS, DECKER AND SMID, Fort Worth, TX |
| Polymer80, Inc. | Dennis Daniels, James W. Porter, Marc A. Nardone, BRADLEY ARANT BOULT CUMMINGS LLP |

*/s/Erin M. Erhardt*
Attorney of Record for *Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

The Defendant-Appellant Agencies undertook a rulemaking and promulgated a Final Rule, *inter alia*, redefining "firearm" and "frame or receiver," which exceeds the Agencies' congressionally limited authority under their enabling statute, the Gun Control Act of 1968, and violates the United States Constitution and several provisions of the Administrative Procedure Act. In the absence of the challenged Preliminary Injunction, the Final Rule would irreparably harm Plaintiff Tactical Machining and the Individual Plaintiffs. Further, the Final Rule significantly impacts Plaintiff Firearms Policy Coalition and its thousands of members. Given the gravity and complexity of this issue, and the harm that could befall Plaintiffs, Plaintiffs respectfully request that the Court hold oral argument in this appeal.

# TABLE OF CONTENTS

| <u>Contents</u> | | | | <u>Page</u> |
|---|---|---|---|---|
| CERTIFICATE OF INTERESTED PERSONS | | | | i |
| STATEMENT REGARDING ORAL ARGUMENT | | | | iii |
| TABLE OF CONTENTS | | | | iv |
| TABLE OF AUTHORITIES | | | | vii |
| INTRODUCTION | | | | 1 |
| JURISDICTIONAL STATEMENT | | | | 2 |
| STATEMENT OF THE ISSUES | | | | 2 |
| STATEMENT OF THE CASE | | | | 3 |
| I. | Legal Background | | | 3 |
| | A. | The Administrative Procedure Act | | 3 |
| | B. | Historic Firearm Regulations | | 3 |
| | | 1. | The Agencies' application of the term "frame or receiver" | 5 |
| | | 2. | The Agencies' regulatory re-definitions in the Final Rule | 7 |
| II. | Procedural Background | | | 9 |
| SUMMARY OF ARGUMENT | | | | 12 |
| STANDARD OF REVIEW | | | | 14 |
| ARGUMENT | | | | 15 |
| I. | PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS | | | 15 |

A.  The Agencies Lack Authority to Define "Frame or Receiver" Inconsistent with the GCA ................................ 16

  1.  The text of the GCA precludes the Agencies' new "frame or receiver" definition .......................... 18

      a.  It matters when Congress uses language one place in a statute and not elsewhere ........ 18

      b.  § 921(a)(3)(B) does not incorporate § 921(a)(3)(A) by reference ........................... 22

      c.  "Frame" and "receiver" had distinct public meanings in 1968 ............................... 24

  2.  History of the GCA ................................................. 27

B.  "Firearm" in the GCA Does Not Include a "Weapons Parts Kit" ...................................................................... 29

  1.  Congress knew how to regulate "parts" but chose not to do so in the context of "firearms" ....... 29

  2.  The GCA's legislative history reflects an intentional decision by Congress not to generally regulate firearm parts .............................. 33

  3.  The Agencies have previously recognized their inability to regulate firearm parts kits ..................... 34

  4.  Adding parts kits does not clarify existing law ........ 35

C.  *Chevron* Deference is Inapplicable Here ........................... 38

II.  THE DISTRICT COURT CORRECTLY ISSUED A PRELIMINARY INJUNCTION ................................................. 40

A.  The District Court Did Not Commit Clear Error by Finding Irreparable Harm .................................................. 41

  1.  The District Court found the Final Rule would inflict multiple kinds of harm on Plaintiffs .............. 42

  2.  Financial ruin constitutes irreparable harm ............. 44

3.     Tactical Machining's nonrecoverable compliance costs are irreparable ............................. 45

4.     Individual Plaintiffs' chilled conduct and risk of prosecution constitute irreparable harm .............. 49

B.     The District Court Did Not Abuse Its Discretion and Properly Considered the Public Interest by Issuing a Tailored Injunction ................................................. 52

CONCLUSION ........................................................................ 55

CERTIFICATE OF SERVICE ................................................. 57

CERTIFICATE OF COMPLIANCE ........................................ 58

# TABLE OF AUTHORITIES

CASES | PAGE(S)

*A.O. Smith Corp. v. FTC,*
530 F.2d 515 (3d Cir. 1976)................................................................... 48

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
141 S. Ct. 2485 (2021) ........................................................... 47

*Alabama v. North Carolina,*
560 U.S. 330 (2010) ................................................................ 24

*Allison Engine Co., Inc. v. U.S. ex rel. Sanders,*
553 U.S. 662 (2008) ......................................................... 20, 21

*Am. Hosp. Ass'n v. Harris,*
625 F.2d 1328 (7th Cir. 1980)................................................ 48

*Atwood Turnkey Drilling, Inc. v. Petroleo Barsileiro, S.A.,*
875 F.2d 1174 (5th Cir. 1989)................................................ 44

*Barnhart v. Sigmon Coal Co.,*
534 U.S. 438 (2002) ......................................................... 19, 20

*Blue Bell Bio-Med. v. Cin-Bad, Inc.,*
864 F.2d 1253 (5th Cir. 1989)................................................ 15

*Brackeen v. Haaland,*
994 F.3d 249 (5th Cir. 2021)................................................. 28

*Burns v. Alcala,*
420 U.S. 575 (1975) ............................................................... 24

*Cargill v. Garland,*
57 F.4th 447 (5th Cir. 2023) (*en banc*) ................................ *passim*

*Chamber of Com. of the U.S. v. Dep't of Labor,*
885 F.3d 360 (5th Cir. 2018)................................................. 24

*Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.,*
933 F.2d 1285 (5th Cir. 1991)............................................... 22

*City of Burbank v. Gen. Elec. Co.*,
    329 F.2d 825 (9th Cir. 1964)................................................................. 20

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021) ......................................................................... 19, 32

*Colt's Patent Firearms Mfg. Co. v. N.Y. Sporting Goods Co.*,
    190 F. 563 (2d Cir. 1911)..................................................................... 26

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) ............................................................................. 18

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*,
    710 F.3d 579 (5th Cir. 2013)................................................................ 14, 40

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
    661 F.2d 328 (5th Cir. 1981)................................................................ 50

*Envtl. Def. Fund v. Marsh*,
    651 F.2d 983 (5th Cir. 1981)................................................................ 54

*Freedom Holdings, Inc. v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005).................................................................. 48

*Garland v. Remington Arms Co.*,
    137 F. Supp. 622 (S.D.N.Y. 1956)........................................................ 26

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) .............................................................. 54

*Griffin v. Oceanic Contractors, Inc.*,
    458 U.S. 564 (1982) ............................................................................. 28

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
    968 F.3d 454 (5th Cir. 2020)................................................................ 39

*Humana Inc. v. Forsyth*,
    525 U.S. 299 (1999) ............................................................................. 33

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010).............................................................. 54

*In re Nikoloutsos*,
  199 F.3d 233 (5th Cir. 2000).................................................................. 41

*In re Tusa-Expo Holdings, Inc.*,
  811 F.3d 786 (5th Cir. 2016).................................................................. 40

*Iowa Util. Bd. v. FCC*,
  109 F.3d 418 (8th Cir. 1996).................................................................. 48

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011).................................................................. 44

*Ladd v. Livingston*,
  777 F.3d 286 (5th Cir. 2015).................................................................. 14

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) .................................................................. 54

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ............................................... 14, 43, 47

*Loving v. United States*,
  517 U.S. 748 (1996).................................................................. 29

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994).................................................................. 53

*Moore v. Brown*,
  868 F.3d 398 (5th Cir. 2017).................................................................. 14

*Pedersen v. United States*,
  109 Ct. Cl. 226 (1947).................................................................. 26

*Perrin v. United States*,
  444 U.S. 37 (1979) .................................................................. 24

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
  415 U.S. 1 (1974).................................................................. 48

*Richey v. Smith*,
  515 F.2d 1239 (5th Cir. 1975).................................................................. 50

*State v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ............................................................. 41, 54

*Susan B. Anthony List v. Dreihaus,*
    573 U.S. 149 (2014) ............................................................................ 50

*Tex. Pipeline Ass'n v. FERC,*
    661 F.3d 258 (5th Cir. 2011) .............................................................. 23

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) .............................................. 44, 46, 47

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) .............................................................. 14

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ............................................................................ 46

*Toler v. United States,*
    198 A.3d 767 (D.C. App. 2018) ......................................................... 51

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001) .............................................................................. 37

*United States v. Annis,*
    446 F.3d 852 (8th Cir. 2006) ....................................................... 36, 37

*United States v. Bittner,*
    19 F.4th 734 (5th Cir. 2021) .............................................................. 18

*United States v. Castleman,*
    134 S. Ct. 1405 (2014) ....................................................................... 24

*United States v. Garcia,*
    707 F. App'x 231 (5th Cir. 2017) ...................................................... 40

*United States v. Kaluza,*
    780 F.3d 647 (5th Cir. 2015) .............................................................. 25

*United States v. Mix,*
    791 F.3d 603 (5th Cir. 2015) .............................................................. 46

*United States v. Ron Pair Enters., Inc.*,
  489 U.S. 235 (1989) ............................................................... 18

*United States v. Ryles*,
  988 F.2d 13 (5th Cir. 1993) .................................................. 36, 37

*United States v. Scroggins*,
  599 F.3d 433 (5th Cir. 2010) ................................................ 17, 22

*United States v. Stewart*,
  451 F.3d 1071 (9th Cir. 2006) .................................................. 36

*United States v. Thomas*,
  No. 17-194, 2019 WL 4095569 (D.D.C. Aug. 29, 2019) .................... 23

*United States v. Wick*,
  697 F. App'x 507 (9th Cir. 2017) ............................................. 36

*United States v. Wong Kim Bo*,
  472 F.2d 720 (5th Cir. 1972) .................................................. 20

*Util. Air Reg. Grp. v. EPA*,
  573 U.S. 302 (2014) ............................................................... 29

*Wages and White Lion Invs., LLC v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ............................................... 46

*Washington v. Reno*,
  35 F.3d 1093 (6th Cir. 1994) .................................................. 54

*Women's Med. Ctr. of Nw. Hous. v. Bell*,
  248 F.3d 411 (5th Cir. 2001) ............................................... 14, 15

