**Nos. 22-11071, 22-11086**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

Case No. 22-11071

Jennifer VanDerStok; Michael G. Andren; Tactical Machining, L.L.C., a limited liability company; Firearms Policy Coalition, Inc., a nonprofit corporation,
*Plaintiffs-Appellees*,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,
*Defendants-Appellants*.

consolidated with

---

Case No. 22-11086

BlackHawk Manufacturing Group, Inc., doing business as 80 Percent Arms,
*Intervenor Plaintiff-Appellee*,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms and Explosives,
*Defendants-Appellants*.

---

On Appeal from United States District Court
for the Northern District of Texas, No. 4:22-CV-00691-O

---

## BRIEF FOR INTERVENOR PLAINTIFF-APPELLEE

---

[*Counsel Listed on Inside Cover*]

Michael J. Sullivan
MA State Bar No. 487210
msullivan@ashcroftlawfirm.com
Nathan P. Brennan
MN State Bar No. 389954
nbrennan@ashcroftlawfirm.com
J. Christopher Amrhein, Jr.
MA State Bar No. 703170
camrhein@ashcroftlawfirm.com
ASHCROFT LAW FIRM, LLC
200 State Street
Boston, MA 02109
(617) 573-9400

*Counsel for Intervenor Plaintiff-
Appellee BlackHawk Manufacturing
Group, Inc.*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Plaintiff-Appellees: | Counsel for All Appellees: |
|---|---|
| Jennifer VanDerStok<br><br>Michael G. Andren<br><br>Tactical Machining, L.L.C.<br><br>Firearms Policy Coalition, Inc. | Erin M. Erhardt and Kaitlyn D. Schiraldi, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood, CO<br><br>Cody J. Wisniewski, FIREARMS POLICY COALITION, Las Vegas, NV |

| Intervenor-Appellee: | Counsel for Intervenor-Appellees: |
|---|---|
| BlackHawk Manufacturing Group Inc., *d/b/a* 80 Percent Arms | Brian Daniel Poe, BRIAN D. POE ATTORNEY PLLC, Fort Worth, TX<br><br>J. Christopher Amrhein, Jr., Michael J. Sullivan, and Nathan P. Brennan, ASHCROFT LAW FIRM, LLC, Boston, MA |

| Additional Intervenors Below: | Counsel for Additional Intervenors: |
|---|---|
| Defense Distributed<br><br>Second Amendment Foundation Inc. | Charles Flores, Nicholas M. Bruno, and Zachary Nelson, BECK REDDEN LLP, Houston, TX |

| Defendant-Appellants: | Counsel for All Appellants: |
|---|---|
| Merrick Garland, U.S. Attorney General<br><br>U.S. Department of Justice | Abby Wright, Sean Janda, and Martin Tomlinson, U.S. DEPARTMENT OF JUSTICE, Washington, D.C. |

| | |
|---|---|
| Steven Dettlebach, ATF Director<br><br>Bureau of Alcohol, Tobacco, Firearms, and Explosives | |

| Other Interested Parties (*Amici*) Not Including Governments: | Counsel for Interested Parties: |
|---|---|
| Brady<br>Everytown for Gun Safety Action Fund<br>March For Our Lives | Kathleen Hartnett, Daniel Grooms, Adam Katz, and Rachel Alpert, COOLEY, L.L.P. San Francisco, CA |
| District Attorneys for the Counties of Dallas and Travis, Texas Prosecutors Against Gun Violence | Lee Richards, Arthur Greenspan, David Massey, Rachel Mechanic, Jacob Taber, and Rebecca Salk, PERKINS COIE, L.L.P. Dallas, TX |

| Proposed Intervenors Below: | Counsel for Proposed Intervenors: |
|---|---|
| Not an LLC dba JSD Supply | J. Mark Brewer, BREWER & PRITCHARD, P.C., Houston, TX<br><br>Matthew Joseph Smid, DANIEL, MOORE, EVANS, BIGGS, DECKER AND SMID, Fort Worth, TX |
| Polymer80, Inc. | Dennis Daniels, James W. Porter, Marc A. Nardone, BRADLEY ARANT BOULT CUMMINGS LLP |

*/s/Michael J. Sullivan*
Attorney of record for BlackHawk
Manufacturing Group, Incorporated

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(2) and Fifth Circuit Rule 28.2.3, Intervenor Plaintiff–Appellee BlackHawk Manufacturing Group, Incorporated ("BlackHawk" or "Intervenor") respectfully submits that oral argument will substantially assist the Court in its consideration of the issues presented in this consolidated appeal.

This case raises important questions concerning authority of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives to promulgate new regulatory definitions that fundamentally and impermissibly re-interpret the primary statutory definition that the agency—*for its entire existence*—has found to be the limit of its delegated authority under the 1968 Gun Control Act. A plain reading of the statutory language, coupled with the circumstances surrounding the promulgation of the regulation and the criminal liability that it may create, shows that the agency lacked the authority to issue its regulation as it did.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS ................................................................................... iv

TABLE OF AUTHORITIES ........................................................................... vii

INTRODUCTION ............................................................................................ 1

JURISDICTIONAL STATEMENT ................................................................. 3

STATEMENT OF THE ISSUES ...................................................................... 4

STATEMENT OF THE CASE ......................................................................... 4

   I.    LEGAL BACKGROUND ...................................................................... 4

        A.    The Gun Control Act of 1968 and ATF Implementing
             Regulations ............................................................................. 4

        B.    ATF's Consistent Interpretation of the Gun Control Act Over
             Five Decades of Enforcement and Guidance to Industry
             and the Public ......................................................................... 7

        C.    Americans' Long-Standing Tradition of Homemade
             Gunmaking ............................................................................. 9

        D.    The Biden Administration Announces That It "Will Not
             Wait for Congress to Act to Take Its Own Steps" on
             Gun Control .......................................................................... 12

   II.    PROCEDURAL BACKGROUND .......................................................... 14

SUMMARY OF THE ARGUMENT ................................................................ 15

APPLICABLE LAW AND STANDARDS OF REVIEW .................................. 17

ARGUMENT ................................................................................................. 18

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .............. 18

A.    The Rule Violates the Plain Language of the Gun
Control Act ........................................................................19

      1.    Congress Unambiguously Excluded Partially
Complete, Disassembled, or Otherwise Nonfunctional
Frames or Receivers from the Statutory Definition
of "Firearm" ........................................................19

      2.    Congress Unambiguously Excluded Weapon Parts
Kit From the Statutory Definition of "Firearm" .....................23

B.    Even If the Statutory Language Is Ambiguous, This Court
Need Not Defer to the Government's Interpretation .........................25

C.    Any Ambiguity Concerning the Ambit of the Gun
Control Act Should Be Resolved in Favor of Lenity.........................26

II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
WHEN IT FOUND IRREPARABLE HARM TO
BLACKHAWK ..................................................................28

