**Nos. 22-11071, 22-11086**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Case No. 22-11071

Jennifer VanDerStok; Michael G. Andren; Tactical Machining, L.L.C., a limited liability company; Firearms Policy Coalition, Incorporated, a nonprofit corporation,

Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendants-Appellants.

consolidated with

No. 22-11086

Blackhawk Manufacturing Group, Incorporated, doing business as 80 Percent Arms,

Intervenor Plaintiff-Appellee,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas

**REPLY BRIEF FOR APPELLANTS**

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION AND SUMMARY ..................................................................................1

ARGUMENT ..........................................................................................................................2

I.  Plaintiffs Are Unlikely to Succeed on the Merits..................................................2

II.  The Equitable Factors Independently Foreclose the Extraordinary
     Remedy of a Preliminary Injunction...................................................................... 16

     A.  The Balance of the Equities Strongly Tilts Against Injunctive
         Relief ......................................................................................................................16

     B.  There Is No Irreparable Harm to Plaintiffs.................................................21

CONCLUSION ..................................................................................................................... 27

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                                       **Page(s)**

*A.O. Smith Corp. v. FTC,*
  530 F.2d 515 (3d Cir. 1976) ................................................................. 24

*Azar v. Allina Health Servs.,*
  139 S. Ct. 1804 (2019) ......................................................................... 7

*Babbitt v. Sweet Home Chapter of Communities for a Great Or.,*
  515 U.S. 687 (1995) ...................................................................... 15-16

*BST Holdings v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) ................................................................. 20

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) ................................................................. 15

*County of Maui v. Hawaii Wildlife Fund,*
  140 S. Ct. 1462 (2020) ......................................................................... 15

*Freedom Holdings, Inc. v. Spitzer,*
  408 F.3d 112 (2d Cir. 2005) ................................................................. 24

*Iowa Utils. Bd. v. FCC,*
  109 F.3d 418 (8th Cir. 1996) ................................................................. 24

*Louisiana v. Biden,*
   F.4th 1017 (5th Cir. 2022) ......................................................... 24, 25

*Maracich v. Spears,*
  570 U.S. 48 (2013) ............................................................................... 15

*R.R. Ricou & Sons Co. v. Fairbanks, Morse & Co.,*
  11 F.2d 103 (5th Cir. 1926) ................................................................... 6

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) ............................................................................. 15

*Texas v. Biden,*
  10 F.4th 538 (5th Cir. 2021) ................................................. 20, 21, 23, 26

*Texas v. EPA,*
  829 F.3d 405 (5th Cir. 2016) ............................................................... 24

*United States v. Annis,*
  446 F.3d 852 (8th Cir. 2006) ............................................................ 9, 10

*United States v. O'Brien,*
  391 U.S. 367 (1968) ............................................................................. 7

*United States v. Ron Pair Enters.,*
  489 U.S. 235 (1989) ............................................................................ 11

*United States v. Ryles,*
  988 F.2d 13 (5th Cir. 1993) ........................................................... 9, 10

*United States v. Scroggins,*
  599 F.3d 433 (5th Cir. 2010) ............................................................. 4

*United States v. Stewart,*
  451 F.3d 1071 (9th Cir. 2006) ....................................................... 9, 10

*United States v. Wick,*
  697 F. App'x 507 (9th Cir. 2017) .................................................. 9, 10

*Wages & White Lion Invs., LLC v. FDA,*
  16 F.4th 1130 (5th Cir. 2021) ........................................................... 24

*Winter v. NRDC,*
  555 U.S. 7 (2008) ........................................................................ 20, 24

**Statutes:**

Gun Control Act of 1968:
  18 U.S.C. § 921(a)(3) ......................................................................... 1
  18 U.S.C. § 921(a)(3)(A) .................................................................... 9
  18 U.S.C. § 921(a)(4)(C) ................................................................... 12
  18 U.S.C. § 921(a)(25) ...................................................................... 12
  18 U.S.C. § 922(g) ............................................................................ 19

26 U.S.C. § 5845(b) ............................................................................ 12

**Regulation:**

27 C.F.R. § 478.12(c) ........................................................................... 2

**Legislative Materials:**

114 Cong. Rec. 10,859 (1968) .............................................. 7

S. Rep. No. 90-1501, at 29 (1968) .................................... 7, 14

**Other Authorities:**

ATF, *Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers* (Sept. 27, 2022), https://perma.cc/M2AZ-BSW8 ...................................22

*Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022) ........................................ 2, 17

80% Arms, *ATF Ban Reversed*, https://perma.cc/2LZA-K9TD ........................... 18, 19

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012)............................................. 7, 13

## INTRODUCTION AND SUMMARY

Plaintiffs do not dispute that the Rule they challenge advances critical public-safety and law-enforcement interests by keeping firearms out of the hands of individuals who cannot lawfully possess them and preventing the proliferation of untraceable firearms. Plaintiffs also do not dispute that the Rule does not prohibit any plaintiff from purchasing or selling any firearm. Plaintiffs nonetheless ask this Court to uphold the district court's order preliminarily enjoining the Rule and permitting plaintiffs to continue to deal in unserialized firearms without performing background checks. This Court should decline that invitation.