## CONSTITUTIONAL PROVISIONS

U.S. CONST. ART. I, §1 ............................................................... 28

## STATUTES

5 U.S.C. § 551 ........................................................................ 3

5 U.S.C. § 706(2)(A)–(F) ......................................................... 3

18 U.S.C. § 921 ................................................................... 4, 51

18 U.S.C. § 921(a) ............................................................. 33

18 U.S.C. § 921(a)(3).......................................................... *passim*

18 U.S.C. § 921(a)(3)(A) .................................................... *passim*

18 U.S.C. § 921(a)(3)(B) .................................................... *passim*

18 U.S.C. § 921(a)(4)(A) .................................................... 30

18 U.S.C. § 921(a)(4)(B) .................................................... 30, 31

18 U.S.C. § 921(a)(4)(C) .................................................... 20, 30

18 U.S.C. § 921(a)(24)........................................................ 32

18 U.S.C. § 921(a)(25)........................................................ 30, 32

18 U.S.C. § 922................................................................... 39, 40, 51

18 U.S.C. § 922(a)(3)........................................................... 51

18 U.S.C. § 922(g) .............................................................. 53

18 U.S.C. § 922(g)(5)(A)..................................................... 40

18 U.S.C. § 924................................................................... 5, 39, 51

18 U.S.C. § 926(a) .............................................................. 4

26 U.S.C. § 5845(b) ............................................................ *passim*

28 U.S.C. §1292(a)(1).......................................................... 2

28 U.S.C. § 1331 ................................................................ 2

Federal Firearms Act of 1938, Pub. L. No. 75-785, 52 Stat.
   1250 (1938) (repealed 1968)............................................ 4

National Firearms Act of 1934, Pub. L. 73-474,
   48 Stat. 1236 (1934)........................................................ 3

National Firearms Act Amendments of 1968, Pub. L. 90-618,
   82 Stat. 1231 (1968)........................................................ 31

**RULES**

*U.S.S.G.* § 1B1.1 ................................................................ 37

*U.S.S.G.* § 2D1.1 ................................................................ 37

**REGULATIONS**

27 C.F.R. § 478.11 ........................................................... 10, 29

27 C.F.R. § 478.12 ........................................................... 10

27 C.F.R. § 478.12(c) ....................................................... 29

28 C.F.R. § 0.130 ............................................................. 5

*Commerce in Firearms and Ammunition*,
33 Fed. Reg. 18,555 (Dec. 14, 1968) (codified at 26 C.F.R. pt.
178) ............................................................................ 5

*Definition of "Frame or Receiver" and Identification of Firearms*,
86 Fed. Reg. 27,720 (May 21, 2021) (codified at 27 C.F.R. pts.
447, 478, 479) ............................................................... 7

*Definition of "Frame or Receiver" and Identification of
Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27
C.F.R. pts. 447, 478, 479) ............................................... *passim*

*Machine Guns, Destructive Devices, and Certain Other
Firearms*, 36 Fed. Reg. 14,255 (Aug. 3, 1971) (codified at 26
C.F.R. pt. 179) .............................................................. 5

**OTHER AUTHORITIES**

114 Cong. Rec. 10,859 (Apr. 29, 1968) ............................... 27

114 Cong. Rec. 10,862 (Apr. 29, 1968) ............................... 20

Antonin Scalia & Bryan A. Garner, READING LAW: THE
INTERPRETATION OF LEGAL TEXTS (2012) ........................... 19, 23

*ATF, Regulatory Impact Analysis and Final Regulatory
Flexibility Analysis* (Apr. 2022) ..................................... 10

*Biden announces new rules for "ghost guns," introduces ATF director nominee*, CBS News (Apr. 11, 2022) ..................................... 7

*Biden considers executive actions on guns, calls on Congress to pass weapons ban*, Reuters (Mar. 23, 2021) ..................................... 7

H.R. Rep. 1577 (1968) ........................................................... 34

John Olson, Olson's Encyclopedia of Small Arms (1985) ............ 25

S. Rep. No. 90-1097 (1968) ..................................................... 4, 34

*The Biden Plan to End Our Gun Violence Epidemic*, Biden-Harris Democrats ..................................................... 6

*Untraceable Firearms Act of 2018*, ....................................... 6
  H.R. 6643, 115th Cong. (2018)

*Untraceable Firearms Act of 2018*, 
  S. 3300, 115th Cong. (2018) ................................................. 6

*Untraceable Firearms Act of 2021*, 
  H.R. 3088, 117th Cong. (2021) ............................................. 7

*Untraceable Firearms Act of 2021*, 
  S. 1558, 117th Cong. (2021) ................................................ 7

Webster's Third International Dictionary (1971) ....................... 25

## INTRODUCTION

Defendant-Appellees the Department of Justice ("DOJ") and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") (collectively, "Agencies") promulgated a Final Rule seeking to expand their regulatory reach and to regulate items they had previously treated as non-firearms as if the items were now "firearms" under the Gun Control Act of 1968 ("GCA"). The rulemaking, however, was flawed in a number of ways. Most pertinent here, the Agencies purport to enlarge their jurisdiction by rewriting the definition of "firearm" via federal regulation—more specifically, by appropriating terms that Congress used in other statutory sections of the GCA and grafting them into the definition of "frame or receiver" where Congress intentionally omitted them. This usurpation of congressional constraints violates basic tenets of statutory interpretation, leading to the inexorable conclusion that the Agencies exceeded the authority granted them and violated the Administrative Procedure Act ("APA") as well as constitutional provisions meant to keep each branch of government constrained.

In addition to being unlawful, the rule at issue, the *Definition of "Frame or Receiver" and Identification of Firearms* ("Final Rule"), 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, 479), if enforced, would cause irreparable harm to Plaintiff-Appellees. Plaintiff-Appellee Tactical Machining, LLC ("Tactical Machining"), would be driven out of business or forced to incur

nonrecoverable costs necessary to fundamentally alter its business operations. The Final Rule would also cause irreparable harm to the Individual Plaintiffs, forcing them to curtail their conduct or face the risk of criminal penalties. The District Court therefore entered a narrow injunction, preliminarily enjoining portions of the Final Rule as to Tactical Machining, Tactical Machining's customers, and Individual Plaintiffs. The District Court's conclusions of law and findings of fact were correct, it did not abuse its discretion, and its entry of the Preliminary Injunction below was proper.

## JURISDICTIONAL STATEMENT

Plaintiff-Appellees ("Plaintiffs") filed suit asserting that the Final Rule violates the APA and the U.S. Constitution. The District Court had jurisdiction under 28 U.S.C. § 1331; this Court has jurisdiction under 28 U.S.C. §1292(a)(1).

## STATEMENT OF THE ISSUES

Plaintiffs challenge the Agencies' attempt to regulate various materials that do not meet the GCA's definition of "firearm" as if they did. The District Court correctly determined that Plaintiffs satisfied each preliminary injunction factor and thus issued a Preliminary Injunction narrowly enjoining the enforcement of two discreet portions of the Final Rule as to limited Plaintiffs and explicitly excluding protection for persons otherwise prohibited from possessing firearms under federal

law. The question presented is whether the District Court abused its discretion in so doing.

## STATEMENT OF THE CASE

### I.    Legal Background

#### A.    The Administrative Procedure Act

The APA sets congressionally established requirements Executive Branch agencies must follow to promulgate federal regulations. *See* 5 U.S.C. § 551, *et seq.* The APA also empowers courts to review agency actions for procedural and substantive lawfulness and to "hold unlawful and set aside agency action . . . found to be" arbitrary, capricious, not in accordance with law, contrary to constitutional right, power, or privilege, in excess of statutory authority, or promulgated without observance of required procedures. 5 U.S.C. § 706(2)(A)–(F).

#### B.    Historic Firearm Regulations

In 1934, Congress enacted the National Firearms Act ("NFA") to place a cost-prohibitive tax on short-barreled shotguns and rifles, certain concealable non-handgun firearms, machineguns, and silencers. National Firearms Act of 1934, Pub. L. 73-474, 48 Stat. 1236, 1236 (1934). In 1938, Congress passed the Federal Firearms Act ("FFA") defining a "firearm" as "any weapon . . . designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm

silencer, *or any part or parts of such weapon*." Federal Firearms Act of 1938, Pub. L. No. 75-785, 52 Stat. 1250, 1250 (1938) (repealed 1968) (emphasis added).

Thirty years later, Congress enacted the GCA, superseding the FFA, amending the NFA, and establishing a new definition of "firearm." *See* 18 U.S.C. § 921, *et seq.* As defined in the GCA:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3). It is important to note here that the terms "designed to" and "may readily be converted to" only appear in subsection A, not prior to the breakdown of subsections and not anywhere else in the definition.

Congress, via the GCA, intentionally repudiated the FFA's definition of "firearm" under which "any part or parts of such a weapon [were] included[,]" specifically because it was "impractical to have controls over each small part of a firearm. Thus, the revised definition substitute[d] only the major parts of the firearm; that is, frame or receiver for the words 'any part or parts.'" S. Rep. No. 90-1097, at 2200 (1968).

The ATF has the authority to enforce the GCA, which carries criminal penalties. *See* 18 U.S.C. § 926(a) (delegation to enforce GCA to Attorney General);

28 C.F.R. § 0.130 (sub-delegation to ATF); 18 U.S.C. § 924 (penalties for GCA violations).

### 1.    The Agencies' application of the term "frame or receiver."

"Frame or receiver" in 18 U.S.C. § 921(a)(3)(B) is not independently defined by the statute. Contemporaneous agency regulations defined a "frame or receiver" as: "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, *and* firing mechanism, and which is usually threaded at its forward portion to receive the barrel." *Commerce in Firearms and Ammunition*, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968) (codified at 26 C.F.R. pt. 178) (emphasis added); *Machine Guns, Destructive Devices, and Certain Other Firearms*, 36 Fed. Reg. 14,255, 14,257 (Aug. 3, 1971) (codified at 26 C.F.R. pt. 179). Even prior to those rules, however, some weapons' central component housed fewer than all three elements. To remedy their own regulatory deficiency, the Agencies simply chose to regulate the weapon part that most resembled a "frame or receiver." Final Rule at 24,655 (Agencies determined which portion "more nearly" fit the regulatory definition).

During this time, the Agencies recognized that they could not regulate items that "may readily be converted" into a "frame or receiver,"[1] Congress considered

---

[1] *See* Fed. Defs.' Mot. for Summ. J., *Syracuse v. ATF*, No. 1:20-cv-06885, ECF No. 98, at 14 (S.D.N.Y. Jan. 29, 2021) ("*Syracuse* Mot. Summ. J.") ("[A]n unfinished

and rejected legislation[2] regulating these non-firearm objects ("NFOs"),[3] and special interest groups sued to force regulation of NFOs, which the Agencies initially resisted.[4]

Meanwhile, then-presidential candidate Biden campaigned against so-called "ghost guns"—a pejorative for privately manufactured firearms that have been legal since before the United States' founding. He proposed "passing legislation requiring that purchasers of gun kits . . . pass a federal background check."[5] Once elected,

---

frame or receiver does not meet the <u>statutory</u> definition of 'firearm' simply because it is 'designed to' or 'can readily be converted into' a frame or receiver. Instead, a device is a firearm either: (1) because it *is* a frame or receiver or; (2) it is a device that is designed to or can readily be converted into a device that 'expel[s] a projectile by the action of an explosive.'") (underlined emphasis added).