    A.  The Government Fails to Identify Any Clear Error...........................28

    B.  ATF's December 27, 2022 Open Letter Does Not
Undermine the District Court's Finding of Irreparable
Harm ...................................................................30

    C.  The Government Does Not Show the District Court Erred
When It Found Irreparable Harm in the Form of Nonrecoverable
Compliance Costs.....................................................31

    D.  The District Court Did Not Abuse its Discretion in Finding
the Balance of the Equities and the Public Interest Favor
Upholding Injunctive Relief.............................................33

CONCLUSION.................................................................36

CERTIFICATE OF SERVICE ...............................................................37

CERTIFICATE OF COMPLIANCE......................................................38

# TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                  <u>**PAGE(S)**</u>

*Affiliated Prof'l Home Health Care Agency v. Shalala*,
    164 F.3d 282 (5th Cir. 1999) .......................................................................18

*Am. Health Care Ass'n v. Burwell*,
    217 F. Supp. 3d 921 (N.D. Miss. 2016) ......................................................35

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
    875 F.2d 1174 (5th Cir. 1989) .........................................................17, 28, 35

*Benefit Recovery, Inc. v. Donelon*,
    521 F.3d 326 (5th Cir. 2008) .......................................................................29

*Browning v. Kramer*,
    931 F.2d 340 (5th Cir. 1991) .......................................................................29

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin.,
United States Dep't of Lab.*,
    17 F.4th 604 (5th Cir. 2021) .......................................................................34

*California v. ATF*,
    No. 3:20-CV-06761, 2020 WL 9849685
    (N.D. Cal. Nov. 30, 2020) .............................................................11, 23, 26

*Cargill v. Garland*,
    57 F. 4th 447 (5th Cir. 2023) ...............................................................*passim*

*Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)..............................................................................*passim*

*City of Dallas, Texas v. Hall*,
    No. 3:07-CV-0060-P, 2008 WL 11350041 (N.D. Tex. July 28, 2008)........35

*City of Syracuse v. ATF*,
    No. 1:20-CV-06885 (S.D.N.Y. Jan. 29, 2021)............................................12

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021)........................................................................... 21, 24

*Concerned Women for Am., Inc. v. Lafayette Cnty.*,
    883 F.2d 32 (5th Cir. 1989) ......................................................................18

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
    710 F.3d 579 (5th Cir. 2013) ...................................................................18

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
    762 F.2d 464 (5th Cir. 1985) ............................................................. 18, 29

*Gilbert v. Donahoe*,
    751 F.3d 303 (5th Cir. 2014) ...................................................................27

*Huawei Technologies USA, Inc. v. FCC*,
    2 F.4th 421 (5th Cir. 2021) ......................................................................19

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ...................................................................16

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)......................................................................34

*New York v. Burger*,
    482 U.S. 691 (1987)..................................................................................22

*Nken v. Holder*,
    556 U.S. 418 (2009)..................................................................................33

*State v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ....................................................................34

*Sturgeon v. Frost*,
    577 U.S. 424 (2016)..................................................................................20

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) .............................................................. 31, 36

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ................................................................ 36

*United States v. Biswell*,
   406 U.S. 311 (1972) ................................................................ 22

*United States v. Kaluza*,
   780 F.3d 647 (5th Cir. 2015) ................................................... 20

*United States v. Ron Pair Enters., Inc.*,
   489 U.S. 235  (1989) ............................................................... 19

*Western Refining Southwest, Inc. v. FERC*,
   636 F.3d 719 (5th Cir. 2011) ................................................... 19

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) .................................................................... 33

*Wisc. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ................................................ 31

**Statutes**

18 U.S.C. § 921 ................................................................ *passim*

18 U.S.C. § 922 ................................................................... 4, 25

18 U.S.C. § 923 ................................................................. 4, 5, 7

18 U.S.C. § 924 .................................................................... 7, 8

28 U.S.C. § 1292(a)(1) ............................................................ 3

28 U.S.C. § 1331 .................................................................... 3

**Rules**

24 C.F.R. § 478.12(c) .............................................................. 20

27 C.F.R. § 478 ............................................................... *passim*

27 C.F.R. § 479 ................................................................................... 5

**Other Authorities**

*Commerce in Firearms and Ammunition*,
   33 Fed. Reg. 18,555 (Dec. 14, 1968)................................................ 6

*Definition of "Frame or Receiver" and Identification of Firearms,*
   87 Fed. Reg. 24, 652 (Apr. 26, 2022).................................... *passim*

*Definition of "Frame or Receiver" and Identification of Firearms*,
   86 Fed. Reg. 27,720 (May 21, 2021)...............................................13

Gun Control Act of 1968 ............................................... *passim*

Pub. L. No. 90-618, § 101, 82 Stat. 1213 ................................. 5

S. 1558, 117th Cong. (2021) (Untraceable Firearms Act of 2021) .......................12

5 H.R. 1454, 117th Cong. (2021) (Ghost Guns Are Guns Act) ...........................12

# INTRODUCTION

This case represents yet another example of the Executive Branch seeking to remedy a perceived problem—on its own and due to legislative inaction—through an agency rulemaking. This Court recently recognized in *Cargill v. Garland* that the solemn responsibility to determine our nation's public policy lies with the United States Congress, and the federal court's task is confined to deciding cases and controversies, which requires it to apply the law as Congress has written it. 57 F. 4th 447, 461 (5th Cir. 2023) (*en banc*). While some commentators—and the Government in its opening brief on appeal—argue that the regulation promulgated by ATF at issue in this case (the "Rule") is needed and good public policy, the Rule contravenes a plain reading of the applicable statutory language and allows ATF—and not Congress—to expand the scope of its jurisdiction and to subject many law-abiding citizens to new criminal liability.

Congress delegated to ATF the authority to regulate firearms in interstate commerce under the Gun Control Act of 1968. The statutory scheme established by Congress—and the scope of ATF's regulatory authority—turns primarily on the definition of "firearm". For decades, ATF took the position that the kinds of unfinished parts and components at issue in the rulemaking did not fall within Congress's "firearm" definition. As the American tradition of homemade gunmaking grew in popularity, demand for such components increased among

hobbyists and the do-it-yourself gunmaking community, and entrepreneurs invested millions of dollars into building businesses to meet this demand.

Then, in 2021, ATF reversed its long-standing position. ATF reversed its position after Congress failed to pass legislation to change the way ATF defines the term "firearm", and the President of the United States, in large measure seeking to deliver on a campaign promise, instructed the United States Department of Justice to issue a proposed rule within 30 days. ROA.1344–45 (Intervenor Complaint ¶¶ 47, 50).

Following through with the directive, ATF promulgated the Rule in April 2021 purporting to regulate partially manufactured firearm parts and weapon parts kits. ATF acknowledged that such unfinished parts had been lawfully sold and purchased in the past but asserted that such parts would become "firearms" upon the Rule's effective date as part of ATF's expansion of regulatory reach to include not only unfinished parts, but also a vast array of jigs, tools, templates, instructions, and the like. Although the Rule subjects many who possess or sell certain unfinished parts and components to potential criminal liability, the specific parameters of such criminal culpability are unclear.