Congress has long required importers, manufacturers, and dealers of firearms to comply with licensing, background check, serialization, and recordkeeping requirements to ensure that firearms are not sold to those, such as felons, who are prohibited from possessing them and to enable law enforcement to trace firearms used in crimes. In enacting those requirements, Congress defined "firearm" to include, as relevant here, "any weapon" that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive," as well as the "frame or receiver" (that is, the major structural component) "of any such weapon." 18 U.S.C. § 921(a)(3). In the Rule at issue in this case, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) clarified, as relevant here, that kits or aggregations of parts that enable a purchaser to readily assemble an operational weapon, or readily construct a functional frame or receiver, fall within the statutory definition of "firearm" and so

must be sold in compliance with the Gun Control Act's requirements. *See Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022).

As the government demonstrated in its opening brief, the district court's decision to enjoin the Rule was incorrect on every level: the Rule comports with the statute; the balance of the equities and public interest weigh decisively in the government's favor; and no plaintiff is irreparably harmed by the Rule. Plaintiffs rebut none of these showings. On the merits, plaintiffs fail to grapple with the text of the statute and instead focus on irrelevant or out-of-context quotations from legislative history or previous litigation statements in an attempt to manufacture a conflict between the statute and the Rule. And on the equities, plaintiffs fail to explain how any minimal compliance costs could possibly outweigh the critical public-safety and law-enforcement interests advanced by the Rule. This Court should vacate the preliminary injunction.

## ARGUMENT

### I.    Plaintiffs Are Unlikely to Succeed on the Merits

**1.** The government demonstrated in its opening brief that the district court erred in concluding that the Rule's clarification that a "frame" or "receiver" includes a partially complete, disassembled, or nonfunctional frame or receiver that may "readily" be converted into a functional one, *see* 27 C.F.R. § 478.12(c), conflicts with the Gun Control Act. As explained, the statute does not provide any definition of "frame" or "receiver." In interpreting those terms to include a partially complete

2

frame or receiver that may "readily" be converted to a functional one, ATF acted consistently with the text of the statute and with Congress's similar approach to defining other terms in similar contexts. Any contrary approach would permit individuals to circumvent federal firearms requirements that serve critically important functions by keeping firearms out of the hands of felons and other prohibited persons and enabling law enforcement to trace firearms used in crimes. And the interpretation is supported by the agency's longstanding practice of treating certain partially complete frames or receivers as frames or receivers for these purposes. ATF's interpretation plainly comports with the Gun Control Act. *See* Opening Br. 18-24.

Plaintiffs barely contest these points. Instead, plaintiffs advance a scattershot of arguments that rely on a fundamental misunderstanding of the Gun Control Act, the Rule, and ATF's longstanding approach to implementing the statute. *See* VanDerStok Br. 16-29; BlackHawk Br. 19-22. None provides any support for the district court's injunction.

**a.** At the outset, plaintiffs advance the puzzling contention (at VanDerStok Br. 16-17; BlackHawk Br. 21 n.1) that the government waived the argument that the Rule's definition of "frame or receiver" comports with the statute. In its opening brief, the government devoted six pages (at 18-24) to arguing that the Rule's definition is consistent with the statute and that the district court erred in holding to the contrary. Plaintiffs assert nonetheless that the argument is waived because the relevant portions of the brief cite only the statute and the Rule and not, they say, the "relevant

legal standards and Fifth Circuit precedent." VanDerStok Br. 17. This argument is

hard to understand: as plaintiffs recognize, statutory "text is the most direct path to

the plain meaning" of the statute. VanDerStok Br. 18. Thus, the government's focus

on the statute—and on the Rule's interpretation of the statute—is indeed a focus on

the most "relevant legal standards." It is also unclear what precedent the government

ignored: plaintiffs themselves fail to cite any pertinent precedent interpreting the

relevant statutory provision. The issue of whether the Rule faithfully implements the

statute was thus "adequately presented" for this Court's review. *United States v.*

*Scroggins*, 599 F.3d 433, 447 (5th Cir. 2010).

**b.** When plaintiffs do turn to the merits of the statutory interpretation

question, they fare no better.

First, plaintiffs nowhere grapple with the fact that Congress did not provide

any definition of "frame" or "receiver." Their primary contention for the invalidity of

the Rule's definition (at VanDerStok Br. 18-21; BlackHawk Br. 19-22) is that

Congress implicitly precluded the Rule's interpretation because Congress defined

other terms—including "firearm," "machinegun," and "destructive device"—to

include nonfunctional versions of those weapons that may "readily" be converted or

assembled to functional versions but did not so define "frame" or "receiver." But the

government demonstrated the error of this argument in its opening brief: it "proceeds

from the incorrect premise that § 921(a)(3)(B) itself defines 'frame or receiver' and so

some inference may be drawn from the nonexistence of 'readily' language in that provision." Opening Br. 21-22. Plaintiffs simply refuse to engage with this point.