[2] *See Ghost Guns Are Guns Act*, H.R. 1278, 115th Cong. (2017); *Untraceable Firearms Act of 2018*, H.R. 6643, 115th Cong. (2018); *Untraceable Firearms Act of 2018*, S. 3300, 115th Cong. (2018).

[3] The items generally discussed herein are colloquially referred to as "receiver blanks," "partially-manufactured frames," "partially-manufactured receivers," "80% frames," "80% receivers," "unfinished frames," or "unfinished receivers." These marketing terms bear no legal significance. Plaintiffs refer to them as non-firearm objects ("NFOs").

[4] "A receiver blank may not 'readily be converted to expel a projectile by the action of an explosive,' is not 'designed to . . . expel a projectile' in and of itself, and is not itself a 'receiver.' It is therefore not a 'firearm' within the meaning of the statute." Fed. Defs.' Mot. to Dismiss, *California v. ATF*, No. 3:20-cv-06761-EMC, ECF No. 29, at 24 (N.D. Cal. Nov. 30, 2020).

[5] *The Biden Plan to End Our Gun Violence Epidemic*, Biden-Harris Democrats, https://joebiden.com/gunsafety/ (last visited Feb. 9, 2023).

President Biden "urged Congress to swiftly pass gun control laws[,]"[6] which Congress considered but chose not to enact.[7]

### 2.    The Agencies' regulatory re-definitions in the Final Rule.

On May 21, 2021, the Agencies published a proposed rule to revise GCA implementing regulations. *See Definition of "Frame or Receiver" and Identification of Firearms* ("Proposed Rule"), 86 Fed. Reg. 27,720 (May 21, 2021) (to be codified at 27 C.F.R. pts. 447, 478, 479). The Proposed Rule reflected the Agencies' plan to, *inter alia*, expand the definition of "firearm" and to define "frame or receiver" to include NFOs, along with so-called "frame or receiver parts kits" and "weapons parts kits." *See* Proposed Rule at 27,746.

The Agencies published the Final Rule fifteen days after President Biden "instructed the Attorney General to write a regulation that would rein in the proliferation of 'ghost guns' because [he] was having trouble getting it passed in the Congress[.]"[8] The Final Rule was formally published in April 2022 and took effect on August 24, 2022. The Final Rule grafts the terms "designed to" and "may be

---

[6] *Biden considers executive actions on guns, calls on Congress to pass weapons ban*, REUTERS (Mar. 23, 2021), https://www.reuters.com/article/usa-guns-idINKBN2BG0A5.

[7] *See, e.g.*, *Untraceable Firearms Act of 2021*, H.R. 3088, 117th Cong. (2021); *Untraceable Firearms Act of 2021*, S. 1558, 117th Cong. (2021).

[8] *Biden announces new rules for "ghost guns," introduces ATF director nominee*, CBS NEWS, at 2:51 (Apr. 11, 2022), https://www.cbsnews.com/video/biden-ghost-guns-atf-director-nominee/#x.

readily converted to" from a single statutory subsection of the definition of a "firearm" into the Agencies' regulatory definition of "frame or receiver." Final Rule at 24,739. Specifically, the Final Rule redefines "frame or receiver" to include "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, *that is designed to or may readily be completed, assembled, restored, or otherwise converted* to function as a frame or receiver[.]" *Id*. (emphasis added). Moreover, the Agencies give themselves the authority to consider available jigs, molds, tools, instructions, and more, to "determine" if an item is a "frame or receiver." *Id.* The Final Rule then "[e]xpressly excludes from the definition of 'frame or receiver' unformed blocks of metal, liquid polymers, and other raw materials," out of necessity because of its broad reach. *Id.* at 24,700.

The Final Rule also adds "weapon parts kits" to the regulatory definition of firearm, stating that "section 921(a)(3)(A) should be read to include weapon parts kits and aggregations of weapon parts that . . . may or may not be designed to expel a projectile by the action of an explosive in their present form or configuration, *but may readily be converted to do so*." Final Rule at 24,684 (emphasis added). Thus, the Final Rule's regulatory "firearm" definition includes "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.* at 24,735.

## II.    Procedural Background

Plaintiffs filed their Petition for Review on August 11, 2022, and then sought a preliminary injunction against enforcement of the Final Rule. ROA.41–93; ROA.159–206. Plaintiffs argue that the definitions of "frame or receiver" and "weapon parts kit" exceed the Agencies' authority and that the Final Rule violates Separation of Powers principles, fails to follow required notice and comment procedures, and is arbitrary and capricious. ROA.41–93. Plaintiffs provided declarations stating, among other things, that over 90% of Tactical Machining's business consists of selling NFOs and related items, and without that income Tactical Machining would be out of business in months. ROA.207–11. To avoid prosecution, Tactical Machining stopped sales of NFOs and in approximately six days lost over $45,000 in sales. ROA.745–46 ¶¶ 4–5. After further Agency statements, Tactical Machining resumed sales, but orders were still down 50–75%. ROA.746–47 ¶¶ 6, 12.

On September 2, 2022, the District Court granted Plaintiffs' motion in part. ROA.750–72. The court held that Plaintiffs demonstrated a likelihood of success on the merits of their claims that inclusions of "partially complete, disassembled, or nonfunctional frame[s] or receiver[s]" and of "weapon parts kits" conflicted with the GCA and exceeded the Agencies' authority. ROA.755–65. The District Court found that Congress regulated "readily converted" items, but not as to a "frame or

receiver;" and regulated some collections of weapon parts, but not for firearms. ROA.761–63. Having found Plaintiffs' likely to succeed on the merits for these claims, the court declined to address Plaintiffs' remaining claims. ROA.764.

The District Court then accepted Tactical Machining's testimony about its lost sales and the threat to its business, noting that the Agencies anticipated that the Final Rule may cause small entities "the dissolution of the entire business." ROA.765–66 (citing *ATF, Regulatory Impact Analysis and Final Regulatory Flexibility Analysis* 124 (Apr. 2022)[9]). Further, the court found Tactical Machining's harm irreparable because it was "so great as to threaten the existence of the movant's business[,]" and because any compliance costs are nonrecoverable. ROA.765–68 (internal quotation and citation omitted). The District Court found, at that time, that the remaining Plaintiffs had not yet proven irreparable harm. ROA.769.

Finally, the court found that, "[o]n balance," the equities and public interest favor Plaintiffs, particularly since the court "tailored the scope of the preliminary injunction with careful attention[.]" ROA.770–71. The District Court enjoined the Agencies "from implementing . . . against Tactical Machining, LLC the provisions in 27 C.F.R. §§ 478.11 and 478.12 that" the court held unlawful. ROA.772.

---

[9] https://www.atf.gov/firearms/docs/rulemaking/ria-final-rule-2021r-05f-definition-frame-or-receiver-and-identification/download

Plaintiffs filed a motion to expand the Preliminary Injunction, providing supplemental declarations explaining the criminal risks individuals faced because of the Final Rule. ROA.933–56 (request to expand Preliminary Injunction); ROA.910–30 (declarations). As a result, even after entry of the Preliminary Injunction, Tactical Machining's sales were critically low and would not sustain its business. ROA.914–15 ¶¶ 4–8, 10. The District Court again granted Plaintiffs' motion in part and expanded the Preliminary Injunction to include Tactical Machining's customers and Individual Plaintiffs. ROA.1201–02. The court held that the risks of criminal consequences stemming from the Final Rule and the alleged choice to comply "or else" establish irreparable harm. ROA.1188–92. The District Court further found that to provide adequate relief to Tactical Machining, the Preliminary Injunction had to include its customers. ROA.1197–99. Days later the court *sua sponte* excluded "individuals prohibited from possessing firearms" from being covered by the Preliminary Injunction. ROA.1206–10. The court found that this limitation further balanced the hardships of the parties, served the public interest, and addressed concerns about "high-risk individuals." ROA.1209 (internal quotation and citation omitted).

The Agencies appealed these orders and a similar preliminary injunction granted to Intervenor Blackhawk Manufacturing Group, Inc. ROA.1496–1501.

Meanwhile, Plaintiffs moved for summary judgment on the entirety of their claims and seek full vacatur of the Final Rule; briefing on Plaintiffs' motion is scheduled to be complete on March 6, 2023. ECF No. 131–133, 141, 145.

## SUMMARY OF THE ARGUMENT

Executive agencies cannot expand legislation through creative interpretation, yet that is exactly what the Agencies have done here. Federal firearms statutes, in particular the GCA, meticulously set forth what Congress sought to regulate, expanding the statutory regulation in some places to cover items or parts that can be readily converted, restored, or assembled to become a weapon, but foregoing such expansions elsewhere. The Agencies unlawfully seek to bypass Congress's limitations by stealing expansive concepts from various places in the GCA and inserting them where Congress intentionally chose not to.

The GCA regulates a firearm "frame or receiver" as a firearm. The Agencies want to regulate more, so the Final Rule also treats "partially complete, disassembled, or nonfunctional" items, including parts kits, as frames and receivers. But well-accepted methods of statutory interpretation provide that where Congress expressly chose to reference something in one place but not elsewhere, Congress's choice was intentional and cannot be disregarded. Moreover, the terms "frame and receiver" had understood meanings when the GCA passed, and the Agencies' expansion is inconsistent with that meaning and the history of the GCA.

Similarly, the Agencies added "weapon parts kit" to the regulatory definition of firearm. Again, however, Congress explicitly regulated parts where it chose to, but not for firearms. Indeed, the legislative history of the GCA reflects Congress's considered choice not to regulate all firearm parts.

Despite the Agencies' broad rhetoric, this appeal is limited to the Preliminary Injunction that prohibits the Agencies from enforcing two regulatory subsections amended by the Final Rule against two individuals and Tactical Machining and its customers. The District Court did not commit clear error or abuse its discretion by issuing that preliminary relief. The Final Rule, if enforced against Tactical Machining and its customers, will either drive it out of business or force it to incur significant nonrecoverable costs; both are irreparable. The Final Rule, if enforced against Individual Plaintiffs, also causes irreparable harm by putting them to the Hobson's choice of indulging the Agencies' unlawful authority and curtailing acquisition of NFOs or facing criminal prosecution. To prevent the irreparable harm, the District Court entered a narrowly tailored Preliminary Injunction, covering a subset of the Plaintiffs from a subset of the Rule, and only for a short while. The court also prevented persons federally prohibited from possessing firearms from benefiting from its injunction. This careful crafting of the Preliminary Injunction was not an abuse of discretion.