The Rule reverses decades of consistent guidance from ATF, including scores of classification letters, that certain "partially complete or unassembled frames or receivers" (even those including parts, tools, and instructions to assist in the

manufacturing process) have not "reached a stage of manufacture" to be properly classified as the "frame or receiver" of a "firearm," and thus are not regulated by federal law. With its promulgation of the Rule, ATF jettisons decades of prior legal guidance in favor of an entirely novel and incorrect interpretation of the Gun Control Act that frees the agency from the confines of the statutory definitions it affirmed, maintained and enforced for over the past half century.

The Rule simply cannot be reconciled with the text of the statutory language in several important respects and its enforcement threatens the existence of Plaintiffs' and Intervenor's businesses. This Court should affirm the preliminary injunction entered by the district court in this case.

## JURISDICTIONAL STATEMENT

The district court granted Plaintiffs' and Intervenor's (collectively, "Plaintiffs" or "Appellees") motions for the entry or extension of a preliminary injunction on September 2, 2022; October 1, 2022; and November 3, 2022. *See* ROA.33, 36, 39. Defendants-Appellants timely filed notices of appeal from the first two orders on November 1, 2022, and from the third order on November 4, 2022. *See* ROA.39–40. The district court had jurisdiction over the case under 28 U.S.C. § 1331, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

Plaintiffs challenge various regulations promulgated as part of an omnibus rulemaking issued by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") entitled *Definition of "Frame or Receiver" and Identification of Firearms*, which took effect on August 24, 2022 (the "Rule"). The Rule purported to extend the scope of objects and activities ATF seeks to regulate under the 1968 Gun Control Act. The district court granted Plaintiffs' motions for a preliminary injunction, concluding that: Plaintiffs were likely to succeed on their claims that two provisions of the Rule conflict with the plain language of the statute; Plaintiffs had demonstrated substantial threat of irreparable harm; and the balance of the equities and the public interest weighed in favor of relief. The question presented here is whether the district court abused its discretion in granting that preliminary injunction.

## STATEMENT OF THE CASE

### I.   LEGAL BACKGROUND

### A.    The Gun Control Act of 1968 and ATF Implementing Regulations

Congress enacted the Gun Control Act in 1968, as amended, 18 U.S.C. §§ 921 *et seq.*, which established federal regulations for persons engaging in the business of importing, manufacturing, or dealing in "firearms." *See generally* 18 U.S.C. §§ 922– 923. Congress vested in ATF the authority to prescribe regulations "necessary to

carry out the provisions of" the Gun Control Act, *id*. § 926(a), but made clear that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms" for appropriate purposes. Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213, 1213–14. The Gun Control Act further stated that "this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title." *Id*. § 101, 82 Stat. at 1214.

Against this backdrop, ATF has promulgated implementing regulations pursuant to the requirements of the Gun Control Act. *See* 27 C.F.R. parts 478–479. The Gun Control Act requires entities that import, manufacture, or deal in firearms to obtain a federal firearms license, 18 U.S.C. § 923(a), to maintain records of firearm acquisition and disposition as prescribed by regulation, *id*. § 923(g)(1)(A), and to conduct background checks before transferring firearms to a non-licensee, *id*. § 922(t). The Gun Control Act also requires licensed importers and manufacturers to identify each firearm they import or manufacture by means of a serial number on the weapon's receiver or frame. *Id*. § 923(i).

The scope of the Gun Control Act—and ATF's attendant regulatory authority—is centered on and bounded by the Gun Control Act's four-part definition of "firearm" as: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921. In its initial regulations promulgated in 1968 and at all times prior to the effective date of the Rule, ATF's definition of "firearm" followed Congress's definition nearly verbatim:

> Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. In the case of a licensed collector, the term shall mean only curios and relics.

27 C.F.R. § 478.11; *cf.* 18 U.S.C. § 921(a)(3).

The Gun Control Act does not include a statutory definition of a "frame or receiver", but shortly after the act's passage in 1968, ATF promulgated regulations which provided a one-sentence definition of "frame or receiver" as: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Final Rule, *Commerce in Firearms and Ammunition*, 33 Fed. Reg. 18,555

(Dec. 14, 1968) (then codified at 26 C.F.R. § 178.11, and today appearing at 27 C.F.R. § 478.11) ("1968 Rule").

At the time ATF promulgated its 1968 Rule, it was no secret that some commonly-used weapons featured a "striker" rather than a hammer and other weapons had a central component which housed fewer than all three elements. ROA.1553 (Rule at 24,655). ATF addressed this incongruity by applying its own definition of "frame or receiver" to the component most closely fit the legal definition within the limits set forth in the Gun Control Act. *See* ROA.1553 (Rule at 24,655). This interpretative rubric was permitted by courts, and the agency took and held the position that the Gun Control Act authorized ATF to regulate items that "may readily be converted" into a weapon that expels a projectile by the act of an explosion, but did not authorize the federal regulation of items that "may readily be converted" into a "frame or receiver of any such weapon".

**B.    ATF's Consistent Interpretation of the Gun Control Act over Five Decades of Enforcement and Guidance to Industry and the Public**

For decades prior to the Rule, ATF's above-discussed regulatory definition guided the agency's enforcement of a licensing regime that governs the importation, manufacture, and dealing of products that constitute firearms. The Gun Control Act requires licensed importers and licensed manufacturers to "identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm

imported or manufactured by such importer or manufacturer." 18 U.S.C. § 923(i). Failure to follow these requirements can result in criminal liability. *See* 18 U.S.C. § 924(a)(1) (making it is a crime to violate "any other provision of this chapter," referring to Title 18, Chapter 44, of the United States Code, which contains sections 921–931). Therefore, it was and is essential for law-abiding businesses in the firearms industry to have clarity and predictability about what products meet the definitions of a "firearm" and "frame or receiver."

As shown in the five decades of agency activity presented in the Administrative Record submitted in the district court proceeding, ATF's implementing regulations maintained continuity with the Gun Control Act's text regarding the definition of "firearm", and ATF's definition of "frame or receiver" provided basic regulatory stability while technology evolved and the American tradition of homemade gunmaking continued to gain popularity. *See* ROA.1428–52 (Index of Administrative Record). ATF's definitions on the whole prior to the Rule allowed the agency to communicate with industry in a relatively coherent, constructive and consistent manner so that licensees and the public alike had reasonable certainty and a common understanding as to the basic definition of "firearm" and the parameters of ATF's regulations regarding licensure, compliance, and criminal conduct. Indeed, the Administrative Record contains numerous classification letters and guidance that demonstrate areas of laudable consistency in

ATF's generally permissible interpretation of the Gun Control Act and the application of agency rules in determinations made over the course of decades. *See*, *e.g.*, ROA.214–26 (ATF classification letters to Tactical Machining, Inc.).