Second, plaintiffs fail to grapple with the district court's recognition that an "incomplete receiver may still be a receiver within the meaning of the statute, depending on the degree of completeness." ROA.759-60. In suggesting otherwise— that only fully functional frames and receivers are covered by the statute—several of plaintiffs' arguments prove far too much; that result would make a mockery of the regulatory scheme, and even plaintiffs do not affirmatively defend that implication of their arguments.

For example, plaintiffs contend (at VanDerStok Br. 24-26) that ATF's interpretation is inconsistent with the plain meaning of the statutory phrase "frame or receiver," because various historic dictionaries, patents, and court decisions use the terms "frame" or "receiver" to refer to "functional and complete" frames or receivers. But as the district court explained, it cannot be the case that only fully functional frames and receivers are covered by the statute. And plaintiffs' argument fails on multiple additional levels. For one, the fact that various texts refer to a functional frame or receiver as a frame or receiver is unsurprising; it is of course true that complete frames and receivers constitute frames and receivers. None of the sources quoted by plaintiffs addresses the relevant question here: At what point in the manufacturing process does an item become a frame or receiver within the meaning of the Gun Control Act? And plaintiffs' argument is not furthered by their citation (at

5

VanDerStok Br. 26-27) to a 1926 case explaining that, for purposes of asserting a maritime claim, the words "boat" and "vessel" generally describe completed watercraft because it "is not customary for a structure to be called a 'boat' or 'vessel' and to have a name before it is launched." *R.R. Ricou & Sons Co. v. Fairbanks, Morse & Co.*, 11 F.2d 103, 104 (5th Cir. 1926). It hardly bears mentioning that a century-old custom dictating when a boat is christened and maritime law applies is irrelevant here.

In addition, plaintiffs' attempt to ascribe their own absolutist position to ATF (at VanDerStok Br. 21, 27) misses the mark entirely. As explained, *see* Opening Br. 20-21, ATF has long understood that certain partially complete frames and receivers constitute frames or receivers under the Gun Control Act and has consistently argued that the statute regulates frames or receivers once they have reached a sufficiently "critical stage of manufacture," a "line-drawing exercise [that] is necessarily carried out on a device-by-device basis," ATF Summary Judgment Br. at 9, *Syracuse v. ATF*, No. 1:20-cv-6885 (S.D.N.Y. Jan. 29, 2021), Dkt. No. 98.

Third, plaintiffs fail to contend with Congress's desire, evident throughout the Gun Control Act, to regulate incomplete weapons and thus ensure that individuals cannot circumvent Congress's public-safety regime by dealing in nearly-complete firearms, destructive devices, machineguns, or other weapons. By clarifying that the statutory definition of "firearm" includes certain partially complete frames and receivers, the Rule implements this clear Congressional intent and properly adheres to the well-established principle that statutes should be interpreted "to work rather than

fail." Antonin Scalia & Bryan A. Garner, *Reading Law* 63 (2012) (explaining the presumption against ineffectiveness).

Plaintiffs urge instead (at VanDerStok Br. 27-28) that legislative history reflects a narrower goal for the "readily converted" language in the definition of "firearm"; specifically, plaintiffs assert that this language was simply an attempt to address so-called "starter guns." That analysis is unpersuasive. As an initial matter, as explained, Congress repeatedly included similar "readily" language in defining related statutory terms—not only "firearm" but also "destructive device" and "machinegun." Taken together, those inclusions plainly reflect an intent to sweep more broadly than just addressing starter guns. In any event, even assuming plaintiffs' understanding of the legislative history were correct, a statute's legislative history cannot overcome its "clear text and structure." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1815 (2019).

But plaintiffs' understanding is not persuasive even on its own terms; plaintiffs cite one Senator's explanation of an amendment proposed in April 1968 that reflects some, but not all, of the language eventually enacted as the definition of "firearm," *see* 114 Cong. Rec. 10,859 (1968). A later (and more authoritative, *see United States v. O'Brien*, 391 U.S. 367, 385 (1968)) Senate committee report on a version of the statute that more closely matches the enacted provision makes clear Congress's intent—consistent with the language actually enacted—to more broadly regulate "unserviceable firearms." S. Rep. No. 90-1501, at 29 (1968). As explained, this intent is consistent with the Gun Control Act's text, context, and structure, including

Congress's choice to define other relevant terms in a similar way. It is thus not the case, as plaintiffs suggest (at VanDerStok Br. 28-29), that the government improperly relies on legislative purpose to justify regulating nonfunctional frames and receivers.