## STANDARD OF REVIEW

This Court reviews a grant of preliminary injunction for abuse of discretion, reviews associated findings of fact under the clearly erroneous standard, and reviews conclusions of law *de novo*. *See Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022). Under the clearly erroneous standard, any findings of fact that are "'plausible in light of the record as a whole'" will be upheld. *Id.* (quoting *Moore v. Brown*, 868 F.3d 398, 403 (5th Cir. 2017)). Moreover, the District Court's decision may be affirmed on any grounds supported in the record. *Id.* (citing *Texas v. United States*, 809 F.3d 134, 178 (5th Cir. 2015)).

A preliminary injunction is proper where the movant demonstrated likelihood of success on the merits, a substantial risk of irreparable harm, being favored by the balance of the equities, and that the injunction would not disserve the public interest. *Id.* (citing *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015)). "To show a likelihood of success, the plaintiff . . . need not prove that he is entitled to summary judgment." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013).

Appellant-Defendants cite *Women's Medical Center of Northwest Houston v. Bell*, 248 F.3d 411, 418–19 (5th Cir. 2001), asserting that a preliminary injunction "'grounded in erroneous legal principles is reviewed *de novo*[,]'" and that they believe the lower court improperly collapsed the preliminary injunction factors.

14

Feds' Br. at 24[10] (quoting *Bell*, 248 F.3d at 419). However, the underlying cases make clear that this applies only when a court has "completely disregarded the proper legal analysis[,]" *Blue Bell Bio-Med. v. Cin-Bad, Inc.*, 864 F.2d 1253, 1259 (5th Cir. 1989), or applied the wrong legal standards. *See Falcon Rice Mill, Inc. v. Cmty. Rice Mill, Inc.*, 725 F.2d 336, 344 (5th Cir. 1984) (rejecting assertion that court applied trademark standards to trade dress claim).

## ARGUMENT

## I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

The Agencies' efforts amount to nothing more than an attempt to expand the GCA. In the Final Rule, the Agencies expand the definition of "frame or receiver" to include items that are "designed to or may be readily completed, assembled, restored, or otherwise converted" to become frames or receivers. This takes terms from at least four other places surrounding the statutory subsection at issue and incorporates them where Congress did not.

Likewise, the Agencies expand "firearm" by stating that the definition "shall [now] include a weapon parts kit[.]" Final Rule at 24,735. Again, Congress explicitly provided for the regulation of "parts" elsewhere in the GCA, but not here. Longstanding precedent from the Supreme Court and this Circuit demands that when

---

[10] Page references are to the electronically stamped pages, not internal pagination.

Congress uses a term in one place but not elsewhere, that choice be treated as intentional and controlling. For this reason, and because the history of the GCA demonstrates that the Agencies' actions are inconsistent with the statute, the Agencies exceeded their authority. Plaintiffs are likely to prevail on their claims, just as the District Court determined.

### A.    The Agencies Lack Authority to Define "Frame or Receiver" Inconsistent with the GCA

The Final Rule's regulatory redefinition of "frame or receiver" expands the Agencies' authority beyond the limits of the GCA, as found in its text and buttressed by its history and purpose. The Final Rule is therefore unlawful.

While, as explained below, Plaintiffs prevail on the merits, the Agencies have waived any argument to the contrary by failing to cite legal authority in support of their position. The Agencies' argument for their expansion of "frame or receiver" spans pages 25–31 of their brief, yet the only *legal* citations made on those pages are to the statute and Final Rule that are the subject of this action, Feds' Br. at 25–30, a statutory provision related to machineguns, Feds' Br. at 26, and an extra-record letter issued by the Agencies, Feds' Br. at 30.

The Agencies *do not cite a single case* in support of their argument that they are free to appropriate terms Congress used in one place and insert them elsewhere in the statute. The Agencies fail to address the cases cited by both the District Court and Plaintiffs demonstrating why the Agencies are wrong under fundamental

16

precepts of statutory interpretation. The Agencies have therefore waived their argument. *See United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010) (argument is waived if party fails to identify relevant legal standards and Fifth Circuit precedent).

Should this Court nonetheless reach the merits, this Circuit recently addressed how to evaluate this precise type of legal question. In *Cargill v. Garland*, this Circuit, sitting *en banc*, reviewed an APA challenge to the Agencies' rule that amended federal regulation to treat bump stocks as machineguns. 57 F.4th 447, 450 (5th Cir. 2023). The Court concluded that "a bump stock does not fall within the definition of 'machinegun' as set forth in federal law" and, accordingly, "ATF lacked the authority to issue a regulation purporting to define the term as such." *Id*. In so finding, the Court looked to the plain text of the statutory definition. *See id.* at 458 ("Our primary task is to interpret the meaning of machinegun as defined in 26 U.S.C. § 5845(b).").

Here, the Agencies' regulatory redefinition of "frame or receiver" likewise goes beyond their authority. Under the plain meaning of the GCA, the Agencies cannot incorporate the "readily converted" language from subsection (A) of the definition of "firearm" into subsection (B), nor can the Agencies regulate items that *may become* "frames or receivers." *See* ROA.755–60.

### 1.   The text of the GCA precludes the Agencies' new "frame or receiver" definition.

The Final Rule's redefinition of "frame or receiver" exceeds the plain meaning of the GCA, as evidenced by the text and structure of the GCA and the understood public meaning of those terms when the GCA was enacted. As to the first, Congress intentionally included something "readily converted to" or "designed to" expel a projectile under subsection (A) yet left both concepts out of subsection (B) regarding a "frame or receiver." *See* 18 U.S.C. § 921(a)(3)(A)–(B). As to the second, the terms "frame" and "receiver" have had recognized public meanings since at least the early 1900s. The public definitions confirm that "frame" and "receiver" did not encompass those items the Agencies now seek to regulate.

### a.   It matters when Congress uses language one place in a statute and not elsewhere.

The text is the most direct path to the plain meaning of the GCA, and the text is where statutory interpretation begins. *See United States v. Bittner*, 19 F.4th 734, 743 (5th Cir. 2021) ("When interpreting a statute, we begin with the text."); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). When "the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (internal quotation and citation omitted); ROA.756.

18

This Court reinforced this method of statutory interpretation in *Cargill*, beginning its inquiry by evaluating the plain meaning of the statute at the time it was passed. 57 F.4th at 459 ("The first phrase we consider is 'by a single function of the trigger.' At the time the statute was passed, 'function' meant 'action.'") (citations omitted). The Court was careful to avoid grafting "words that do not exist in the statute" into its analysis, *id.* at 459–60, and instead relied on dictionaries and rules of grammar, *id.* at 459–61. The Court then looked to "context for further clues[,]" noting that "context tells [the Court] that Congress knew how to write a definition" because it did so elsewhere, "but chose not to do so here." *Id*. at 461. "With statutes, '[c]ontext is a primary determinant of meaning.'" *Id.* (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012)).

Here too, Congress used phrases and concepts in one part of the statute, but not where the Agencies insert them. "'[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)). Statutory "words are to be given their natural, plain, ordinary and commonly understood meaning[,] . . . and where Congress has carefully employed a term in one place and excluded it in

another, *it should not be implied where excluded*." *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) (citing *City of Burbank v. Gen. Elec. Co.*, 329 F.2d 825, 832 (9th Cir. 1964)) (emphasis added); *see Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008) (quoting *Sigmon Coal Co.*, 534 U.S. at 452).

Despite Congress's clear omission, the Final Rule inserts "may readily be converted" from § 921(a)(3)(A) into § 921(a)(3)(B), ignoring the structure and altering the meaning of the text. In the GCA, Congress included "or may readily be converted" in 18 U.S.C. § 921(a)(3)(A)'s regulation of a weapon, included "may be readily assembled" in the definition of a destructive device, 18 U.S.C. § 921(a)(4)(C), and included "can readily be restored to shoot" in the definition of a machinegun. *See* 114 Cong. Rec. 10,862 (April 29, 1968).[11]

Pursuant to *Wong Kim Bo*, *Allison Engine*, and *Sigmon Coal*, one must presume Congress "intentionally and purposefully" excluded these phrases from § 921(a)(3)(B)'s regulation of a "frame or receiver." The Agencies ignored Congress and replaced the statutory text in accord with their policy preferences by "includ[ing] a *partially complete, disassembled, or nonfunctional frame or receiver*, including a frame or receiver parts kit" that "*may readily be* completed, assembled, restored, or

---

[11]   https://www.congress.gov/bound-congressional-record/1968/04/29/114/senate-section/article/10839-10909?q=%7B%22search%22%3A%5B%22april+29%2C+1968%22%2C%22april%22%2C%2229%2C%22%2C%221968%22%5D%7D&s=3&r=6

otherwise *converted* to function as a frame or receiver[.]" Final Rule at 24,739 (emphases added). The Agencies offer no precedent to support their implied argument that the holdings of these and dozens of similar cases should not apply.

The Agencies' failure is all the more telling in light of their prior admission that the statutory omissions were meaningful. *See* Fed. Defs.' Mot. for Summ. J., *Syracuse v. ATF*, No. 1:20-cv-06885, ECF No. 98, at 34 (S.D.N.Y. Jan. 29, 2021) ("*Syracuse* Mot. Summ. J.") ("'When Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally[.]'") (quoting *Allison Engine Co.*, 553 U.S. at 671). The text and structure of the GCA refute rather than support the Agencies' argument that Congress "inten[ded] to permit ATF to adopt an interpretation" like the Final Rule. Feds' Br. at 26.

> The Final Rule's redefinition of 'frame or receiver' conflicts with the statute's plain meaning. . . . That which *may become* a receiver is not itself a receiver. Congress could have included firearm parts that 'may readily be converted' to frames or receivers, as it did with 'weapons' that 'may readily be converted' to fire a projectile. But it omitted that language when talking about frames and receivers.

ROA.757. Congress's omission of "readily converted" from the GCA's regulation of "frame or receiver" establishes Plaintiffs' likelihood of success.

### b. § 921(a)(3)(B) does not incorporate § 921(a)(3)(A) by reference.

The Agencies embrace a novel theory on appeal, claiming that their interpretation is correct due to "Congress's linking of the frame-or-receiver provision [in § 921(a)(3)(B)] to § 921(a)(3)(A)." Feds' Br. at 20. This argument was not raised by Appellants below, is not supported with legal citation, and is thus waived. *See United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010) (argument is waived if party fails to identify relevant legal standards and Fifth Circuit precedent).[12]

Even if not waived, the cherry-picked, selective incorporation or "linking" argument defies common grammar rules. *See Cargill*, 57 F.4th at 459–61. Notably, 18 U.S.C. § 921(a)(3) states:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

The Agencies argue "firearm" in (B) includes "any such weapon," which they argue in turn "explicitly refer[s] back to" the "description of such weapons" which in turn

---

[12] *Amici* Gun Violence Prevention Groups also raise the argument, but an issue waived by an appellant cannot be raised by an *amicus curiae*. Brief for Gun Violence Prevention Groups Supporting Defendant-Appellants at *19–21, *VanDerStok v. Garland*, Nos. 22-11071, 22-11086 (Dec. 29, 2022); *see Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1293 (5th Cir. 1991).

includes "[weapons] that 'may be readily converted to' operable weapons." Feds'
Br. at 27. But subsection (A) makes no mention of "operable," which the Agencies
graft into their argument without explanation.