ATF provided decades of consistent guidance through scores of classification letters ruling that certain "partially complete or unassembled frames or receivers" (even those including parts, tools, and instructions to assist in the manufacturing process) have not "reached a stage of manufacture" to be properly classified as the "frame or receiver" of a "firearm," and thus are outside the regulatory scope of federal law. *See* ROA.214–26. ATF's adherence to the Gun Control Act's definition of "firearm" enabled the agency to communicate the distinctions between Gun Control Act-regulated "firearms" and unregulated non-firearm items to industry and the public in a reasonably straightforward, understandable manner.

## C.    Americans' Long-Standing Tradition of Homemade Gunmaking

The United States has a long tradition of individuals privately making their own firearms, dating back to the American Revolution. "[G]un-making at home was essential to the Continental Army, and typically, it was more practical and efficient to assemble [a firearm from parts] rather than completely start from scratch." ROA.1390. Law-abiding individuals in this country have always been allowed to make their own firearms, even after the passage of the Gun Control Act.

As described above, the "frame or receiver" of a firearm is the component of the firearm that is subject to federal firearms regulations. *See* 18 U.S.C. § 921(a)(3)(B) (defining a "firearm" as including "the frame or receiver of any such weapon"). Today, many Americans who choose to make their own firearms do so using frame and receiver blanks, also known as "unfinished" or "incomplete" frames and receivers, which are raw materials that have undergone some, but not all, of the stages of manufacturing necessary to produce a complete, functioning firearm frame or receiver.

As Americans' interest in homemade gunmaking has continued to grow, so too has consumer demand for raw materials and technology essential for do-it-yourself gunmaking.  Consequently, companies like BlackHawk and other entrepreneurs invested capital and built businesses and business models to provide non-firearm products and technology to lawful purchasers—substantially in reliance on the relative certainty and stability provided by ATF's adherence to the statutory definitions established by Congress in the Gun Control Act.

Of particular importance were ATF's numerous written classification determinations to businesses in which ATF, after analyzing a submitted item, affirmed that "partially complete or unassembled frames or receivers", even when accompanied by parts, tools, and instructions to assist in the manufacturing process, have not "reached a stage of manufacture" to be properly classified as the "frame or

receiver" of a "firearm," and thus are outside the regulatory scope of federal law. *E.g.*, ROA.214–26.

These determinations were predicated on ATF's long-standing interpretation of the statutory definition of "firearm", which ATF has defended in multiple legal proceedings. As recently as November 2020 and January 2021, the Government defended these classification determinations and affirmed its pre-Rule interpretation of the statute in litigation against gun-control proponents:

> Plaintiffs' challenges to ATF's classifications also seek to undercut the process under which, for decades, ATF has reviewed numerous items to determine if they should be classified as "firearms" under the GCA, bringing to bear the agency's technical, scientific, mechanical, and legal expertise. Receivers for the AR-15, the most common rifle in America, have a space within them called the fire-control cavity, which accommodates the firing components. The **longstanding position of ATF is that,** where a block of metal (or other material) that **may someday be manufactured into a receiver** bears no markings that delineate where the fire-control cavity is to be formed and has not yet been even partially formed, **that item is not yet a receiver**…

ROA.1391 (citing Government's brief in *California v. ATF*, No. 3:20-CV-06761, 2020 WL 9849685 (N.D. Cal. Nov. 30, 2020) (emphasis added)). And again in 2021, ATF and Department of Justice emphasized ATF's consistent application of classification standards spanning more than four decades: "The Record contains classification letters dating back to the 1970s. These classification letters make plain that ATF has consistently adopted a standard whereby the degree of machining to the frame or receiver determined whether the device constituted a firearm. . . ."

ROA.1391–92 (citing Government's brief in *City of Syracuse v. ATF*, No. 1:20-CV-06885 (S.D.N.Y. Jan. 29, 2021)).

### D. The Biden Administration Announces That It "Will Not Wait for Congress to Act to Take Its Own Steps" on Gun Control

President Joseph R. Biden, Jr. campaigned on a promise to "Stop 'ghost guns'" which the Biden campaign described as a weapon obtained illegally by people "assembling one on their own [] by buying a kit of disassembled gun parts." ROA.1391. Specifically, then-candidate Biden promised to "pass[] legislation" to "stop the proliferation of these so-called 'ghost guns.'"

After President Biden took office, members of Congress proposed bills changing the way ATF classifies frame and receiver blanks not currently defined as firearms. None of those bills became law. *See*, *e.g.*, S. 1558, 117th Cong. (2021) (Untraceable Firearms Act of 2021); 5 H.R. 1454, 117th Cong. (2021) (Ghost Guns Are Guns Act). Unable to accomplish its legislative goal through Congress, the Biden administration turned to unilateral executive action to achieve its aims for regulating firearms. On April 7, 2021, the White House issued an announcement stating that "this Administration will not wait for Congress to act to take its own steps" on gun control and instructing the Department of Justice to "within 30 days . . . issue a proposed rule to help stop the proliferation" of so-called "ghost guns." ROA.1392–93.

In a White House Rose Garden press conference on April 8, 2021, President Biden, accompanied by Attorney General Garland, stated that he "asked the Attorney General and his team to identify for me immediate, concrete actions I could take now without having to go through the Congress." ROA.1393. Attorney General Garland stated in his remarks that "the proliferation of the so-called ghost guns" was caused by a "regulatory loophole" or "gap," even though the proliferation of such products was actually the direct result of ATF's proper legal determinations pursuant to the Gun Control Act approving the lawful, unregulated sale of such products. ROA.1393.

On May 7, 2021, ATF issued proposed rule 2021R–05, titled *Definition of "Frame or Receiver" and Identification of Firearms*, 86 Fed. Reg. 27,720 (May 21, 2021). On May 11, 2021, the U.S. Senate Committee on the Judiciary's Subcommittee on the Constitution held a hearing on proposed legislation addressing so-called "ghost guns", during which Senator Richard Blumenthal admitted that one reason he proposed the legislation was that "under federal law" frame and receiver blanks are not classified as firearms. ROA.1393–94.

On April 11, 2022, President Biden announced the completion of the Rule, stating that a "year ago this week . . . I instructed the Attorney General to write a regulation that would rein in the proliferation of ghost guns because I was having trouble getting anything passed in the Congress." ROA.1395. The Final Rule was

published on April 26, 2022, titled *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022), and took effect on August 24, 2022.

## II.  PROCEDURAL BACKGROUND

On August 11, 2022, plaintiffs Jennifer VanDerStok, Michael G. Andren, Firearms Policy Coalition, Inc., and Tactical Machining LLC (collectively, "Original Plaintiffs") commenced this action against defendants United States Attorney General Merrick Garland ("Attorney General"), United States Department of Justice ("DOJ"), Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Steven Dettelbach, and ATF (collectively, the "Government") seeking declaratory and injunctive relief from the Rule. ROA.42–94.  BlackHawk joined the Original Plaintiffs in this action to challenge the legality of that regulation on multiple grounds, arguing that unfinished parts, components, and other items do not fall within the definitions as set forth in federal law, and thus that ATF lacked the authority to issue a regulation purporting to reclassify them as such. ROA.37.