Finally, although plaintiffs spend substantial time (at VanDerStok Br. 22-24) attacking the government's argument that Congress explicitly referred back to the primary definition of firearm in the frame-or-receiver provision, plaintiffs' attacks appear to rest on a misunderstanding of the point. Indeed, it is indisputable that Congress in fact textually linked the two provisions: § 921(a)(3)(A) defines "firearm" to include "any weapon" that "is designed to or may readily be converted to" fire live ammunition, and § 921(a)(3)(B) refers to the "frame or receiver of any such weapon"—that is, any weapon, functional or not, referenced in § 921(a)(3)(A). *See* Opening Br. 20. As explained, Congress's linking of the two provisions provides additional support for ATF's decision to define "frame" and "receiver" in a way consistent with Congress's definition of "firearm" in the linked provision. Plaintiffs have no response to that general point regarding the statutory structure; instead, their arguments seem to rest on the mistaken belief that the government argued that the frame-or-receiver provision incorporates by reference all portions of the primary definition of firearm.

**2.** As the government demonstrated in its opening brief, the Rule's clarification that certain weapon parts kits constitute "firearms" under the Gun Control Act also comports with the statute. The Act's definition of "firearm" as including any weapon

8

that "is designed to or may readily be converted to expel a projectile by the action of an explosive," 18 U.S.C. § 921(a)(3)(A), makes clear Congress's intent to cover certain partially complete, or nonoperational, weapons. A weapon parts kit that includes parts to enable the ready assembly of an operational firearm plainly satisfies the statute's definition: it is both "designed to" and "may readily be converted" to be an operational firearm. Fundamentally, such a kit is no different from a partially disassembled firearm, and consistent with the Rule's conclusion, courts have long held that such weapons may constitute "firearms." *See* Opening Br. 24-28.

**a.** In response, plaintiffs nowhere engage with the statutory text nor do they even attempt to refute ATF's plain-text explanation that a weapon parts kit containing the parts necessary to readily assemble an operational firearm is "designed to" be, and "may readily be converted" to be, an operational firearm. That failure to grapple with the statutory definition is fatal to their argument.

Nor do plaintiffs offer any persuasive response to the longstanding precedent cited by the government holding that even disassembled or nonoperational weapons may constitute "firearms" under the "designed to" or "readily converted" prongs of the Gun Control Act's definition. *See* Opening Br. 25 (citing *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993); *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006); *United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017); *United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006)). Indeed, plaintiffs do not dispute that a weapon parts kit is, in essence, a disassembled firearm.

Plaintiffs instead attempt to distinguish the cases the government relies upon by arguing (at VanDerStok Br. 36-37) that the weapons at issue in those cases may also have qualified as "firearms" under the frame-or-receiver prong of the statutory definition or as "dangerous weapons" under a different prong of the Sentencing Guidelines definition. That attempted distinction fails. In each case, the court of appeals expressly relied on the conclusion that the weapon in question was either "designed to" be, or could be "readily converted" to be, an operational firearm—not on a conclusion that the weapon included a functional frame or receiver or otherwise qualified as a "dangerous weapon." *See Ryles*, 988 F.2d at 16 ("Because Ryles' disassembled shotgun could have been 'readily converted' to an operable firearm," it was a firearm.); *Annis*, 446 F.3d at 857 (concluding a "partially disassembled" rifle was a firearm because the definition of "firearm" "turns on what the weapon is designed to do" (quotation omitted)); *Wick*, 697 F. App'x at 508 (declining to consider "whether a demilled receiver may, by itself, support a firearm conviction" because the "complete Uzi parts kits" being sold by the defendant "contained all the necessary components to assemble a fully functioning firearm with relative ease" and thus could "readily be converted to expel a projectile by the action of an explosive" (quotation omitted)); *Stewart*, 451 F.3d at 1073 n.2 (affidavit containing statements establishing "how easily [the defendant's] kits could be converted" to operable firearms "supported a finding of probable cause" that the kits constituted firearms under the readily-converted prong).

10

**b.** Rather than persuasively engage with the statutory text or with the overwhelming precedent interpreting that text, plaintiffs instead advance a series of arguments based on context, legislative history, and past agency litigation statements. As an initial matter, this line of argument skips over the plain text of the statute to draw inferences from other places and must be rejected; when a "statute's language is plain, the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989) (quotation omitted).

Even beyond that problem, however, each of plaintiffs' arguments on this score fundamentally misunderstands the interaction between the Rule and the materials they cite. In the main, plaintiffs' cited materials suggest that Congress did not intend to regulate individual firearm parts (aside from the frame or receiver of a firearm), and plaintiffs extrapolate from that intention to conclude that the Rule contravenes the statute. But the leap from non-regulation of individual parts to non-regulation of weapon parts kits that contain essentially a disassembled weapon finds no purchase in logic or the statute.

At the outset, plaintiffs advance (at VanDerStok Br. 29-33; BlackHawk Br. 24) a contextual argument that because Congress has specifically identified "parts" or "combinations of parts" when defining other items in the firearms statutes (including destructive devices, silencers, and machineguns), it should be assumed that Congress did not intend to cover "parts" or "combinations of parts" with its definition of "firearm." But this argument is unpersuasive for the reasons explained in the

11

government's opening brief. *See* Opening Br. 27-28. The words that Congress used—covering any weapon that is "designed to" or "may readily be converted to" expel a projectile—are substantively identical to statutory language using the phrase "combinations of parts."