Moreover, "may readily be converted to" does not mean readily converted to
an operable state, but rather readily "converted to expel a projectile by the action of
an explosive," which provides the scope for the type of weapon addressed in this
provision. Even if subsection (B) called back to (A), it would most naturally be
understood to mean "the frame or receiver of any weapon which will expel a
projectile by the action of an explosive." The Agencies cannot twist statutory
language to find new authority. *See Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264
(5th Cir. 2011) ("[A]gencies cannot manufacture statutory ambiguity with semantics
to enlarge their congressionally mandated border.").

The structure of § 921(a)(3) is: "firearm" means: (A), (B), (C), or (D). The
structure of the statute is not (and would not be sufficiently finitely defined if)
"firearm" means any amalgamation of any of the words in (A), (B), (C), or (D).
Moreover, as one court has already found "[t]o read 'any such weapon' in §
921(a)(3)(B) to incorporate all of the requirements of § 921(a)(3)(A) would render
§ 921(a)(3)(B) meaningless." *United States v. Thomas*, No. 17-194 (RDM), 2019
WL 4095569, at *7 (D.D.C. Aug. 29, 2019); *United States v. Koss*, 831 F.3d 259,
254 (5th Cir. 2016) (mem.) (Dennis, J., dissenting) (quoting READING LAW 174) ("'If

possible, every word and every provision [of an enactment] is to be given effect. . . . None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.'").

### c.     "Frame" and "receiver" had distinct public meanings in 1968.

Beyond the omission of certain words, the meaning of the words present in the GCA also preclude the Agencies' argument. "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citing *Burns v. Alcala*, 420 U.S. 575, 580–81 (1975)); *accord Cargill*, 57 F.4th at 459 (looking to the definition of relevant terms "[a]t the time the statue was passed"). There is a "'settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law term it uses.'" *Chamber of Com. of the U.S. v. Dep't of Labor*, 885 F.3d 360, 369–70 (5th Cir. 2018) (quoting *United States v. Castleman*, 134 S. Ct. 1405, 1410 (2014)). The purpose of this construction is consistency—the statute's scope does not evolve with time, but can only change with congressional action. Congress did not separately define "frame or receiver," so the words bear their ordinary, contemporaneous meanings. *See Alabama v. North Carolina*, 560 U.S. 330, 340 (2010) ("Since the Compact contains no definition of

'sanctions,' we give the word its ordinary meaning."); *Kaluza*, 780 F.3d at 659 (beginning with the assumption that words express their ordinary meaning).

Here, this Circuit can start as it did in *Cargill*, with dictionaries. In 1971, shortly after the GCA was enacted, the Webster's International Dictionary defined a "frame" as "'the basic unit of a handgun which serves as a mounting for the barrel and operating parts of the arm[,]'" and a "receiver" as "'the metal frame in which the action of a firearm is fitted and to which the breech end of the barrel is attached[.]'" Final Rule at 24,654 (quoting WEBSTER'S THIRD INTERNATIONAL DICTIONARY 902, 1894 (1971)). A popular firearms encyclopedia defined a "frame" as "'the basic structure and principal component of a firearm[.]'" Final Rule at 24,654 (quoting JOHN OLSON, OLSON'S ENCYCLOPEDIA OF SMALL ARMS 72 (1985)). The encyclopedia also defines a "receiver" as "the part of a gun that takes the charge from the magazine and holds it until it is seated in the breech. Specifically, the metal part of a gun that houses the breech action and firing mechanism[.]" OLSON'S ENCYCLOPEDIA 138.

Moreover, historical context demonstrates the same meaning of "frame" and "receiver" as dictionaries and encyclopedias. In 1903, Springfield Armory patented a rifle that included the firing pin, bolt, and striker as part of the receiver.[13] Similarly,

---

[13]    *Schematic View of the Springfield Model 1903*, FORGE OF INNOVATION, http://forgeofinnovation.org/Springfield_Armory_1892-

other weapons registered with the patent office prior to 1968 identified the "frame" or "receiver." *See Colt's Patent Firearms Mfg. Co. v. N.Y. Sporting Goods Co.*, 190 F. 563, 563–64 (2d Cir. 1911) (referring to the "frame" of a pistol); *Pedersen v. United States*, 109 Ct. Cl. 226, 254–55 (1947) (referring to the "receiver" of a rifle); *Garland v. Remington Arms Co.*, 137 F. Supp. 622, 622–24 (S.D.N.Y. 1956) (referring to the "receiver" of a rifle). These "frames" and "receivers" were all a single item that either housed or served as a mounting for the key operating components of the firearm.

These examples and definitions confirm that the plain meaning of "frame" or "receiver" referred to functional and complete components, not "partially complete" and "nonfunctional" items, a "parts kit," nor anything that is "clearly identifiable as an unfinished component part of a weapon[.]" Final Rule at 24,739. The plain text of the GCA, along with the historical meaning and implementation, all demonstrate that the Agencies' newly redefined "frame or receiver" regulation falls outside of the scope of their authority. *See R.R. Ricou & Sons Co. v. Fairbanks, Morse & Co.*, 11 F.2d 103, 104 (5th Cir. 1926) (noting that "common usage" of terms "are understood to describe structures so far completed as to be capable of being used" and that "a qualifying adjective . . . was not needed to indicate the absence of an

---

1945/Themes/Technology_and_Manufacture/World_War_II/M1_Background/M1 903_schem.html (last visited Feb. 9, 2023).

intention to give that statute the effect of" applying before the item "becomes capable of being used").

Even the Agencies acknowledged this limitation as recently as 2020:

> [P]ursuant to the above <u>statutory</u> definition, a device is a firearm if it is either: (1) a frame or receiver or (2) a device that is designed to or can readily be converted into a device that expels a projectile. Importantly, the "designed to" and "readily be converted" language are only present in the first clause of the <u>statutory</u> definition. 18 U.S.C. § 921(a)(3)(A). Therefore, an unfinished frame or receiver does not meet the <u>statutory</u> definition of "firearm" simply because it is "designed to" or "can readily be converted into" a frame or receiver. Instead, a device is a firearm either: (1) because it *is* a frame or receiver or; (2) it is a device that is designed to or can readily be converted into a device that "expel[s] a projectile by the action of an explosive." *Id.* § 921(a)(3)(A)– (B).

*Syracuse*, Mot. Summ. J., at 14 (underlined emphases added).

The terms Congress chose to use and not to use in each section of the GCA matter. The Agencies may not rewrite the statute to their liking.

### 2.     History of the GCA

In addition to the plain text, the history of the GCA confirms that the Agencies lack authority to expand "frame or receiver" as they have. Specifically, Congress included the "readily converted" language to address starter guns—complete, working handguns designed to discharge blank ammunition. *See* 114 Cong. Rec. 10,859 (April 29, 1968)[14] ("Added to the term 'firearm' are weapons which 'may be

---

[14]   https://www.congress.gov/bound-congressional-record/1968/04/29/114/senate-section/article/10839-

readily converted to' a firearm. The purpose of this addition is to include specifically any starter gun designed for use with blank ammunition which will or which may be readily converted to expel a projectile or projectiles by the action of an explosive."). There is no support for the Agencies' argument that Congress intended "readily converted" to extend to frames, receivers, or other weapon parts, which is perhaps why they fail to cite to any.

Finding no purchase in the text of the GCA, the Agencies turn to their current interpretation of its purpose, arguing that any approach other than that of the Final Rule "would permit persons to circumvent statutory requirements[.]" Feds' Br. at 27. But the Supreme Court has held that "[t]here is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982). Thus, an agency cannot elevate its sense of purpose over the language of a statute. Allowing the Agencies to pass regulations in excess of the GCA would violate our constitutional structure. *See* U.S. CONST. ART. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States[.]"); *Brackeen v. Haaland*, 994 F.3d 249, 420 (5th Cir. 2021) ("'The fundamental precept of the delegation doctrine is that the lawmaking function

---

10909?q=%7B%22search%22%3A%5B%22april+29%2C+1968%22%2C%22apri l%22%2C%2229%2C%22%2C%221968%22%5D%7D&s=3&r=6

belongs to Congress[.]'" (quoting *Loving v. United States*, 517 U.S. 748, 758 (1996)).

"An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 325 (2014). The District Court correctly determined that Plaintiffs are likely to succeed on the merits of their claim that the Final Rule exceeds the Agencies' authority and violates the APA. ROA.764 ("Plaintiffs have demonstrated a strong likelihood of success on their claims that the Final Rule—specifically, 27 C.F.R. §§ 478.11, 478.12(c)—exceeds the scope of ATF's authority under Gun Control Act.").

## B.    "Firearm" in the GCA Does Not Include a "Weapons Parts Kit"

Employing the tools of statutory construction and precedent demonstrated above also leads to the conclusion that Agencies' insertion of "weapon parts kit" into the "firearm" definition exceeds their authority. Congress regulated parts where it chose to and not elsewhere. The Agencies cannot negate the omissions and choices made by Congress, including the conscious choice to abandon the prior approach under the FFA, which regulated all firearm parts.

### 1.    Congress knew how to regulate "parts" but chose not to do so in the context of "firearms."

The text and statutory context of § 921(a)(3) demonstrate that "firearm," as intended by Congress, does not include parts kits. Congress chose to regulate parts

that may be used to create a destructive device, silencer, or machinegun. The omission of "parts" from firearm was intentional.

Context is a "primary determinant of meaning[,]" and looking at § 921(a) in its entirety proves that had Congress meant to include weapon parts or weapons parts kits within the definition of "firearm," it knew how to do so—and did in fact do so in other areas of the GCA. *Cargill*, 57 F.4th at 461 (internal quotation and citation omitted). Indeed, as the District Court noted, "[w]hen Congress sought to regulate *parts* of weapons, it did so meticulously." ROA.760.

Congress defined a "destructive device" as: "(A) any explosive, incendiary, or poison gas;" (B) weapons with a bore exceeding a specific size; "and (C) *any combination of parts* either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B)[.]" 18 U.S.C. § 921(a)(4)(A)–(C) (emphasis added). Similarly, Congress defined "firearm silencer" and "firearm muffler" as "any device for silencing, muffling, or diminishing the report of a portable firearm, *including any combination of parts*, designed or redesigned, and intended for *use in assembling* or fabricating a firearm silencer or firearm muffler, *and any part* intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(25) (emphases added).