In granting a preliminary injunction first to Original Plaintiffs, and then to BlackHawk, the district court (O'Connor, J.) found that the Rule's "redefinition of 'frame or receiver' conflicts with the statute's plain meaning" and "is facially unlawful." ROA.758–59 (addressing 27 C.F.R. § 478.11); ROA.1652–63 (Order extending injunction to BlackHawk); *see also* ROA.1173–75 (Order clarifying

scope of preliminary injunction). The district court further found that the Rule "unlawfully treats weapon parts kits as firearms." ROA.762 (addressing 27 C.F.R. § 478.12(c)). The district court also found that Plaintiffs had demonstrated the substantial threat of irreparable harm and that the balance of equities and public interest favored the granting of injunctive relief. *See* ROA.766–72.

The district court's analysis with respect to BlackHawk's request for injunctive relief was essentially identical to that of Original Plaintiffs, and its order including factual findings that, like Tactical Machining LLC, BlackHawk had demonstrated the substantial threat of irreparable harm by respective declarations describing the threat of extinction posed by the Rule. *See* ROA.1656–62.

## SUMMARY OF THE ARGUMENT

The district court correctly concluded that "Plaintiffs have demonstrated a strong likelihood of success on their claims that the Final Rule—specifically, 27 C.F.R. §§ 478.11, 478.12(c)—exceeds the scope of ATF's authority under the Gun Control Act". ROA.765. The district court also correctly found that denial of injunctive relief would lead to irreparable injury, and that granting relief would not harm the public interest. Nothing in the Government's opening brief provides a basis to reverse the district court's orders. This Court should affirm the district court.

The Rule at issue exceeds ATF's statutory authority under the plain language of the Gun Control Act in two crucial respects. First, the Rule impermissibly

expands ATF's authority over parts that may be "readily converted" into frames or receivers, when Congress limited ATF's authority to "frames or receivers" as such. Second, the Rule impermissibly treats a "weapon parts kit" as a "firearm".

The Government's argument that the Rule represents a "clarification" is simply wrong, Government's Opening Brief ("Government's Br.") at 14, and its new position cannot be reconciled with the plain language of the statute and Congress's careful decisions in crafting the Gun Control Act and its reach. The unfinished parts, components and kits ATF purports to regulate—and in many instances, criminalize—do not meet any applicable definitions of a "firearm", which extends to "any *weapon* … which will or is designed to or may readily be converted to expel a projectile" or "the frame or receiver of any such weapon". 18 U.S.C. § 921 (emphasis added). Put simply, parts that *may* become receivers, including "partially complete, disassembled, or nonfunctional frame[s] or receiver[s]", 27 C.F.R. § 478.12(c), are neither "weapons", nor a "frame or receiver of any such weapon".

Nor did the district court abuse its discretion in finding that BlackHawk showed a substantial threat of irreparable harm. The district court correctly relied upon Circuit precedent that "[g]enerally, economic loss is not an irreparable harm because it can be recovered as damages at the end of the litigation . . . . [B]ut an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." ROA.767 (citing *Janvey v. Alguire*, 647 F.3d

585, 600 (5th Cir. 2011) and quoting *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989)).

The Government fails to address substantively, much less identify any reversible deficiency in, the district court's findings regarding the factual allegations in BlackHawk's sworn declarations. *See* ROA.1657–58, 1662. Indeed, the Government's argument for reversing the district court's *factual* findings consists of little more than an expanded recitation of their previously unavailing *legal* commentary, now accompanied by a post-injunction Open Letter issued by ATF in late 2022 that the Government suggest renders the district court's determination obsolete.

Finally, the district court appropriately considered and concluded the balance of equities and public interests weighed in favor of Plaintiffs, a determination fully consistent with Fifth Circuit's articulation of the required analysis where the district court finds substantial likelihood of success on the merits. While the Government expresses its disagreement with the district court's likelihood-of-success finding and reasserts a purported law-enforcement public interest, it provides little, if any, legal basis to warrant reversing that conclusion.

## APPLICABLE LAW AND STANDARD OF REVIEW

A preliminary injunction requires a showing of (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm absent an

injunction; (3) a balance of hardships favoring an injunction; and (4) no detriment to the public interest. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). Irreparable harm refers to harm for which there is no adequate remedy at law. *Id*.

In reviewing a district court's grant of a preliminary injunction, the appellate court evaluates "whether the issuance of the injunction, in the light of the applicable standard, constitutes an abuse of discretion." *Concerned Women for Am., Inc. v. Lafayette Cnty.*, 883 F.2d 32, 34 (5th Cir. 1989) (citation and alterations omitted). "[F]indings of fact that support the district court's decision are examined for clear error, whereas conclusions of law are reviewed de novo." *Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 284–85 (5th Cir. 1999); *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) ("The appellate court is not simply to substitute its judgment for the trial court's, else that court's announced discretion would be meaningless.").

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

The district court's entry of preliminary injunctive relief should be affirmed on appeal. A plain reading of the statute unambiguously shows that the Rule fails to conform to the statutory text. If the statute is unambiguous, it does not matter whether deference under *Chevron USA, Inc. v. Natural Resources Defense Council,*

*Inc.*, 467 U.S. 837 (1984), applies. *See*, *e.g.*, *Western Refining Southwest, Inc. v. FERC*, 636 F.3d 719, 727 (5th Cir. 2011). But if the statute were somehow ambiguous on the question presented here, *Chevron* would not apply to the Government's interpretation for several reasons. *See Cargill*, 57 F.4th at 465–68. Last, even assuming *arguendo* that the relevant statute is ambiguous, the rule of lenity would apply to resolve that ambiguity in favor of BlackHawk's interpretation here. *See id*. at 469. Under any of these grounds, Plaintiffs are likely to succeed on the merits.

### A.    The Rule Violates the Plain Language of the Gun Control Act

This Court must reverse an agency's interpretation that fails to conform to the statutory text." *Huawei Technologies USA, Inc. v. FCC*, 2 F.4th 421, 433 (5th Cir. 2021). Here, the Rule's expansion of ATF's authority to regulate parts, nonfunctional and incomplete components, and weapon parts kits contravenes the unambiguous expressed intent of Congress in the Gun Control Act to decline to regulate such items and activities.

### 1.    Congress Unambiguously Excluded Partially Complete, Disassembled, or Otherwise Nonfunctional Frames or Receivers from the Statutory Definition of "Firearm"

The district court correctly observed here that "[w]hen the statute's language is plain, the sole function of the courts is to enforce it according to its terms'", ROA.757 (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)

(internal quotes omitted)), and, to that end, "the Court beg[ins] with the assumption that the words were meant to express their ordinary meaning." ROA.757 (quoting *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015)). Indeed, this Court made clear that a court's starting point is to "determin[e] the statute's meaning using traditional statutory-interpretation tools. . . . 'the old-fashioned way.'" *Cargill*, 57 F.4th at 458. But "[s]tatutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" ROA.757 (quoting *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016)).