Moreover, each of the definitions incorporating "parts" or "combinations of parts" that plaintiffs point to reflects Congress's intent to regulate parts in a way that goes beyond the Rule's interpretation of the definition of "firearm" to include certain complete weapon parts kits that are essentially disassembled weapons. With respect to both destructive devices and machineguns, Congress has specifically regulated those parts (or combinations of parts) designed to convert unregulated items into regulated destructive devices or machineguns. *See* 18 U.S.C. § 921(a)(4)(C); 26 U.S.C. § 5845(b). And with respect to silencers, Congress has regulated "any part intended only for use" in assembling a silencer. 18 U.S.C. § 921(a)(25). Plaintiffs' argument (at VanDerStok Br. 37-38) that ATF's interpretation would render the explicit inclusion of parts in these other definitions superfluous thus has no force.

And although the definitions of "machinegun" and "firearm silencer" also include prongs reaching complete combinations of parts designed to be assembled into a machinegun or firearm silencer, Congress's decision to frame those definitions in terms of "combinations of parts" (rather than, as with the definition of "firearm," in terms of an item that is "designed to" or "may readily be converted" to expel a projectile) likely reflects the fact that Congress was already regulating those items

through the language of "parts" and thus does not provide any basis for drawing the negative inference about Congressional intent that plaintiffs hypothesize.

In any event, even were the Court to believe, as the district court did, that there is some material difference between the language Congress used in the other cited provisions and the language used in defining "firearm," any inference drawn from that difference is exceedingly weak. The contextual canon plaintiffs rely on, "more than most other canons," "assumes a perfection of drafting that, as an empirical matter, is not often achieved." Scalia & Garner, *supra*, at 170. In short, Congress will "often" employ "different words to denote the same concept." *Id.*

Failing to locate any support for their argument in the statute, plaintiffs next turn to legislative history, contending (at VanDerStok Br. 33-34) that the relevant committee reports reflect Congress's determination that it would be impractical to regulate "each small part" of a firearm. That legislative history is irrelevant here, because, as explained, the Rule does not regulate "each small part" of a firearm. Instead, the Rule recognizes, consistent with the statutory text, that certain weapon parts kits, or aggregations of weapon parts, that contain the components required to readily assemble an operational firearm will collectively constitute a "firearm" under the statute. By regulating such aggregations collectively, the Rule not only tracks the statutory language but also avoids the practical pitfalls that would accompany any attempt to require the sale of each individual firearm part to comport with the Gun Control Act's serialization, recordkeeping, and other requirements. Moreover, to the

extent that the legislative history plaintiffs cite is relevant, it reinforces Congress's

focus on the practical realities of firearms regulation. *See* S. Rep. 90-1501, at 29. And

plaintiffs have never even attempted to show (nor could they possibly show) how

their proposed understanding of the statute—which would permit manufacturers to

circumvent the Gun Control Act by selling a complete kit containing all of the parts

necessary to readily assemble an operational firearm without serializing the firearm,

running a background check on the purchaser, or keeping a record of the

transaction—is consistent with federal firearms law.

Finally, and for similar reasons, plaintiffs' attempted reliance (at VanDerStok

Br. 34-35; BlackHawk Br. 23) on ATF's statements in previous litigation disclaiming

authority to regulate each part of a firearm is unpersuasive. Again, the Rule does not

regulate individual firearm parts (except, as required by statute, individual frames and

receivers). Instead, the Rule recognizes that, at some point, an aggregation of parts—

such as those in certain weapon parts kits—may be sufficiently complete so as to be

designed to (or readily convertible to) expel a projectile. It is only such aggregations of

parts that the Rule regulates, consistent with the definition of "firearm" in the Gun

Control Act.

**3.** Finally, BlackHawk—although not the original plaintiffs—argues (at 26-28)

that if the Gun Control Act's definitions are ambiguous, then plaintiffs should prevail

under the rule of lenity. That argument is unavailing.

14

As an initial matter, interpreting the Gun Control Act requires the Court first to avail itself "of all traditional tools of statutory construction" to see if they "provide meaningful guidance." *Cargill v. Garland*, 57 F.4th 447, 469 (5th Cir. 2023) (en banc). The rule of lenity only potentially comes into play if, after exhausting those traditional interpretative tools, "there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (quotation omitted).