Thus, the GCA explicitly allows *parts* of "destructive devices" to be regulated as "destructive devices," and *parts* of "firearm silencers" and "firearm mufflers" to

be regulated as "firearm silencers" and "firearm mufflers." The definition of "firearm," however, excludes any similar language.

The same inclusion of parts also exists in Congress's contemporaneous redefinition of "machinegun." National Firearms Act Amendments of 1968, Pub. L. 90-618, 82 Stat. 1231 (1968) ("'[M]achinegun . . . shall also include . . . *any combination of parts* designed and intended for use in converting a weapon into a machinegun, and *any combination of parts* from which a machinegun can be assembled") (emphases added); 26 U.S.C. § 5845(b).

The definitions of "machinegun" and "destructive device" are particularly illuminating. Both definitions, like the definition of "firearm," begin with an ultimate subject ("machinegun" or "destructive device") followed immediately by the subject complement "weapon." 26 U.S.C. § 5845(b); 18 U.S.C. § 921(a)(4)(B); *see Cargill*, 57 F.4th at 460 (deconstructing language of 26 U.S.C. § 5845(b) by subject and subject complement). Both also contain language similar to the "designed to or may readily be converted to expel a projectile by the action of an explosive" language contained in the first sub-definition of firearm. 26 U.S.C. § 5845(b) ("any weapon which shoots, is *designed to* shoot, or can be *readily* restored to shoot. . .") (emphases added); 18 U.S.C. § 921(a)(4)(B) ("any type of weapon . . . which *may be readily converted to*[] expel a projectile by the action of an explosive or other propellant")

(emphasis added). Unlike the definition of "firearm," however, both definitions specifically and explicitly cover parts and combinations of parts.

The definitions of firearm "silencer," "muffler," and "machinegun" also include combinations of parts from which the regulated item can be assembled. A "firearm silencer or firearm muffler" includes "any combination of parts . . . for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(25). Similarly, a machinegun includes "any combination of parts from which a machinegun can be assembled." 26 U.S.C. § 5845(b). What is a "combination of parts from which a machinegun can be assembled" if not a weapons parts kits for machineguns? Yet Congress did not include any such language in its definition of "firearm," even though the definitions are otherwise similar in their structure, grammar, and word choice, and even though Congress specifically incorporated that definition of "machinegun" into the GCA by reference. *See* 18 U.S.C. 921(a)(24) ("The term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).").

As fully demonstrated above, "when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally or purposely in the disparate inclusion or exclusion." *Collins*, 141 S. Ct. at 1782 (citations and internal quotation marks

32

omitted). Here, Congress included language regarding "parts" and "combination[s] of parts" in sections (4) and (25) of 18 U.S.C. § 921(a) (and in 26 U.S.C. 5845(b)) but omitted such language in section (3) of § 921(a). It must be presumed that Congress acted intentionally.

The Agencies, however, treat Congress's intentional omission of terms as an invitation to incorporate those same omitted terms. Ironically, the Agencies disparage the District Court for "plucking . . . other language from statutory provisions that it believed 'Congress could have' used" in § 921(a)(3)(A). Feds' Br. at 34. The reasoning employed by the District Court, however, is consistent with this Court's reasoning in *Cargill* and with reasoning used by the Supreme Court. *See*, *e.g.*, *Cargill*, 57 F.4th at 460–61 (finding it significant that some statutory definitions were from shooter's perspective, but definition in question excluded mention of the shooter); *Humana Inc. v. Forsyth*, 525 U.S. 299, 308–09 (1999) (looking to other statutes to note language "Congress could have" used). It is the Agencies' approach of poaching language from elsewhere in the statute that turns traditional statutory interpretation on its head, not the District Court's.

**2.    The GCA's legislative history reflects an intentional decision by Congress not to generally regulate firearm parts.**

The legislative history surrounding the GCA provides further evidence that Congress did not intend to regulate unidentified firearm parts. When Congress was

discussing the changes implemented with the GCA's supersession of the FFA, it specifically noted:

> Under the present definition of "firearm," any part or parts of such a weapon are included. It has been found that it is impractical to have controls over each small part of a firearm. Thus, the revised definition substitutes only the major parts of the firearm; that is, frame or receiver for the words "any part or parts."

S. Rep. No. 90-1097 (1968); *see also* H.R. Rep. 1577 (1968) (same). This legislative history demonstrates that Congress thought it *impractical*—not "unnecessary" or "superfluous"—to regulate individual weapon parts, aside from the "frame or receiver," as "firearms."

### 3. The Agencies have previously recognized their inability to regulate firearm parts kits.

In recent litigation, the Agencies recognized that the GCA does not grant them the authority to regulate weapons parts, aside from the frame or receiver: "As a *statutory* matter, Congress has legislatively defined a 'firearm' to be a weapon that may be readily converted to expel a projectile by the action of an explosive, or the frame or receiver of such weapon, *but has explicitly excluded 'firearms parts' from that definition*." Fed. Defs.' Mot. to Dismiss, *California v. ATF*, No. 3:30-cv-06761-EMC, ECF No. 29, at 10 (N.D. Cal. Nov. 30, 2020) (emphases added). The Agencies also recognized, as discussed *supra* pp. 18–21, that provisions of the GCA defining "destructive device" and "firearm silencer" or "firearm muffler" "demonstrate that

*Congress knew how to regulate 'parts' that were 'designed' to be assembled into a regulated device*." *Syracuse* Mot. Summ. J., at 33–34 (emphasis added).

In *Syracuse*, the Agencies rejected a reading of § 921(a)(3) under which "any object would be 'designed to' be an operable firearm if it were intended to become part of one" because that "would require any component of a gun to be regulated as a firearm." *Id.* at 33. The Agencies now claim that their prior statements are inapposite: "The language quoted simply states that *individual* firearm parts were not considered 'firearms' under the statute" whereas "kits consisting of enough component parts such that they may be readily converted to a functional weapon are considered 'firearms.'" ROA.485. Thus, the Agencies suggest there is some amorphous tipping point at which a weapons parts kit contains "enough component parts" that it is suddenly transformed into a "firearm." Neither the plain language of the GCA nor the legislative history support this conclusion.

### 4.    Adding parts kits does not clarify existing law.

If, as the Agencies claim, a weapon parts kit is "essentially" and is indistinguishable from a disassembled but otherwise functional firearm, Feds' Br. at 32, 34, then the Agencies' insertion of weapon parts kit into the definition of firearm would be superfluous. The Agencies contend that "[a] weapon parts kit is, in essence, nothing more than a disassembled, currently nonfunctional weapon that is designed and intended to be assembled into a functional weapon." *Id.* at 34. Of course, if a

weapons parts kit contains a frame or receiver (discussed *supra* section I.A) it is already regulated as a firearm under the GCA—through § 921(a)(3)(B), which covers "frames and receivers," *not* through § 921(a)(3)(A)'s coverage of "weapons."

To the extent that a weapons parts kit does not contain a frame or receiver, the Agencies fail to explain how such a kit could be a "weapon" designed to or readily converted to expel a projectile without the firearm's major component. Indeed, while the Agencies declare that "all relevant precedent[] make[s] clear" that "certain weapon parts kits constitute 'firearms,'" Feds' Br. at 31, the Agencies do not identify specific precedent where a frame or receiver was missing, but the item was nonetheless deemed a firearm. *See United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993) (shotgun inoperable in that barrel was detached was still a firearm, no indication frame or receiver not present); *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006) (shotgun missing clip and bolt is still a firearm); *United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017) (defendant selling "complete" Uzi parts kits with "all the necessary components," court declined to determine whether demilled (nonfunctional) receivers were "firearms"); *United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006) (decision focused on congressional authority to regulate machineguns; parts kit underlying warrant was not at issue ).

Furthermore, some of the cases cited by the Agencies are distinguishable because they evaluate Section 2.D1.1 of the Sentencing Guidelines, which applies

to dangerous weapons, not just firearms. *See Ryles*, 988 F.2d at 16 (defendant was appealing sentencing enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) which refers to possession of a dangerous weapon); *Annis*, 446 F.3d 857 (same); *U.S.S.G.* § 2D1.1. ("firearm" and "dangerous weapon" are defined in USSG commentary); *U.S.S.G.* § 1B1.1 ("dangerous weapon" is defined, in USSG commentary, so broadly as to include a hand wrapped in a towel to give the appearance of a gun).

Nor should the Court accept the Agencies' argument that weapon parts are already included in "firearm" such that explicitly adding parts to the definition of "firearm" would have been superfluous. Feds' Br. at 33–34. This argument once again ignores the context of surrounding statutory provisions. The Agencies contend that "it was . . . unnecessary (and would have been superfluous) for Congress to also separately regulate parts or aggregations of parts as such." *Id.* at 34. True, "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). Yet it is the *Agencies'* interpretation that renders various statutory provisions superfluous. Interpreting the definition of "firearm" to include weapons parts and weapons parts kits, absent any reference thereto in the plain language of § 921(a)(3), would render superfluous the inclusion of "parts," "combination of parts," and "combination of parts from which a machinegun can be

assembled" in the definitions of "destructive device," "firearm silencer" and "firearm muffler," and "machinegun" in §§ 921(a)(4) and (25) and § 5845(b). Thus, the Agencies' interpretation violates this canon of statutory construction.

Congress could have used the same language it used in 18 U.S.C. §§ 921(a)(4) and (25) and in 26 U.S.C. § 5845(b) regarding "parts" and "combination[s] of parts" in its definition of "firearm" in § 921(a)(3). Congress did not. The statutory context, legislative history, and basic canons of statutory construction demonstrate that this exclusion was intentional and meaningful.

### C.    *Chevron* Deference is Inapplicable Here

The Agencies' interpretation of the GCA is not entitled to *Chevron* or other deference. The Agencies' brief is silent regarding the issue of deference, but frequently cites no authority other than the Agencies' own statements, implicitly requesting that the Court defer to their agency expertise. *See* Feds' Br. at 25–31; *supra* p. 16. Deference is inappropriate, however, because the GCA is not ambiguous, the Agencies disclaimed *Chevron* below and did not invoke it here, and the definition of "firearm" has clear and common criminal implications.

First, the plain meaning of the terms in the GCA answer the statutory interpretation questions in this case. The first step in the *Chevron* analysis requires a court to determine whether Congress has directly spoken to the question and in doing so to exhaust "all the traditional tools of construction," to account for the

specific and broader contexts of the statute. *See Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020) (internal quotation and citation omitted). If those tools and context settle the matter, then a court must give effect to the intent of Congress and not defer to the agency. *Id.*; *see supra* section I.A.