The Rule violates these cannons of statutory interpretation by expanding ATF's jurisdiction to include "partially complete, disassembled, or nonfunctional frame[s] or receiver[s]." ROA.758 (citing 24 C.F.R. § 478.12(c)). Congress expressly defined "firearm" to be (primarily): "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. 921(a)(3)(A). Alternatively, Congress sought to regulate (by itself): "(B) the frame or receiver of any such weapon". *Id.* § 921(a)(3)(B). ATF's redefinition of "frame or receiver" conflicts with the statute's plain meaning by altering Congress's definition of "firearm" to cover firearm *parts*, which are neither a "weapon", nor "the frame or receiver of any such weapon". 18 U.S.C. § 921(a)(3)(A), (B). To use the district court's succinct summarization of

one of the Rule's leading interpretative problems: "That which *may become* a receiver is not itself a receiver." ROA.757 (emphasis in original).

While the Government argues that "[i]n interpreting those terms to include a nonfunctional frame or receiver that may 'readily' be converted to a functional one, ATF acted consistently with the text of the provision," Government's Br. at 14; *see id*. at 19, its argument has no discernible support that can be directly traced to statutory language. Nor does the Government provide caselaw or other non-ATF legal authority for its position.[1]

Congress included in its definition of "weapons" those that "will" or "may readily be converted" to expel a projectile. 18 U.S.C. § 921(a)(3)(A).  Congress could have included similar language extending the definition to a nonfunctional frame or receiver (or firearm parts) that "may readily be converted" to a frame or receiver, as it did with "weapons", but did not. *Id*. § 921(a)(3)(B). Of course, "when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021). And the Government's reliance on Congress's

---

[1] BlackHawk hereby incorporates the arguments made in Original Plaintiffs' brief that the Government has waived its statutory construction and interpretation arguments in failing to cite legal authority in support of its position. Original Plaintiffs' Brief at 16–17, 22 (ECF No. 68 at 31–32, 37).

decision to broaden definitions in other statutory enactments in this area of law cuts against the Rule, not for it. Government's Br. at 19–20 (citing 26 U.S.C. § 5845(b) (defining "machinegun" to include a weapon that "can be readily restored to shoot[] automatically more than one shot, without manual reloading, by a single function of the trigger")).

Equally so, Congress's inclusion in the definition of "firearm" those weapons "designed to" expel a projectile, *see* 18 U.S.C. § 921(a)(3)(A), evinces a purposeful act to exclude the partially complete, disassembled, or otherwise nonfunctional frames or receivers ATF purports to regulate under the Rule. Even assuming the premise that a firearm part is "designed" to be or may one day become a frame or receiver, regulation does not necessarily serve the goals of the Gun Control Act, and certainly "does not change the fact that, in that moment, it is not 'the frame or receiver of any such weapon'" as required by the plain language of the statute. ROA.760 (citing 18 U.S.C. § 921(a)(3)(B)); *see New York v. Burger*, 482 U.S. 691, 713 (1987) (observing "the regulatory goals of the Gun Control Act were narrower: the Act ensured that '*weapons* [were] distributed through regular channels and in a traceable manner and [made] possible the prevention of sales to undesirable customers and the detection of the origin of particular *firearms*.'" (emphases added) (alterations in original) (citing *United States v. Biswell*, 406 U.S. 311, 315–16 (1972)).

### 2.     Congress Unambiguously Excluded Weapon Parts Kit From the Statutory Definition of "Firearm"

ATF additionally exceeded its authority by purporting to regulate, for the first time, "weapons parts kits," in other words (according to the Government), an "aggregations of weapon parts". ROA.486. To attempt to do so, ATF adopted a new definition of "firearm": "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11 (definition of "firearm").

Under the plain language of section 921(a)(3)(B), the only firearm *parts* that may be regulated as a "firearm" are "the frame or receiver of any such weapon". 18 U.S.C. § 921(a)(3)(B). The Rule's attempt to regulate items that are less than a "frame or receiver", or other parts, simply because they are grouped into a "weapons part kit" is untethered to any statutory authorization—an interpretive position that ATF has long held and as recently as 2020 articulated unequivocally in court filings:

> As a statutory matter, Congress has legislatively defined a "firearm" to be a weapon that may be readily converted to expel a projectile by the action of an explosive, or the frame or receiver of such weapon, but has explicitly excluded "firearms parts" from that definition. Congress has determined that "firearms" are subject to regulation under the GCA, and that anything that is not a firearm is largely excluded from federal regulation.

ROA.199 (citing Government's brief in *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685 (N.D. Cal. Nov. 30, 2020)).

The Government's above-quoted statutory interpretation was correct in 2020 and remains so today. The Gun Control Act does not give ATF any general authority to regulate weapon parts, nor has ATF claimed otherwise prior to the Rule and this litigation. *See* ROA.501 (Government makes hedged concession that "ATF generally does not regulate firearm parts"). Congress's decision to allow for the regulation of "parts" of "destructive devices" in section 921(a)(4)(D), moreover, shows that it unambiguously sought to preclude the regulation set forth in that aspect of the Rule. *Collins*, 141 S. Ct. at 1782 ("courts should give effect to Congress's deliberate exclusion").

The Rule (and the Government in its brief at 24) attempts to bridge this gap by cherry picking (and relying upon) the phrases "designed to" and "may readily be converted" and "assembled" from various other places in the statute both to create its own definition of "firearm" and to seek to interpret them. But there is no reason to believe that Congress authorized ATF to regulate aggregation of weapon parts based on statutory language found in *other* sections of the Gun Control Act— particularly where it was used in one subsection of the definition of "firearm", *see* 18 U.S.C. § 921(a)(3)(A), but not the following, *see id*. § 921(a)(3)(B).

* * *

As this Court observed in *Cargill*, context and grammar matter and, as in that case, "Congress knew how to write a definition" that would have followed the

24

Government's preferred reading "if it wanted to[, b]ut it did not." 57 F.4th at 460. And again, as in *Cargill*, "[t]he Government offers nothing to overcome this plain reading[.]" *Id*.

### B.    Even If the Statutory Language Is Ambiguous, This Court Need Not Defer to the Government's Interpretation

Plaintiffs naturally do not believe that the statutory language in the Gun Control Act is ambiguous on the question presented here and instead contend that the text unambiguously precludes the Government's position. If this Court nonetheless disagrees, *Chevron* deference would not apply for three reasons.

First, as this Court observed in *Cargill*, *Chevron* does not apply for the simple reason that the Government does not ask to apply it. ROA.765 (observing that "Defendants do not argue that Chevron deference applies."). The Government's opening brief here makes no mention of *Chevron*, and "that means that the *Chevron* argument has been waived—not merely forfeited." *Cargill*, 57 F.4th at 465 (citations omitted).