Here, the relevant tools of interpretation include, as explained, the statutory text, context, and structure, as well as longstanding interpretative history and precedent, all of which confirm that ATF properly interpreted the statute. And those traditional tools of interpretation are further supplemented in this case by the agency's interpretation, embodied in the Rule. That Rule, issued through notice-and-comment rulemaking, reflects the "body of experience and informed judgment" that the expert agency possesses and "to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). As the Supreme Court has explained, "we often pay particular attention to an agency's views in light of the agency's expertise in a given area, its knowledge gained through practical experience, and its familiarity with the interpretive demands of administrative need." *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020). And the Court has further confirmed that a regulation itself can provide the fair notice of prohibited conduct required to avoid any need to turn to the rule of lenity. *See Babbitt v. Sweet Home Chapter*

15

*of Communities for a Great Or.*, 515 U.S. 687, 704 n.18 (1995). Here, taking all of these tools of interpretation together yields a firm conclusion that the Rule reflects the best understanding of the relevant statutory provisions. There is thus no "grievous ambiguity" that the rule of lenity might be employed to resolve.

## II.    The Equitable Factors Independently Foreclose the Extraordinary Remedy of a Preliminary Injunction

In its opening brief, the government demonstrated the errors underlying the district court's balancing of the equities at stake in this litigation. Plaintiffs do nothing more than repeat those errors in their response briefs. Because no plaintiff has come forward with anything approaching a sufficiently weighty countervailing interest that could justify the preliminary injunction, this Court should vacate the preliminary injunction.

### A.    The Balance of the Equities Strongly Tilts Against Injunctive Relief

**1.** As explained, the district court erred in determining that the balance of the equities and the public interest weighed in favor of the preliminary injunction. On plaintiffs' side of the ledger, the Rule does not forbid any plaintiff from selling or purchasing any firearm, weapon parts kit, or other item; instead, it primarily clarifies that certain items must be sold in accordance with the Gun Control Act's licensing, recordkeeping, and background check requirements. Plaintiffs' harms, to the extent they exist at all, are therefore limited to the minimal cost of complying with the Act's relatively modest requirements. *See* Opening Br. 28-29.

Conversely, as the government showed in its opening brief, the Rule serves critical public-safety interests. *See* Opening Br. 39-41. In 2021 alone, nearly 20,000 unserialized firearms were reported to ATF as having been recovered by law enforcement from potential crime scenes, and the government has recently encountered substantial illegal trafficking in, and illegal possession by prohibited persons of, such firearms. 87 Fed. Reg. at 24,656-57. This proliferation "severely undermines" the ability of law enforcement to determine "where, by whom, or when" a firearm used in a crime was manufactured and sold, thereby substantially impairing officers' ability to apprehend criminals. In addition, by requiring that certain weapon parts kits and partially complete frames and receivers be sold in compliance with the Gun Control Act's background check requirements, the Rule helps ensure that prohibited persons do not acquire firearms in the first place and prevents (for example) violent felons from purchasing ready-to-assemble AR-15-style rifles over the Internet. *See id.* at 24,655.

**2.** Plaintiffs do not dispute any of this. Instead, they urge that the injunction they received is, in fact, insignificant, and they echo their earlier arguments that the Rule violates the Gun Control Act. Neither point is true and neither, in any event, could support the district court's determination that the balance of the equities favors plaintiffs.

**a.** Plaintiffs' attempts to downplay the impact of the injunction must be rejected. Plaintiffs argue (at VanDerStok Br. 52-53) that the district court's injunction

will have only limited public-safety harms because it only protects the plaintiffs (and their customers) for a limited time before final judgment. But in attempting to portray the injunction as narrow, plaintiffs wholly ignore the reality of firearms sales. The question is not the number of manufacturers protected by the injunction, but rather the number of firearms sold without serial numbers and without background checks. And were there any doubt that plaintiffs understand the injunction's potential to drive up their sales, a visit to their websites removes it: for example, BlackHawk's website touts that is "currently the only manufacturer where" individuals can purchase certain firearms without complying with the Gun Control Act. *See* 80% Arms, *ATF Ban Reversed*, https://perma.cc/2LZA-K9TD; *see also id.* (advertising that other companies are not "able to lawfully sell both jigs and" partially complete lower AR-15 receivers).

For similar reasons, the limited temporal nature of the preliminary injunction does not materially reduce the harm to public safety. Once plaintiffs complete a sale of a weapon parts kit or a nonfunctional frame or receiver, there is no reasonable prospect of ATF or plaintiffs reclaiming the firearms were the government to prevail in this case. The injunction thus allows the further proliferation of untraceable firearms, which will continue to cause harm even once the injunction is vacated or superseded. Moreover, the knowledge that the injunction may be temporally limited creates a strong incentive for prohibited persons or other individuals who desire to possess untraceable firearms to purchase as many such firearms as possible while the injunction is in effect. Indeed, because BlackHawk is "not sure how long this

18

injunction will last," the company is "strongly encourag[ing]" customers to "stock[] up

now." *See ATF Ban Reversed*, *supra*; *see also id.* ("The injunction is not permanent, it will

only last until the issuance of a final judgment in a case. We strongly suggest that you

place an order now as we do not know what the outcome of this case will be.").