Second, the Agencies waived the application of *Chevron*. In *Cargill*, this Court considered whether *Chevron* applies when not requested by the government—it does not—and whether *Chevron* can be waived—it can. 57 F.4th at 464–66. The Court determined that "*Chevron* is merely a legal argument that the government can make" or choose not to make. *Id.* at 466. Here, the Agencies argued below that "there is no need to reach" the question of whether *Chevron* applies. ROA.499–500. In their brief to this Court, they make no mention of "deference," "*Chevron*," or the associated principles. *Chevron* arguments have therefore been waived. *See Cargill*, 57 F.4th at 464–66.

Third, *Chevron* does not apply to criminal statutes. The government routinely brings criminal cases "to counter the illegal trafficking of unserialized . . . weapons," to enforce the "prohibited persons" from possessing firearms, and other related federal firearm crimes. *See* Feds' Br. at 39–40 (quoting Final Rule at 24,656–57). Violations of the GCA carry criminal penalties, including imprisonment. *See* 18 U.S.C. §§ 922, 924. This Court has stated that it "must not apply *Chevron* where, as

here, the Government seeks to define the scope of activities that subject the public to criminal penalties." *Cargill*, 57 F.4th at 467; *see also United States v. Garcia*, 707 F. App'x 231, 234 (5th Cir. 2017) ("Following the Supreme Court's instruction that no deference is owed to agency interpretations of criminal statutes, specifically the ATF's interpretation of 18 U.S.C. § 922, we decline to show deference to the ATF regulation interpreting § 922(g)(5)(A).")

The GCA precludes the Agencies' efforts to expand their power, the Final Rule exceeds the Agencies' authority, and Plaintiffs will prevail on the merits.

## II.    THE DISTRICT COURT CORRECTLY ISSUED A PRELIMINARY INJUNCTION

The District Court properly found that Plaintiffs Tactical Machining, VanDerStok, and Andren would suffer irreparable harm as a result of the Final Rule, ROA.765–68, ROA.1186–92; and that the court could enter an injunction consistent with the public interest, ROA.770–71, ROA.1201, ROA.1206–07, ROA.1209.

Preliminary injunctions are equitable remedies. To obtain an injunction, a plaintiff must prove: (1) likelihood of success on the merits; (2) it will suffer irreparable injury absent injunctive relief; (3) the balance of equities tips in its favor; and (4) the issuance of an injunction will not disserve the public interest. *Daniels Health Scis.*, 710 F.3d at 582. A court's findings of fact are reviewed for clear error and balancing of equities is reviewed for abuse of discretion. *In re Tusa-Expo Holdings, Inc.*, 811 F.3d 786, 791 (5th Cir. 2016) ("[F]indings of fact are reviewed

for clear error[.]"); *In re Nikoloutsos*, 199 F.3d 233, 236 (5th Cir. 2000) ("[W]e review the balancing of equities for abuse of discretion.").

The District Court did not clearly err in finding that Tactical Machining would suffer irreparable harm either by likely going out of business or by investing non-recoverable compliance costs, ROA.765–68, or that Individual Plaintiffs would suffer irreparable harm by facing civil and criminal penalties, ROA.1186–92. Nor did the District Court abuse its discretion in disservice to the public interest by granting a Preliminary Injunction limited to specific provisions of the Final Rule, limited to a subset of the Plaintiffs, and that ultimately precluded benefits to persons prohibited from processing firearms. ROA.770–71, ROA.1206–07, ROA.1209.

## A.     The District Court Did Not Commit Clear Error by Finding Irreparable Harm

Going out of business, incurring non-recoverable costs, and risking criminal prosecution are each irreparable harm. There was evidence of each before the District Court, and the court found each present and substantial enough to justify an injunction. The District Court's findings of fact in this regard can only be overturned if they are not plausible in light of the record viewed as a whole. *See State v. Biden*, 10 F.4th 538, 547 (5th Cir. 2021).

**1.    The District Court found the Final Rule would inflict multiple kinds of harm on Plaintiffs.**

Each of the following premises found by the District Court supports its conclusion that Plaintiff Tactical Machining would suffer irreparable harm: (1) Tactical Machining manufactures and sells items subject to regulation under the Final Rule, ROA.753; (2) over 90% of Tactical Machining's business consists of selling items that individuals can use to manufacture frames and receivers, ROA.765; (3) Tactical Machining's claim that it would be put out of business was bolstered by the ATF's own estimate that small entities could experience the dissolution of business, ROA.765–66; (4) when Tactical Machining stopped selling parts that may be regulated under the Final Rule, it lost nearly $50,000 in revenue in a week, ROA.766; (5) Tactical Machining's potential economic loss was so great as to threaten its business, ROA.766; (6) the Agencies admit that the compliance costs are nonrecoverable, ROA.767; (7) the Agencies did not argue that Tactical Machining's compliance costs would be *de minimis*, ROA.767; (8) Tactical Machining had shown substantial financial injury, ROA.767; and (9) Tactical Machining was likely to incur unrecoverable costs, ROA.767–78.

The District Court later found that Individual Plaintiffs would also suffer irreparable harm absent an injunction. Specifically, the court found that Individual Plaintiffs had refrained from buying products subject to the Final Rule "in response to the perceived threat of looming civil and criminal penalties," *see* ROA.1189–91;

that Plaintiffs' "behavior has been effectively chilled by the credible threat of felony indictment," ROA.1191; and that this threat is aggravated by the context of being forced into compliance with a law already found likely unlawful, ROA.1192.

Further, the District Court found that the same concerns impacted Tactical Machining's customers. ROA.1197 ("Tactical Machining's customers' concerns about being prosecuted for violating ATF's Rule mirror those of the Individual Plaintiffs.'"). The court further found that Tactical Machining's sales were down $60,000 over the same time the prior year and, if continued, could not sustain Tactical Machining's business. ROA.1197. Finally, the court found that the only way to provide adequate relief to Tactical Machining itself was to enjoin the Rule as to Tactical Machining's customers. ROA.1198–99 ("Tactical Machining's injuries cannot be remedied if its only source of revenue—customer willingness to transact business—has been severely curtailed.").

Other evidence in the record also supports the finding of irreparable harm. *See Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022) (order can be upheld on any basis found in the record). Specifically, the Final Rule likely made it unlawful to sell or make jigs available with NFOs, which had a significant impact on Tactical Machining. *See* ROA.746 at ¶ 9 ("[S]ales of Tactical Machining's '80% Lowers' would drop anywhere from 20%–50% depending on the length of time that jigs were not available"); ROA.916 at ¶ 15 ("When the ATF published its Final

Rule . . . Tactical Machining stopped selling jigs."),   at ¶ 17 ("If it were not prohibited by the Final Rule, Tactical Machining would again manufacture and sell jigs, which . . . would significantly increase sales."). Additionally, prior to the Preliminary Injunction, Tactical Machining's sales plummeted from 20–40 orders per day to only 10. ROA.747 at ¶ 12. And allowing the situation to continue would, likely force the company "out of business by the end of" 2022. ROA.915 at ¶¶ 8, 10.

### 2.     Financial ruin constitutes irreparable harm.

The Agencies do not contest, and therefore concede, that harm sufficient to drive a company out of business can constitute irreparable harm, as the District Court rightly held. *See* ROA.765–66 (citing *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) and *Atwood Turnkey Drilling, Inc. v. Petroleo Barsileiro, S.A.*, 875 F.2d 1174, 1197 (5th Cir. 1989); *see also Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) (noting while evaluating irreparable harm that challenged agency action "threaten[ed] the very existence of some of Petitioners' businesses").

The District Court found because "[o]ver 90% of Tactical Machining's business consists of producing and selling items that customers can use to self-manufacture frames or receivers and to build firearms," its fear of going out of business was not far-fetched. ROA.765 (citing ROA.207 at ¶¶ 1–2; ROA.210 at ¶ 15 ("Without the income from 91.54% of its products [due to the Final Rule],

Tactical Machining would not be able to maintain its payroll or pay its other expenses.")).

The Agencies simply assert, without any supporting citation, that Tactical Machining's harms were speculative. Feds' Br. at 41 ("[P]laintiffs failed to provide any persuasive evidence explaining how the Rule would lead" to "substantial losses in revenue."). The Agencies provide nothing to meet their burden that the District Court's assessment of the record was a clear error. Tactical Machining, however, provided a myriad of statistics directly reflecting the decline of its business as it took steps to comply with the Final Rule and repeated testimony that, should it be forced to continue with business at that level, its doors would close in months. The Agencies' bare disbelief does not establish clear error.

> ### 3.    Tactical Machining's nonrecoverable compliance costs are irreparable.

Rather than deny that Tactical Machining would go out of business if it could not sell most of its products, the Agencies assert that such harm is self-inflicted because Tactical Machining could just incur the compliance costs and carry on. Feds' Br. at 35–36, 41–43 ("It was the manufacturers' choice to discontinue selling certain products rather than to continue selling them in ways that complied with the Rule."). This argument turns on the false premise that the compliance costs would not constitute irreparable harm, directly contrary to the District Court's holding. ROA.766–67 ("To the extent the Final Rule would impose additional compliance

costs, Defendants admit that such costs are nonrecoverable. And nonrecoverable means irreparable.").

The Agencies' further claim that because Tactical Machining allegedly did not quantify its costs and because so many other businesses "manage to bear those ordinary compliance costs," the costs must be *de minimis*. *See* Feds' Br. at 43–44. The Agencies waived this argument by not making it below. *See* ROA.767 ("Defendants argue the compliance costs are 'modest,' *but not* de minimis.") (emphasis added); *see also United States v. Mix*, 791 F.3d 603, 612 (5th Cir. 2015) ("the government clearly can forfeit arguments by failing to raise them").

Once harm is beyond *de minimis*, "it is *not so much the magnitude but the irreparability that counts . . . .'" Texas v. EPA*, 829 F.3d at 433 (emphasis added); *see* ROA.767 (quoting and emphasizing the same). Further, "'complying with a regulation later held invalid almost always produces the *irreparable harm of nonrecoverable compliance costs*.'" Texas v. EPA*, 829 F.3d at 433 (emphasis added) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part)). Additionally, "federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages and White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Tactical Machining's "lack of a 'guarantee of eventual recovery' is another reason that its alleged harm is irreparable." *Id.* (quoting

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021)).

Rather than argue that Tactical Machining's compliance costs are recoverable, the Agencies erroneously assert that "ordinary" or "routine" compliance costs cannot be irreparable, only "extraordinary" costs. Feds' Br. at 45–46. They dismiss this Court's statements in *Texas v. EPA*, 829 F.3d at 433, that "it is not so much the magnitude but the irreparability that counts" as mere dicta. *See* Feds' Br. at 39. This argument is put to rest by this Circuit's statements in *Louisiana v. Biden*. 55 F.5th at 1033–34. There, this Circuit reiterated that nonrecoverable compliance costs are irreparable; that complying with regulations later held invalid nearly always creates the irreparable harm of nonrecoverable compliance costs; and that it is not the magnitude but the irreparability that matters. *Id.* In short, the Agencies offer no precedent from this Circuit supporting their assertion that nonrecoverable compliance costs must be extraordinary to be irreparable.