Second, *Chevron* does not apply because the statute that the Rule interprets imposes criminal penalties. *Cargill*, 57 F.4th at 467 ("We must not apply *Chevron* where, as here, the Government seeks to define the scope of activities that subject the public to criminal penalties."). Violations of the Gun Control Act give rise to criminal liability, including imprisonment, *see* 18 U.S.C. §§ 922, 924, and this Court

has made clear that it "must not apply *Chevron* where, as here, the Government seeks to define the scope of activities that subject the public to criminal penalties." *Cargill*, 57 F.4th at 467.

Third, *Chevron* does not apply here "because the Government has construed the same statute in two, inconsistent ways at different points in time." *Cargill*, 57 F.4th at 468 ("If we were required to defer to the Government's position, the Government could change the scope of criminal liability at any time."). As described above, as recently as 2020 the Government asserted that "[a]s a statutory matter, Congress has legislatively defined a 'firearm' to be a weapon that may be readily converted to expel a projectile by the action of an explosive, or the frame or receiver of such weapon, but has explicitly excluded 'firearms parts' from that definition," ROA.199 (citing Government's brief in *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685 (N.D. Cal. Nov. 30, 2020)). The Rule shows ATF now takes a substantially different position regarding Congress's statutory definition, and therefore its newly adopted interpretation is not afforded deference.

## C. Any Ambiguity Concerning the Ambit of the Gun Control Act Should Be Resolved in Favor of Lenity

Last, assuming *arguendo* that the relevant statute is ambiguous, the rule of lenity should apply in favor of BlackHawk's interpretation. *United States v. Granderson*, 511 U.S. 39, 54 (1994) ("[W]here text, structure, and history fail to establish that the Government's position is unambiguously correct—we apply the

rule of lenity and resolve the ambiguity in [the defendant's] favor."). As the Government admits in its brief, the record shows that certain named plaintiffs "have chosen to refrain from purchasing products classified" as firearms under the Rule "in response to the perceived threat of looming civil and criminal liability." Government's Br. at 10 (citing ROA.1188–92). The district court itself discussed at length the threat of criminal prosecution posed by the Rule, albeit in the context of irreparable harm. *See* ROA.1189–92; *see also Cargill*, 57 F.4th at 470 (expressing concern that "ATF could change the scope of criminal liability by issuing a regulation").

Again, although BlackHawk does not believe that the statutory language in the Gun Control Act is ambiguous, should this Court disagree, the parties' competing arguments whether ATF has the authority to (re)define the phrase "frame or receiver" satisfy either the "reasonable doubt" or the "grievously ambiguous" standard. *Cargill*, 57 F.4th at 469–70. And although the district court did not consider and apply the rule of lenity in its ruling, this Court may affirm on any basis supported by the record. *Gilbert v. Donahoe*, 751 F.3d 303, 311 (5th Cir. 2014) ("We may affirm on any ground supported by the record, including one not reached by the district court."). Therefore, should this Court's analysis detect some measure of ambiguity in the Gun Control Act provisions at issue here, the criminal ramifications of the statute trigger lenity and resolution in BlackHawk's favor. *Rewis v. United*

*States*, 401 U.S. 808, 812 (1971) ("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity").

## II.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT FOUND IRREPARABLE HARM TO BLACKHAWK

The Government fails show that the district court committed an error of either law of fact when it concluded that BlackHawk "faces a substantial threat of irreparable harm" based on the Original Plaintiffs' discussion of "BlackHawk's alleged injuries at length, describing the manufacturer-retailer's substantial decrease in sales following enactment of the Final Rule due to widespread customer concern about purchasing its products". ROA.1657. That conclusion should be upheld.

### A.     The Government Fails to Identify Any Clear Error

The Government is unable to point to any clear error in the district court's factual finding that BlackHawk's showing of injury met the standard for irreparable harm. That showing included extensive evidence that, following the effective date of the Rule, BlackHawk was forced to discontinue selling key products out of fear of criminal liability and experienced a sharp decline in sales as its fearful-and-confused customers became hesitant to continue purchasing BlackHawk's products. *See* ROA.924–31 (Daniel Lifschitz Decl. ¶¶ 11–14). The evidence submitted to the district court fall squarely within the Fifth Circuit's definition of irreparable injury, which exists where "the potential economic loss is so great as to threaten the

existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989).

On appeal, the Government contends that the district court's conclusions regarding the Rule's impact on BlackHawk "were based on speculation" and not "persuasive evidence". Government's Br. at 34. As a threshold matter, the Government does not appear to have disputed the existence or authenticity of the evidence presented by BlackHawk, nor make the specific argument that the district court should have ignored BlackHawk's evidence. In the absence of such argument, any such argument is forfeited. *Benefit Recovery, Inc. v. Donelon*, 521 F.3d 326, 329 (5th Cir. 2008) (this Court does "not consider arguments or evidence that was not presented to the district court").

Even so, this criticism of the factual findings consists of nothing more than subjective commentary accompanied by, ironically, the Government's own speculation that BlackHawk's immediate revenue losses "were likely attributable to temporary uncertainty" following the Rule's promulgation. Government's Br. at 35. As such, this Court should reject the Government's unfounded invitation to either engage in fact finding, or substitute its judgment for that of the district court. *Browning v. Kramer*, 931 F.2d 340, 345 (5th Cir. 1991) ("As a court for review of errors," we do "not . . . decide facts or make legal conclusions in the first instance," but "review the actions of a trial court for claimed errors."); *Enter. Int'l, Inc. v.*

*Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) ("appellate court is not simply to substitute its judgment for the trial court's, else that court's announced discretion would be meaningless").

###    B.    ATF's December 27, 2022 Open Letter Does Not Undermine the District Court's Finding of Irreparable Harm

Curiously, the Government cites ATF's December 27, 2022 Open Letter recently issued to the firearms industry "to dispel any confusion in the industry or among the public" regarding the Rule and then suggests that the Court should consider that "BlackHawk has not provided any evidence following that Open Letter to suggest that its customers remain confused or unwilling to purchase any specific items even despite the additional guidance provided in the letter." Government's Br. at 35. The Government next offers more speculation as to what BlackHawk "could" do to in regard to "lingering confusion about a particular product." Government's Br. at 35. The Government's use of the Open Letter—a document created well after the district court's orders and which has no functional relevance in this appeal—aptly illustrates the Government's persistent inability to marshal credible factual or legal support for its defense of the Rule.

Factual findings provide a district court with the foundation upon which to exercise its discretion and the basis for this Court's review of that discretion. Neither the Open Letter nor the Government's speculative arguments were before the district court at the time it granted injunctive relief. They accordingly are not proper grounds

for reviewing the district court's decision here. And even if they were, they do not identify any clear error by which this Court may reverse the district court's finding that BlackHawk established likely irreparable harm caused by the Rule.