Underscoring the gravity of the district court's error, plaintiffs rely on the fact

(at VanDerStok Br. 53) that the district court limited the impact of the injunction by

declining to extend the preliminary injunction to individuals—such as felons—

prohibited from possessing firearms under 18 U.S.C. § 922(g). The district court

clarified its own injunction to nominally withdraw from its scope felons,

undocumented immigrants, or other persons prohibited from possessing firearms

under § 922(g), ROA.1207-08. The district court seemingly did so in recognition of

the practical reality that permitting such persons to legally purchase the products

classified as "firearms" under the Rule would allow them to readily assemble

untraceable operational weapons like AR-15 rifles and would create substantial public-

safety risks. But at the same time, the district court's preliminary injunction relieves

the manufacturer plaintiffs of the obligation to undertake any of the steps—such as

running background checks, serializing firearms, and maintaining records of sales—

that Congress has implemented to prevent untraceable firearms from falling into the

hands of prohibited persons. Plaintiffs have not claimed that they have implemented

any such checks of their own volition to ensure that they are not selling their products

to felons, undocumented immigrants, or other prohibited individuals.

**b.** No more persuasive is plaintiffs' brief contention (at VanDerStok Br. 54; BlackHawk Br. 34-35) that the balance of the equities and public interest tip in their favor because the government's (and public's) law-enforcement interests are undermined by the district court's determination that the Rule is likely unlawful. Nowhere do plaintiffs even attempt to rebut the government's argument that collapsing the merits and the equities violates the Supreme Court's admonishment that a plaintiff seeking a preliminary injunction must demonstrate not only that they are "likely to succeed on the merits," but also that "the balance of equities tips in [their] favor" and "that an injunction is in the public interest," *Winter v. NRDC*, 555 U.S. 7, 20 (2008). *Cf.* Opening Br. 41-42.

Rather than engage with the government's argument, plaintiffs simply cite two of this Court's cases in defending their attempt to collapse the preliminary injunction framework. But neither of those cases can bear the weight that plaintiffs assign them. In one case, this Court denied the government's request for a stay pending appeal, but in that context, the burden is on the government as the moving party to demonstrate that it meets each of the stay factors. *See Texas v. Biden*, 10 F.4th 538, 559-60 (5th Cir. 2021) (per curiam). And the other case did not involve, like this case does, conceded and substantial public-safety and law-enforcement injuries from the preliminary injunction. *See BST Holdings v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

**B.    There Is No Irreparable Harm to Plaintiffs**

Not only do plaintiffs' claimed harms fail to outweigh the substantial countervailing public-safety and law-enforcement interests in enforcement of the Rule, they also do not constitute irreparable injury sufficient to justify a preliminary injunction even standing on their own. In contending otherwise, plaintiffs simply repeat the factual findings of the district court, failing to address the government's explanation of how the district court's decision to credit each claimed theory of irreparable harm rested on incorrect legal determinations, not on factual errors.

**1.** At the outset, Tactical Machining (at VanDerStok Br. 42-45) and BlackHawk (at 28-33) contend that the Rule might cause them to go bankrupt. But the manufacturers cannot plausibly attribute any such outcome to the Rule; rather, as explained in the government's opening brief, the manufacturers' speculation regarding bankruptcy rests on a series of their own choices. Although the manufacturers repeat the district court's findings that they experienced a decrease in sales following promulgation of the Rule, the record demonstrates—and plaintiffs do not dispute— that this decrease resulted from the manufacturers' own choice to discontinue selling various products. *See* ROA.766 ("Tactical Machining ceased sales of various parts."); ROA.927 (BlackHawk explaining that it "discontinued" sales of many products). Any such drop in revenue is therefore "self-inflicted" injury that "does not qualify as irreparable." *Texas*, 10 F.4th at 558 (quotation omitted).

Similarly, although the manufacturer plaintiffs speculate (at VanDerStok Br. 43; BlackHawk Br. 28-29) that their customers might not wish to purchase products that might be classified as firearms under the Rule for fear of criminal prosecution, that speculation ignores that the manufacturer plaintiffs themselves could alleviate any such fear by selling those products in compliance with the Gun Control Act. Or, to the extent that plaintiffs do not believe their products constitute firearms under the Rule, they could submit a classification request to ATF to obtain a determination to that effect and alleviate any uncertainty among their customers. Not only have plaintiffs failed to do so, but Tactical Machining even successfully urged the district court to prohibit ATF from completing the company's pending request. *See* ROA.1174.

Even to the extent there might have been some initial customer confusion immediately following promulgation of the Rule that resulted in decreased sales, ATF has since issued an Open Letter to the firearms industry to dispel any confusion by explaining the application of the Rule's definition of "receiver" to partially complete AR-type receivers. *See* Opening Br. 35 (citing ATF, *Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers* (Sept. 27, 2022), https://perma.cc/M2AZ-BSW8). BlackHawk contends (at 30-31) that this letter is irrelevant, because it was issued in December 2022 and so it post-dates the district court's entry of a preliminary injunction. But that is simply incorrect: the letter was issued on September 27, 2022—nearly a month before BlackHawk even filed its

preliminary injunction motion, *see* ROA.1376—and BlackHawk nevertheless failed in district court (and fails in this Court) to provide any basis to believe that there was ongoing customer confusion following the letter.