The precedent the Agencies proffer from other jurisdictions has either been called into question, is distinguishable, or both. The Agencies cite *Iowa Utilities Board v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996), claiming that harm must be "certain and great" to warrant equitable relief. Feds' Br. at 44. But there, the Eighth Circuit found that costs and lost revenues associated with a likely unlawful agency action would cause irreparable harm and that "threat of unrecoverable economic

loss . . . does qualify as irreparable harm." *Iowa Utils. Bd.*, 109 F.3d at 426. The Agencies next cite *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974), Feds' Br. at 44; but that case dealt with litigation costs of a contractor rather than compliance costs, and the contractor's effort to evade administrative exhaustion. *Bannercraft*, 415 U.S. at 24.

The Agencies' reliance on *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112 (2d Cir. 2005), Feds' Br. at 44, fares no better. The "ordinary" costs the court dismissed in that case were potential differences in interest rates between loans, other investments, and an escrow account into which disputed payments were made. *Spitzer*, 408 F.3d at 115. Additionally, the record did not show that compliance would force plaintiffs out of business or change the nature of their day-to-day operations. *Id.*

Finally, the Agencies cite *American Hospital Association v. Harris*, 625 F.2d 1328 (7th Cir. 1980) and *A.O. Smith Corp. v. FTC*, 530 F.2d 515 (3d Cir. 1976). Feds' Br. at 44–45. *American Hospital* is distinguishable for at least three reasons: (1) it dealt with a "condition for receiving federal money[,]" and the federal funds financed the complained-of costs, 625 F.2d at 1330; (2) "any remaining injury was unduly speculative or too insubstantial to constitute threatened irreparable harm," *id.* at 1331; and (3) the Third Circuit required that the "threatened injury must be, in some way, peculiar," *id.* (quoting *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d

Cir. 1976)). The "peculiar" standard is not part of the Fifth Circuit's analysis. Additionally, the Third Circuit specifically reserved for another day "the question of whether lost profits" due to compliance constitute irreparable harm. *Id.*

By contrast, the District Court accepted Tactical Machining's evidence supporting its assertion that it would go out of business. *See* ROA.210 at ¶ 15; ROA.765. The Agencies have not met their burden in establishing that the District Court accepted that evidence in clear error.

### 4. Individual Plaintiffs' chilled conduct and risk of prosecution constitute irreparable harm.

The District Court properly determined that Individual Plaintiffs refrained from purchasing NFOs due to a credible fear of criminal prosecution, suffering irreparable harm. ROA.1190. The District Court noted that violations of constitutionally protected rights may create irreparable harm, ROA.1189; the chilling effect of criminal penalties can create irreparable harm, ROA.1189–90; and wrongful criminal prosecution or prosecution affecting a constitutional interest creates irreparable harm, ROA.1190. Further, compliance with a regulation the court has already found likely unlawful aggravates these harms. ROA.1192. Given the facts, Plaintiffs' "purported choice to comply—or else" with the Final Rule was "adequate to establish irreparable harm." ROA.1190.

Once again, the Agencies have waived any argument to the contrary. *See* ROA.1190–91 ("Defendants offer no response at all to Individual Plaintiffs' alleged

harm. . . . Defendants' silence about whether Individual Plaintiffs are justifiably afraid to purchase items that *are* classified as firearms suggests those concerns are well-founded."); *see also Cargill*, 57 F.4th at 465 ("[A] party waives a legal argument if it fails to raise the argument when presented with the opportunity.").

Even if the Agencies did not waive the argument, they failed to meet their burden in establishing the District Court's finding of irreparable harm was in clear error. Plaintiffs have asserted Separation of Powers, Due Process, and First Amendment claims. Threats on or impairments of constitutionally protected rights, even for minimal periods, can create irreparable harm. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (determination that constitutional right was threatened or in fact being impaired "mandates a finding of irreparable injury"). Moreover, wrongful indictment on a federal firearms charge for the possession of so-called "ghost gun" components would create irreparable harm. *See* ROA.1190 (citing *Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 158–59 (2014) and *Richey v. Smith*, 515 F.2d 1239, 1243 N.10 (5th Cir. 1975)).

Indeed, rather than contest that constitutional violations or criminal indictments create irreparable harm, the Agencies, in essence, argue that the threats are not credible. The Agencies assert that the cited criminal provision applies only to manufacturers and Plaintiffs can easily avoid criminal threats if they just treat the items they want to buy as firearms, subject to FFL transfers and other restrictions.

*See* Feds' Br. at 39–40, 35–38. The District Court, however, referred to potential civil and criminal penalties under 18 U.S.C. §§ 922 and 924. Section 922 lists dozens of unlawful acts associated with the import, sale, manufacture, shipping, transport, receipt, and possession of anything deemed a "firearm," and the majority of those prohibitions apply to "*any person*." *See* 18 U.S.C. § 922 (emphasis added).

In particular, it is unlawful "for *any person*, other than a [licensed entity] to . . . receive" a firearm from someone outside the state. 18 U.S.C. § 922(a)(3) (emphasis added). If an NFO was treated as a firearm, Individual Plaintiffs (and most of Tactical Machining's customers) would be in violation by purchasing NFOs from Tactical Machining if they are shipped out of state. *See* ROA.771 ("Presumably, Tactical Machining's *customers* are still subject to felony charges for buying its products.") (citing 18 U.S.C. § 922(a)(3)). Further, various states and other laws rely upon the § 921(a)(3) definition of firearm, thereby putting Individual Plaintiffs and Tactical Machining's customers at risk of state prosecution based on the Agencies' newly-minted regulatory definition. *See*, *e.g.*, *Toler v. United States*, 198 A.3d 767, 773 (D.C. App. 2018) (D.C. Code patterned on 18 U.S.C. § 921). Finally, as the District Court noted, when a party faces a substantial threat of irreparable harm, "it is no answer to say that it may avoid the harm by complying with an unlawful agency rule." *See* ROA.768.

Tactical Machining and Individual Plaintiffs established irreparable harm and the Agencies have failed to and cannot demonstrate that the District Court's findings of irreparable harm were in clear error.

**B.    The District Court Did Not Abuse Its Discretion and Properly Considered the Public Interest by Issuing a Tailored Injunction**

Finally, the District Court properly exercised its discretion in issuing a carefully crafted injunction that balanced asserted harms and the public interest. The Agencies' arguments that the equities and public interest do not favor an injunction largely turn on their belief that they should prevail on the merits, Feds' Br. at 48–49, and that Plaintiffs are not irreparably harmed, Feds' Br. at 48. These arguments should be rejected for the reasons demonstrated above and those in the District Court's opinions. The Agencies' remaining arguments regarding keeping firearms from prohibited persons and the need for firearm traceability, Feds' Br. at 46–47, are addressed in the narrow scope of the injunction.

Contrary to the Agencies' assertions, the District Court was keenly mindful of its obligations in granting and tailoring an injunction. *See* Feds' Br. at 48–49 (asserting the District Court improperly collapsed its inquiry to likelihood of success on the merits).

The District Court acknowledged that a preliminary injunction is an "extraordinary remedy," and that Plaintiffs had the burden to prove all requirements and make a clear showing that the injunction was warranted. ROA.754–55. The

District Court carefully reviewed Plaintiffs' claims and evidence of irreparable harm, initially finding that only Tactical Machining satisfied its burden. ROA.769 ("Though Tactical Machining has presented sufficient evidence of irreparable harm, the other Plaintiffs have not.").

Only after being presented with additional evidence did the District Court find that Individual Plaintiffs had crossed the threshold to prove irreparable harm. ROA.1186–92, ROA.1196. As to the balancing of equities and interests, the court found that both sides claimed valid public interests and that Plaintiffs had legitimate interests in conducting their business and enjoying their freedoms as law-abiding citizens. ROA.770–71. The District Court thus "tailored the scope of the preliminary injunction with careful attention to avoid further upsetting the balance of the competing public interests." ROA.770–71. The District Court rejected Plaintiffs' request for a broader injunction, noting that the relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." ROA.771 (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)).

Moreover, *sua sponte*, and specifically to address the balance of the hardships and the public interest, the District Court explicitly prohibited the Preliminary Injunction from offering any benefit to "individuals prohibited from possessing firearms under 18 U.S.C. § 922(g)." ROA.1206–09.

The narrower the injunction the less harm to the defendant and the public interest. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010) ("[T]he injunction's narrow scope substantially mitigates the negative effects on the public, practically and economically."); *see also Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 1006 (5th Cir. 1981) ("The court should tailor its relief to fit each particular case."). Here, the injunction is short term, as the parties are already in the midst of summary judgment briefing, and narrow, as it only covers Tactical Machining, its customers, and Individual Plaintiffs. The narrowness and careful crafting of the injunction reflect the District Court's application of the injunctive requirements beyond likelihood of success on the merits.

Finally, the District Court properly weighed the public's interest in agencies complying with statutory mandates. "[T]he 'public interest [is] in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Biden*, 10 F.4th at 559 (quoting *Washington v. Reno*, 35 F.3d 1093, 1102 (6th Cir. 1994)). "And '[t]here is generally no public interest in the perpetuation of unlawful agency action.'" *Id.* at 560 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."). The District Court properly considered unlawful agency action to be against the public interest.

\*     \*     \*

The District Court correctly found Tactical Machining and Individual Plaintiffs would suffer irreparable harm and that all Plaintiffs were likely to succeed on their claim "that ATF's new definitions are inconsistent with the Gun Control Act." ROA.755. This means the Agencies exceeded their constitutional and statutory authority. The public has an uncompromisable interest in the preservation of constitutional and legal requirements, particularly in halting government action that seeks to aggrandize its power over the public. If the Agencies' liberal invocation of "public safety" and "law enforcement" were all that were needed to thwart the Constitution, then liberty would be doomed.

## CONCLUSION

For the foregoing reasons, the District Court's orders should be affirmed.

Respectfully submitted:

*/s/ Erin M. Erhardt*
Erin M. Erhardt
Kaitlyn D. Schiraldi
MOUNTAIN STATES
  LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Telephone: (303) 292-2021
Telecopy: (877) 349-7074
eerhardt@mslegal.org
kschiraldi@mslegal.org

Cody J. Wisniewski
FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392
cwi@fpchq.org

*Attorneys for Plaintiffs-Appellees*

# CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Erin M. Erhardt*
Erin M. Erhardt

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,847 words. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Times Roman 14-point font.

*/s/ Erin M. Erhardt*
Erin M. Erhardt
*Attorney for Plaintiffs-Appellees*
Dated: February 9, 2023