### C. The Government Does Not Show the District Court Erred When It Found Irreparable Harm in the Form of Nonrecoverable Compliance Costs

The Government finally argues that the district court erred in finding that the compliance costs under the Rule were unrecoverable. Government's Br. at 36. The Government relies upon caselaw for the proposition that ordinary compliance costs do not constitute irreparable harm and discusses several cases involving extraordinary regulatory costs, asserting that the district court "declined to address these important principles." Government's Br. at 38.

This argument lacks both support in the record and merit because the district court recognized that "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs". *Texas v. EPA*, 829 F.3d 405, 434 n.41 (5th Cir. 2016) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)); *see also* ROA.768. In addition, the district court recognized that "[w]hen determining whether injury is irreparable, 'it is not so much the magnitude but the irreparability that counts ....'" ROA.768 (quoting *Texas v. EPA, supra*).

Indeed, the district court was well aware that one of the Government's arguments was, at bottom, "compliance is easy and cheap" and that the Plaintiffs need only purchase and maintain a federal firearms license. ROA.767. The district court correctly identified two problems with this contention.

First, "it misunderstands Tactical Machining's business. Tactical Machining already has a federal firearms license. But even as a federally licensed manufacturer, Tactical Machining is unable to continue its direct-to-consumer sales of most of its products because those products are now "firearms". ROA.767. Second, "even if it were factually sound, the Government's argument relies on the incorrect legal premise that compliance costs are not an irreparable harm. To the extent the Final Rule would impose additional compliance costs, the Government admits that such costs are nonrecoverable. And nonrecoverable means irreparable." ROA.767–68. As such, the Government's arguments here continue to misunderstand the relevant respective business models and all but ignore the district court's observations to the same effect.

The Government also criticizes the district court's consideration of ATF's Regulatory Impact Analysis—which predicted the "largest cost" imposed by the Rule would be "the dissolution of the entire business"—and dismissively describe such costs as "self-inflicted injuries" that do not show irreparable harm. Government's Br. at 35–36; *cf.* ROA.766–77. The Government's characterization

32

of such costs as "self-inflicted" merely seeks to reframe its own predictions and does nothing to undermine the district court's finding that, as predicted, the Rule inflicts significant real-world costs that jeopardize the survival of businesses like Manufacturer Plaintiffs. ROA.767.

### D.     The District Court Did Not Abuse its Discretion in Finding the Balance of the Equities and the Public Interest Favor Upholding Injunctive Relief

The final two elements necessary to support a grant of injunctive relief—the balance of equities (the difference in harm to the respective parties) and the public interest—"merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In this assessment, a court weighs "the competing claims of injury and [] consider[s] the effect on each party of the granting or withholding of the requested relief," while also considering the public consequences of granting injunctive relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (internal citations omitted).

In its balance-of-hardships analysis of BlackHawk's motion, the district court found that the threatened injury to the Plaintiffs—the complete elimination of their businesses—and the public's interest in lawful government action "far outweighs any potential harm the government would incur in being temporarily prevented from enforcing its unlawful Rule." ROA.1660; *see also* ROA.771. In its evaluation of the public interest, the district court considered the Government's argument that injuries

to their interests in law enforcement and public safety cannot be vindicated if the Plaintiffs are allowed to sell noncompliant products which "would render it far less likely that law enforcement would be able to trace the firearms in the event they were used to commit a crime." ROA.1660. In this regard, the district court determined that (1) "any injury to the Government's general interest in law enforcement and public safety is appreciably undermined by this Court's preliminary determination that the Final Rule is likely unlawful", (2) that "Plaintiffs' liberty interest—as law-abiding citizens who wish to engage in historically lawful conduct (the purchase and sale of now-regulated parts)—outweighs the Government's remaining interest in preventing prohibited persons from unlawfully possessing firearms." ROA.1660–61.

Both of these conclusions are fully consistent with this Court's recent opinions ruling that "'[t]here is generally no public interest in the perpetuation of unlawful agency action.'" *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 618 (5th Cir. 2021) ("Any interest [an agency] may claim in enforcing an unlawful (and likely unconstitutional) [rule] is illegitimate."). The district court therefore correctly believed that "[j]ust as the Government has an

interest in the law's enforcement, so too does the public have an equally compelling interest in enforcement of the laws that govern its governing authorities" ROA.1661.

Finally, the district court noted that the reasoning regarding the public interest was "strengthened by the fact that the Government's likely *ultra vires* enforcement efforts upset more than fifty years of ATF regulatory precedent against a public that has relied on that historic posture." ROA.1661. Again, the district court's conclusion rested on the sound legal and factual grounds. *See City of Dallas, Texas v. Hall*, No. 3:07-CV-0060-P, 2008 WL 11350041, at *3 (N.D. Tex. July 28, 2008) (finding that injunction would serve the public interest by "ensur[ing] the status quo is maintained so the legal system can resolve this important dispute . . . "), *injunction terminated by* 2009 WL 10708823, at *2 (N.D. Tex. July 27, 2009); *see also Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921, 946 (N.D. Miss. 2016) ("[T]he Rule in this case changes a practice which CMS accepted for many years and this court does not believe that … generalized citations to agency discretion constitute sufficient reason to prevent the courts from making a careful evaluation of the Rule before it goes into effect.").

\* \* \*

The Government steadfastly fails to acknowledge evidence in the record that the Rule's expansion of regulatory requirements adversely impacts an entire of industry comprised of companies like the Plaintiffs whose business models will no

longer be viable and whose operations cannot be long sustained without timely judicial intervention. *Atwood Turnkey*, 875 F.2d at 1179 (irreparable injury, which exists where "the potential economic loss is so great as to threaten the existence of the movant's business"). And while the Government admits that compliance costs are nonrecoverable, *see* ROA.768, it fails to squarely address, much less specifically identify any abuse of discretion or erroneous conclusion of law in, the district court's correct view that "'complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.'" ROA.768 (quoting *Texas v. EPA*, 829 F.3d at 433 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994)). The district court exercised sound discretion in its findings and there is no basis for reversing its orders.

## CONCLUSION

For the forgoing reasons, the orders of the district court should be affirmed.

Respectfully submitted:

*/s/ Michael J. Sullivan*
Michael J. Sullivan
Nathan P. Brennan
J. Christopher Amrhein, Jr.
Ashcroft Law Firm, LLC
200 State Street
Boston, MA 02109
(617) 573-9400
msullivan@ashcroftlawfirm.com
nbrennan@ashcroftlawfirm.com
camrhein@ashcroftlawfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2023, I electronically filed the foregoing record excerpts with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users, and will be served by appellate CM/ECF system.

/s/*Michael J. Sullivan*
Michael J. Sullivan

## CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), and 5ᵗʰ CIR. R. 32.1:  this document contains 8,386 words.

2.  This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5ᵗʰ CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word (Version 2211) in 14-point Times New Roman.

*/s/Michael J. Sullivan*
Michael J. Sullivan