In short, although the manufacturer plaintiffs are correct that evidence in the record suggests they experienced a decline in sales immediately following promulgation of the Rule, they have failed to demonstrate that any decline is ongoing or attributable to anything other than their own choices: their choice to discontinue selling certain products, their choice to refuse to sell firearms in compliance with the Gun Control Act's requirements, and their choice to maximize residual uncertainty by not availing themselves of ATF's classification process. As already explained—and as plaintiffs have failed to rebut—such "self-inflicted" injury "does not qualify as irreparable." *Texas*, 10 F.4th at 558 (quotation omitted).

**2.** Failing to demonstrate that their self-inflicted losses in revenue constitute cognizable irreparable injury, the manufacturer plaintiffs next contend (at VanDerStok Br. 46-49; BlackHawk Br. 32) that the routine compliance costs associated with selling their products in compliance with the Gun Control Act constitute irreparable harm. But the government has already explained that such routine compliance costs do not constitute irreparable harm. *See* Opening Br. 36-39.

In response, plaintiffs primarily rely on stray language from three of this Court's cases suggesting that nonrecoverable compliance costs may qualify as irreparable harm. *See* VanDerStok Br. 46-47. But the government has already

explained that two of those cases—*Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016), and *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021)—do not support that proposition because they both involved extraordinary costs. And the government further explained that to the extent that the language plaintiffs cite in those cases suggests that any nonrecoverable compliance costs constitute irreparable harm, that language is nonbinding dicta that this Court should not follow as inconsistent with the Supreme Court's admonition that preliminary injunctive relief is "extraordinary," *Winter*, 555 U.S. at 24, and the decisions of other courts of appeals. *See* Opening Br. 36-39 (observing that a number of decisions from courts of appeals and the Supreme Court reject the notion that any ordinary unrecoupable costs constitute irreparable harm). Although plaintiffs attempt to distinguish these cases on their facts (at VanDerStok Br. 47-49), none of plaintiffs' attempted distinctions undermines the fundamental point recognized in each of those cases that costs must be in some sense "peculiar," *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976), or "certain and great," *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996)—and certainly not "ordinary compliance costs," *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005)—to justify the extraordinary remedy of a preliminary injunction.

Nor does *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) rehabilitate plaintiffs' argument. That case too involved harms that the Court found to be significant: the potential loss of 700 or more employees who would have quit rather

than comply with a vaccination mandate. And although the Court in a footnote suggested it was bound by *Texas v. EPA*, *see id.* at 1034 n.51, the Court nowhere considered whether the relevant language in *Texas v. EPA* constituted a holding rather than dicta.

**3.** Finally, the individual plaintiffs' argument (at VanDerStok Br. 49-51) that they too are irreparably harmed by the Rule fares no better. As an initial matter, plaintiffs erroneously suggest (at VanDerStok Br. 49-50) that the government has waived any argument that the individual plaintiffs are not irreparably harmed by failing to make such an argument before the district court. The government in fact twice argued—in response to plaintiffs' original motion for a preliminary injunction and again after the district court found their original motion inadequate and afforded them an additional bite at the apple—that the individual plaintiffs had failed to demonstrate the harm required to support a preliminary injunction. *See* ROA.506-07, 1007-09.

And the individual plaintiffs' irreparable harm argument is unpersuasive on the merits. First, although plaintiffs argue (at VanDerStok Br. 50) that the impairment of constitutional rights would constitute irreparable harm, the district court did not conclude—and plaintiffs have not argued on appeal—that plaintiffs are likely to succeed on any of their constitutional challenges to the Rule. Without any developed constitutional argument, plaintiffs cannot claim irreparable harm on this basis.

Second, plaintiffs suggest (at VanDerStok Br. 50-51) that they are irreparably harmed by the Rule because they fear being criminally prosecuted for buying products classified as firearms under the Rule without complying with the Gun Control Act's requirements. But plaintiffs do not dispute that, as the government explained, plaintiffs may continue to purchase any product they want—with no threat of criminal liability—if they comply with the statutory requirements that apply to all firearms purchasers. *See* Opening Br. 32. Nor do plaintiffs dispute that those requirements are not especially onerous; indeed, in a portion of the district court's opinion that plaintiffs do not challenge on appeal, the court described compliance with those requirements as a "merely de minimis" burden. *See* ROA.1188. Thus, to the extent that plaintiffs might face any possible threat of criminal prosecution, such a threat would stem solely from their own decision to purchase firearms without complying with the Gun Control Act's requirements—self-inflicted harm that cannot support an injunction. *See Texas*, 10 F.4th at 558; Opening Br. 32.

## CONCLUSION

For the foregoing reasons, the orders of the district court should be reversed

and the grant of preliminary injunctive relief should be vacated.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*


MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

*s/ Sean R. Janda*
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Sean R. Janda*
Sean R. Janda

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,491 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda